1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

3   UNITED STATES OF AMERICA        )(   DOCKET 4:20-CR-64

4   v.                              )(   AUGUST 18, 2020

5   JUSTIN LUKE MAGNUSON AND        )(   9:58 A.M.

6   CLAY EVERETT MAGNUSON           )(   SHERMAN

7   --------------------------------------------------------------

8   REPORTER'S TRANSCRIPTION OF ARRAIGNMENT AND DETENTION HEARING

9   BEFORE THE HONORABLE CHRISTINE A. NOWAK

10   UNITED STATES MAGISTRATE JUDGE

11   --------------------------------------------------------------

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:     Ms. Heather Rattan

15

16   FOR THE DEFENDANT JUSTIN LUKE MAGNUSON:  Mr. Mike Uhl
17                                           Mr. Rafael De La Garza

18
     FOR THE DEFENDANT CLAY EVERETT MAGNUSON: Mr. Todd Shapiro
19

20

21   THE REPORTER:          MS. SHAWNA GAUNTT-HICKS, CSR, CCR
                            DEPUTY COURT REPORTER
22                          UNITED STATES DISTRICT COURT
                            EASTERN DISTRICT OF TEXAS
23                          (903) 276-1090
                            SHAWNACCR@OUTLOOK.COM
24

25   PROCEEDINGS RECORDED USING DIGITAL AUDIO; TRANSCRIPT PRODUCED
     VIA COMPUTER-AIDED TRANSCRIPTION.

1                          I N D E X

2                                                        PAGE

       GOVERNMENT'S WITNESS:
3
       RYAN SLICKER
4      DIRECT EXAMINATION BY MS. RATTAN.............      14
       CROSS-EXAMINATION BY MR. DE LA GARZA.........      61
5      CROSS-EXAMINATION BY MR. SHAPIRO.............      73
       REDIRECT EXAMINATION BY MS. RATTAN...........      92
6
       TOMMY HALE
7      DIRECT EXAMINATION BY MS. RATTAN.............      96
       CROSS-EXAMINATION BY MR. DE LA GARZA.........     107
8      CROSS-EXAMINATION BY MR. SHAPIRO.............     110

9
       DEFENSE'S WITNESS:
10
       SALLY MAGNUSON
11     DIRECT EXAMINATION BY MR. SHAPIRO...........     114
       CROSS-EXAMINATION BY MS. RATTAN.............     134
12

13     DEFENSE'S WITNESSES:

14     ERIC RYAN YEPEZ
       DIRECT EXAMINATION BY MR. DE LA GARZA........     143
15     CROSS-EXAMINATION BY MS. RATTAN.............     148

16     MARK WEINHARDT
       DIRECT EXAMINATION BY MR. UHL................     153
17     CROSS-EXAMINATION BY MS. RATTAN.............     158

18     WILLIAM STEUART
       DIRECT EXAMINATION BY MR. UHL................     163
19     CROSS-EXAMINATION BY MS. RATTAN.............     170

20     MATTHEW MARTINEZ
       DIRECT EXAMIANTION BY MR. DE LA GARZA........     174
21     CROSS-EXAMINATION BY MS. RATAN..............     176

22

23

24

25

1                           INDEX OF EXHIBITS

2

3    **GOVERNMENT'S**      **DESCRIPTION**                    **PAGE**
     **NUMBER**                                        **OFFERED/ADMITTED**
4
     1              Photos.................         55, 55
5
     2              Phone calls...........        101, 101
6
     3              Justin Luke Magnuson
7                   phone number...........         55, 55

8
     **DEFENSE'S**         **DESCRIPTION**                    **PAGE**
9    **NUMBER**                                        **OFFERED/ADMITTED**

10   1              Letters from Clay
                    Everett Magnuson's
11                  former coaches.........        131, 131

12   2              Provisional license....        181, 181

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

    (Proceedings commence at 9:58 a.m.)

    (Defendants present with counsel.)


        THE COURT:  Cause Number 4:20-CR-64, United States of
America versus Justin Luke Magnuson and the United States of
America versus Clay Everett Magnuson.

        At this time if I can have an appearance on behalf of
the Government, please.

        MS. RATTAN:  Good morning, Your Honor.  Heather
Rattan for the United States, present and ready.

        THE COURT:  Thank you.

        If I could have an appearance at this time on behalf
of Justin Luke Magnuson.  And I will just remind everyone the
acoustics in the room are poor, and, so, gentlemen, I'm either
going to need for you to get one of our handheld microphones or
go around to the podium to announce your appearance.

        MR. UHL:  Your Honor, I'm Mike Uhl for Justin
Magnuson.

        THE COURT:  Thank you.

        An appearance on behalf of Clay Everett Magnuson?

        MR. SHAPIRO:  Your Honor, Todd Shapiro for Clay
Magnuson.

        Is this on or off?

1          THE COURT:  I think it's --

2          MR. SHAPIRO:  Your Honor, Todd Shapiro for Clay

3    Magnuson.  Sorry about that.

4          MR. DE LA GARZA:  Your Honor, Rafael De La Garza,

5    also for Justin Magnuson.

6          THE COURT:  Thank you.

7          All right.  So we are scheduled, as I mentioned, to

8    proceed on the issue of arraignment and on the issue of

9    detention.  I will just confirm before we proceed here today

10   that the Government persists in its request to detain each of

11   Mr. Justin Luke Magnuson and Mr. Clay Everett Magnuson; is that

12   correct?

13         MS. RATTAN:  We do, Your Honor.

14         THE COURT:  And let me go ahead and confirm with

15   counsel before we proceed.  Have you had a sufficient

16   opportunity to speak with your clients regarding the indictment

17   that I may proceed to arraign them here today?

18         MR. UHL:  Yes, Your Honor, on behalf of Justin

19   Magnuson.

20         THE COURT:  And Mr. Shapiro?

21         MR. SHAPIRO:  Yes, Your Honor, on behalf of Clay as

22   well.

23         THE COURT:  And as it relates to the issue of

24   detention, do each of your clients continue to request a full

25   detention hearing here today?

1          MR. UHL:  Justin Magnuson does, Your Honor.  Thank

2    you.

3          MR. SHAPIRO:  And Clay Magnuson does as well, Your

4    Honor.

5          THE COURT:  And you might as well, Mr. Uhl, go ahead

6    and stay standing because I'm going to have just a few more

7    questions for you, if you don't mind, sir.

8          Has the Government had an opportunity to review the

9    pretrial services report?

10          MS. RATTAN:  We have, Your Honor.

11          THE COURT:  And other than any information or

12    evidence you'll proffer to the Court during the course of the

13    hearing today, are there any errors or omissions in that report

14    you care to bring to the Court's attention at this time?

15          MS. RATTAN:  There are omissions.  But as the Court

16    knows, we'll bring those to the Court's attention during the

17    hearing.

18          THE COURT:  And, Mr. Uhl, same question to you.  Have

19    you had an opportunity to review the pretrial services report

20    in this case?

21          MR. UHL:  We have, Your Honor.

22          THE COURT:  And any -- other than anything you'll be

23    proffering to the Court during the course of the hearing, are

24    there any errors or omissions you care to bring to the Court's

25    attention in connection with that report?

1      MR. UHL:  Nothing other than what we'd be proffering.

2      THE COURT:  And Mr. Shapiro?

3      MR. SHAPIRO:  Same answer, Your Honor, other than

4  what we'll be proffering as well.

5      THE COURT:  And, may I ask as well, Ms. Rattan, is

6  this a presumption case?

7      MS. RATTAN:  It is, Your Honor.

8      THE COURT:  And, Mr. Uhl, do you concur?

9      MR. UHL:  Yes.

10     THE COURT:  And Mr. Shapiro?

11     MR. SHAPIRO:  Yes, ma'am.

12     THE COURT:  And let me also ask, gentlemen, have each

13  of you had a full and fair opportunity to talk with your

14  clients about what it means, that this is a presumption case?

15     MR. UHL:  Yes, Your Honor.

16     MR. SHAPIRO:  Yes, ma'am.

17     THE COURT:  And do you believe they understand?

18     MR. UHL:  Yes, Your Honor.

19     MR. SHAPIRO:  Yes, ma'am.

20     THE COURT:  Then we'll go ahead and proceed to

21  arraign your clients first and, then, after that, we'll turn to

22  the issue of detention.

23     In order for us to arraign you, gentlemen, I do need

24  to have each of you sworn.  So if I could go ahead and ask, and

25  if you don't mind, as we did the other day, because you have

1  the same last names, I'm going to refer to you by Mr. Justin

2  and Mr. Clay, just so that we're not confused.

3          Can I ask, Mr. Justin, if you'll tell me your full

4  name?

5          THE DEFENDANT:  Justin Luke Magnuson.

6          THE COURT:  Thank you.

7          And Mr. Clay?

8          THE DEFENDANT:  Clay Everett Magnuson.

9          THE COURT:  Thank you.

10          And, gentlemen, if you'll go ahead and raise those

11  right hands so you can be sworn.

12          (Whereupon, the defendants were sworn.)

13          THE COURT:  Mr. Justin?

14          THE DEFENDANT:  I do.

15          THE COURT:  And Mr. Clay?

16          THE DEFENDANT:  I do.

17          THE COURT:  Thank you, gentlemen.  I'm going to begin

18  by reminding you of the constitutional rights that you have

19  every time you're before the Court.  You have the right to

20  remain silent.  You do not have to say anything at all about

21  the charges that are pending against you in the indictment, but

22  anything that you do say could later be used against you.

23          Do you each understand that you have the right to

24  remain silent, Mr. Justin?

25          THE DEFENDANT:  I do.

1        THE COURT:  And, Mr. Clay, sir?

2        THE DEFENDANT:  I do.

3        THE COURT:  Now, gentlemen, in addition, as we

4   discussed the last time we were together, you have the right to

5   have counsel with you throughout these proceedings.  You have

6   each retained counsel.  Can you advise me at this time?  Do you

7   both understand that you have the right to have counsel with

8   you and that you have each hired your own counsel to be present

9   with you today, Mr. Justin?

10        THE DEFENDANT:  Yes, Your Honor.

11        THE COURT:  And Mr. Clay?

12        THE DEFENDANT:  Yes, Your Honor.

13        THE COURT:  Gentlemen, can you each confirm as well

14   that you have a copy of the indictment that's pending against

15   you?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE DEFENDANT:  Yes, Your Honor.

18        THE COURT:  And that you've had a full and fair

19   opportunity to discuss that with your counsel?

20        THE DEFENDANT:  Yes, Your Honor.

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  So, gentlemen, in light of that, I'm

23   going to go ahead and tell you.  I can have the entirety of the

24   indictment read to you again at this time if you'd like.

25   Alternatively, you may waive that reading, in which case I'm

1   going to have the Government summarize the charges pending

2   against you.

3           Mr. Justin, what would you like to do?

4           THE DEFENDANT:  Waive it, please, Your Honor.

5           THE COURT:  And Mr. Clay?

6           THE DEFENDANT:  Waive it, Your Honor.

7           THE COURT:  So in light of the waiver, I will ask the

8   Government at this time to summarize those counts that are

9   pending against each of these gentlemen and to advise them of

10  the range of penalties and consequences associated with those.

11          MS. RATTAN:  Your Honor, this is a four-count

12  indictment.  Each of the defendants before the Court is charged

13  in Counts 1 through 3.  Count 1 charges each of the defendants

14  with a violation of Title 21 United States Code, Section 846,

15  conspiracy to possess with the intent to distribute marijuana;

16  Count 2 charges each of the defendants with a violation of

17  Title 21 United States Code, Section 846, conspiracy to possess

18  with the intent to distribute hashish oil; Count 3 charges each

19  of the defendants with a violation of Title 18 United States

20  Code, Section 1956(h) and 2, conspiracy to commit money

21  laundering and aiding and abetting.

22          The punishment range for the counts is, Count 1, if

23  it's 1,000 kilograms or more of a mixture or substance

24  containing a detectable amount of marijuana, the punishment

25  range is not less than 10 years and not more than life

1  imprisonment, a fine not to exceed $10 million, or both, and

2  supervised release of at least 5 years; for Count 2, the

3  punishment range is the same as it is for Count 1; Count 3, the

4  punishment range is not more than 20 years' imprisonment, a

5  fine not to exceed $250,000 or twice the pecuniary gain or

6  loss, and a term of supervised release of not more than 3 years

7  if the conspiracy is to violate Title 18 United States Code,

8  Section 1956(a)(1)(A)(i) or (a)(1)(B)(i).  The penalty,

9  however, is not more than ten years' imprisonment, a fine not

10 to exceed $250,000 or twice the pecuniary gain or loss, and a

11 term of supervised release of not more than three years if the

12 conspiracy is to violate Title 18 United States Code, Section

13 1957.

14          Those are the charges and the punishment range, Your

15 Honor.

16          THE COURT:  Thank you.

17          Gentlemen, I'm just going to confirm with each of you

18 that you do understand those pieces of information.

19          So, Mr. Justin, do you understand the charges pending

20 against you in each of Counts 1, 2, and 3 of the indictment and

21 also understand the range of penalties and consequences

22 associated with those counts, sir?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  And, Mr. Clay, same question to you.

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Then, gentlemen, since your counsel have

2    already advised that you're prepared for me to arraign you,

3    I'll ask at this time how do you each plead to each of Counts

4    1, 2, and 3 of the indictment?  Guilty or not guilty.

5          Mr. Justin?

6          THE DEFENDANT:  Not guilty, Your Honor.

7          THE COURT:  And Mr. Clay?

8          THE DEFENDANT:  Not guilty, Your Honor.

9          THE COURT:  Gentlemen, the Court accepts your plea of

10   not guilty to each of those counts.  Your case is assigned to

11   United States District Judge Shawn Jordan.  We will enter a

12   pretrial order and a scheduling order in your case that will

13   govern the dates applicable, and those dates will be provided

14   to your counsel so that you can discuss them with them.

15         We'll go ahead and now proceed with the issue of

16   detention.  And so, gentlemen, I'll ask for you to please be

17   seated at table with your counsel, and the Government may call

18   its first witness.

19         MS. RATTAN:  Your Honor, before calling our first

20   witness, we'd move to invoke the rule, and we'd ask that the

21   lead agents from DEA and IRS be excluded from the rule with the

22   Court's permission.

23         THE COURT:  Mr. Shapiro?

24         MR. SHAPIRO:  We have no objection, Judge.

25         THE COURT:  And Mr. Uhl?

1        MR. UHL:  No -- Yes, Your Honor.  We don't have an

2   objection.

3        THE COURT:  All right.  Then the rule will be

4   invoked.  And any witnesses, other than those persons

5   specifically identified by Ms. Rattan, should please step out

6   into the hallway.

7        THE COURT:  I'll just ask counsel because, obviously,

8   y'all are more familiar with witnesses that are being called.

9   At this time, Ms. Rattan, do you believe that all persons who

10  should be included are present in the courtroom and who should

11  have stepped out have stepped out of the courtroom?

12       MS. RATTAN:  As the Court notes, it's defense

13  counsel.

14       THE COURT:  Mr. Shapiro, are we in compliance at this

15  time?

16       MR. SHAPIRO:  Yes, ma'am.

17       THE COURT:  All right.

18       And Mr. Uhl?

19       MR. UHL:  As far as I know, for my witnesses, yes.  I

20  don't -- I don't recognize some of the people.

21       THE COURT:  Okay.  But they're not anybody you're

22  planning to call?

23       MR. UHL:  No.

24       MR. SHAPIRO:  No, ma'am.

25       THE COURT:  All right.  Then we'll go ahead and

 1    proceed.  Ms. Rattan?

 2             MS. RATTAN:  Thank you, Your Honor.  The United

 3    States calls DEA Task Force Officer Ryan Slicker.

 4             (Whereupon, the witness was sworn.)

 5             THE WITNESS:  Yes.

 6             THE COURT:  Sir, before we proceed here today, if I

 7    might ask if you can please state your full name for the record

 8    as well as spell it.

 9             THE WITNESS:  First name is Ryan, R-Y-A-N.  Last name

10    is Slicker, S-L-I-C-K-E-R.

11             THE COURT:  Thank you.  And, Agent Slicker, I'll just

12    advise you, as it relates to your mask, you're more than

13    welcome to maintain it; however, if you feel more comfortable

14    testifying with it off, you are also welcome to do so, sir.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  You may proceed.

17             MS. RATTAN:  Thank you, Your Honor.

18                        **DIRECT EXAMINATION**

19    **BY MS. RATTAN:**

20    Q.   Please state your name.

21    A.   Ryan Slicker.

22    Q.   Where do you work?

23    A.   Irving Police Department.

24    Q.   And are you on special assignment?

25    A.   Yes.  I'm a task force officer with the DEA.

1    Q.   How long have you been a police officer?

2    A.   Since 2007.

3    Q.   How long have you been with the Irving Police Department?

4    A.   That whole time.

5    Q.   And then, how long have you been on special assignment

6    with DEA?

7    A.   A little over five years.

8    Q.   Can you give the Court an overview of what your experience

9    is as a police officer?

10   A.   Yes.  When I started in 2007, I went to the police

11   academy.  After the police academy, I went through field

12   training, was assigned to patrol.  Did approximately two years

13   regular patrol and then got assigned to a CRI team, which was a

14   crime reduction initiative.  My job during that initiative was

15   to work narcotics.  We had a guy that worked DWI's, a guy that

16   worked burglaries, and a guy that worked narcotics.  My job was

17   working narcotics.  Worked in a uniform capacity, sometimes in

18   a smooth vehicle, sometimes in a marked patrol unit.

19          After approximately two years of doing that, I was

20   moved over to work narcotics as an undercover investigator.  I

21   did four years as an undercover investigator doing drug buys

22   and short-term investigations for the most part.  And then

23   moved over to the DEA as a task force officer.

24   Q.   Now, once you joined DEA as a task force officer, did you

25   use the skills that you developed as an undercover narcotics

1   officer at Irving Police Department?

2   A.   Yes.

3   Q.   And what do you do as a task force officer with DEA?

4   A.   Main difference between regular narcotics and task force

5   officers, we do more long-term investigations, investigations

6   that take years to develop.  We do more complex investigations,

7   investigations that involve wiretaps, mass surveillance --

8   yeah, just definitely bigger cases.

9   Q.   Larger scale?

10  A.   Yes.

11  Q.   And in that regard, were you involved in the investigation

12  of these two defendants, Justin Magnuson and Clay Magnuson?

13  A.   Yes.

14  Q.   And how would you describe your role in this

15  investigation?

16  A.   As a co-case agent.

17  Q.   Let me ask you, focusing on the -- this investigation,

18  this organization, just kind of an overview of the offense,

19  would you describe it as a long-term crime, essentially?

20  A.   Yeah.  We believe it's been going on for probably ten

21  years, maybe a little bit more at this point.  We got involved

22  in 2018.

23  Q.   So although the investigation focusing on the organization

24  started in 2018, the investigation revealed that the crime

25  itself had been going on since 2010?

1   A.   Yes, ma'am.

2   Q.   And, of course, that's how it's alleged in the indictment,

3   on or about -- or in or about 2010 up to the present?

4   A.   Correct.

5   Q.   So we're looking at an organization that's been ongoing

6   for ten years?

7   A.   Yes, ma'am.

8   Q.   So it's long-term.

9        Would you describe the offense as being large-scale?

10  A.   Yes.  We're talking about thousands of pounds of

11  marijuana.

12  Q.   So thousands of pounds of marijuana are involved.  But

13  let's talk about the number of properties, physical properties,

14  real estate, that would have to be involved in this type of

15  large-scale operation.

16       Can you give the Court an idea of what that involves?

17  A.   These two defendants, we believe are involved in two

18  different properties.  But we have other defendants where we're

19  probably right around the neighborhood of ten total marijuana

20  grow properties that are involved in this investigation.

21  Q.   Okay.  And what type of acreage are we talking about in

22  order to support this large-scale distribution of marijuana?

23  A.   Hundreds of acres.

24  Q.   Okay.  So you've got large properties, lots of marijuana;

25  it's been going on for about ten years.

1          What about the locations of these properties?

2   A.   These properties are located in California -- Northern

3   California.

4   Q.   Can you describe the nature of their location?  Are they

5   difficult to get to?

6   A.   Extremely.  They're rural, the neighborhoods -- or not

7   really neighborhoods or the properties out there are very

8   private.  Whenever law enforcement's out there, they know about

9   it.  Whenever helicopters fly over, they know about it.

10  There's, I believe, Facebook pages set up to notify all the

11  growers in the area that law enforcement's there.

12  Q.   Uh-huh.  So where in California are these properties that

13  produce this -- this large-scale amount of marijuana?

14  A.   Grass Valley, Nevada City.

15  Q.   Okay.  And where is that?

16  A.   It's kind of an hour and a half outside of Sacramento,

17  back to the northeast.

18  Q.   Okay.  So it's -- it's up toward Seattle, Washington,

19  essentially?  Oregon?

20  A.   Yes, like Lake Tahoe area.  Little bit north of that.

21  Q.   Okay.  So would you say they're kind of secreted?

22  A.   Very much.  It's very rural.

23  Q.   Okay.  So long-term, large-scale, involving these large

24  pieces of property, and you've talked about the amount of

25  drugs.

1       What about the amount of money that this type of

2    operation would produce?

3    A.   It's tens of millions of dollars.

4    Q.   Okay.  And, in fact, has the investigation corroborated

5    that that's the amount of money that would be produced in this

6    type of organization?

7    A.   Yes, ma'am.

8    Q.   Okay.  Now, what about the number of states involved?  Is

9    it a multi-state operation?

10   A.   Correct.  We have facets of this investigation that have

11   involved California, Nevada, Texas, and New York.

12   Q.   Okay.  Now, we all, of course, are familiar with the issue

13   of marijuana in the United States and the issue of legalization

14   in various states.  You're familiar, as we all are, that

15   marijuana has been legalized in California; is that correct?

16   A.   Correct.

17   Q.   Okay.  Now, the operation that we're talking about here,

18   this long-term, ongoing, large-scale marijuana distribution

19   operation, was it legal in the state of California?

20   A.   It was not.

21   Q.   Okay.  Now, in the last year -- it's been going on for ten

22   years.  In the last year, has the organization focused some

23   effort on legalizing in California?

24   A.   Some parts of this organization have started the process

25   of becoming legal.

1    Q.   Okay.  But just because you've started the process of

2    becoming legal in a ten-year span, while you're trying to

3    become legal, is what you're doing legal before you get your

4    license?

5    A.   No.  Actually, the state of California mandates that the

6    year before you become legal, you cannot grow marijuana on

7    those properties.

8    Q.   Okay.  But that was happening in this organization?

9    A.   Yes.

10   Q.   Okay.  Well, let's assume for a minute that the

11   organization, these properties, these defendants did have

12   licenses to grow in California, which I understand they did

13   not, but let's assume for a minute that they did have licenses

14   to grow.

15         Can they then legally export, manufacture, transport,

16   and export that marijuana outside the state of California?

17   A.   They cannot.  They can only sell to a distributor inside

18   of California.

19   Q.   But this organization was doing that?

20   A.   They were.

21   Q.   Transporting into Texas, New York; there were events in

22   Nevada; is that right?

23   A.   Correct.

24   Q.   In fact, at some point at the end of the investigation,

25   did Oklahoma become involved?

1   A.   Yes.

2   Q.   So you've got a long-term, large-scale, producing lots of

3   marijuana and certainly millions of dollars in proceeds.

4        Can you give us an overview of what the scheme was

5   that was involved?  How was the crime committed?

6   A.   There were several growers out in California that owned

7   properties, including the defendants that had properties out in

8   California.  They would grow the marijuana on those properties.

9   They would harvest the marijuana, take the flower from that

10  marijuana; they would package that flower up; they would hide

11  it in vehicles and trailers; and they would transport that

12  marijuana from California into Texas, where it would then be

13  distributed up and sold in the state of Texas.

14  Q.   When you say "trailers," what are you talking about?

15  A.   They had several enclosed trailers that they utilized, and

16  they had soda machines inside those trailers; and they would

17  put hundreds of pounds of marijuana that was packaged up in

18  vacuum sealed bags inside of those coke machines.

19  Q.   Can you comment on the quality of marijuana that the

20  organization was producing, manufacturing?

21  A.   High-grade marijuana.

22  Q.   High-grade?

23  A.   High-grade, very high-grade.

24  Q.   So you've got a high-grade marijuana that they're

25  producing.

```
 1              And what about the sophistication of the
 2    transportation methods?
 3    A.   They've been utilizing this transportation method for
 4    years without issue.  And it wasn't until we became involved in
 5    the investigation that we were able to locate those vehicles
 6    that were being used for transportation.
 7    Q.   And can you give the Court an idea of the number of people
 8    that would have to be involved in the manufacturing and
 9    harvesting process and the preparation for transportation and
10    the transportation to make this successful?
11    A.   So just on the marijuana part, you're going to have to
12    have growers, you're going to have to have somebody that knows
13    how to grow, knows how to prepare the soil, knows how to level
14    the land.  You have to have water.  You have to have
15    fertilizer.  If you're doing greenhouses, you've got to have a
16    builder that comes in, builds your greenhouses.  And you're
17    going to have to, when it comes time to harvest, you're going
18    to have to hire people in to come cut and to trim.  They call
19    them trimmers.
20              So these trimmers come in, and they're going to have
21    to harvest the flower, just the flower, not the leaves because
22    you just want the high-grade marijuana.  So you're just taking
23    just the -- the best part of the plant.  They're taking that;
24    they're trimming it all up.  They're going to package that all
25    up.  And then they're going to separate all those by the
```

1    different strands of marijuana that they have.

2            They're going to label those up.  It's all going to

3    be packaged up.  They're going to take orders from where

4    they're shipping it to.  So somebody may want a certain amount

5    of poundage of this.  Somebody may want a certain poundage of

6    this type.  So then you're going to have somebody that has to

7    take all those orders in.  They're going to have to look at it,

8    see what they have available.  They're going to have to package

9    those up.  And then, once those are packaged up, they're going

10   to have to get them ready to ship.

11           So then you're going to have to have drivers; you're

12   going to have to have loaders, because these soda machines are

13   extremely heavy.  So it's not just a one-man job.  You're going

14   to have to have other people that are going to be involved in

15   loading these soda machines into these vehicles.  So they're

16   going to load up those machines, and then they're going to

17   transport it all the way from there to Texas.

18           Once they get to Texas, they're going to have to open

19   up those soda machines, remove the marijuana.  They're going to

20   have to figure out which box goes to which distributor at the

21   street level here.  So then that's going to go to those

22   distributors located in Dallas and Austin.

23           Then that individual is going to sell individual

24   packets that he took orders for.  So he's going to sell it by

25   the poundage.  So you're talking 10, 15 pounds.  And then it's

1   going to get moved on from there to people that are going to be

2   selling that marijuana in maybe one-pound increments down to

3   ounces.  Then you're going to go all the way down to

4   street-level dealer that's going to be selling it in 20-dollar,

5   40-dollar bags.  So you're talking possibly hundreds of people

6   involved in this.

7   Q.   So would you describe the operation as sophisticated?

8   A.   Yes.

9   Q.   Would you describe this as an operation that would be

10  helped by someone who had expertise, maybe an advanced degree,

11  a master's in entrepreneurship, a master's in accounting?

12  Would that type of education facilitate, help, support this

13  type of crime?

14  A.   Just because it's an illegal business, it's still a

15  business.  So somebody that knows how to run one would

16  definitely have an advantage.

17  Q.   Uh-huh.  Would you describe this organization as being

18  well run?

19  A.   Yes.

20  Q.   Okay.  Well, you've talked about what's required and the

21  sophistication that's needed to get the product manufactured,

22  on the road, and to the distributors.

23          What about the money side of the operation?  Can you

24  comment on how the money side of the operation worked?  Because

25  you've got to get these illegal proceeds back to California; is

1  that right?

2  A.   Correct.  And this is all a cash business; so you can't

3  use banks.  Unless you have somebody that can work around that.

4  So for the most part, at the very beginning of this

5  investigation, the money was transported back in the same soda

6  machines.  They're doing half a million, million dollars,

7  million-five back in these trailers, transporting them all the

8  way back to California to Grass Valley.  At a certain point in

9  this investigation, we learned this and we started taking down

10 loads of money going back to California.  We took down one

11 money load with approximately half a million dollars, and we

12 took down a second money load of approximately a million

13 dollars.  Once we took down those two loads of U.S. currency,

14 the members of the organization decided that they couldn't put

15 money on the road anymore --

16 Q.   Well, because the organization, at that point driving the

17 proceeds, has lost $1.5 million?

18 A.   Correct.

19 Q.   Was that in roughly a six-, eight-month time span?

20 A.   Correct.

21 Q.   So how does the organization respond to that?

22 A.   They decided to contact a co-conspirator and -- Justin

23 Magnuson -- and asked if they can use his plane.

24 Q.   Okay.  And what happened?

25 A.   They used his plane on several occasions.

1   Q.   Okay.  So at this point, they stopped driving the proceeds

2   back to California.

3          And defendant Justin Magnuson is the owner of a

4   plane?

5   A.   Correct.

6   Q.   Okay.  And what happens?

7   A.   They meet with him, and it is discussed that flying back

8   the marijuana proceeds would be the best route, the safest

9   route.

10  Q.   Okay.  And does Mr. Magnuson make his -- his private plane

11  available to fly the proceeds back to California?

12  A.   Yes.  He's actually on the plane on a couple of occasions.

13  Q.   He himself is on the plane with the proceeds?

14  A.   Yes.

15  Q.   Well, he was going to school, at some point, at UCLA; is

16  that correct?

17  A.   I believe so.

18  Q.   Were there occasions -- or was there an occasion where he

19  flew back from Texas to California to go to class, to go to

20  school, and was also transporting proceeds from the marijuana

21  distribution business?

22  A.   Yes.

23  Q.   So they drove the proceeds back, but when they lost $1.5

24  million, Mr. Magnuson provided his private airplane to fly the

25  proceeds back to California.

1        What other methods were used to get the money back?

2   A.   They were washing money through legitimate businesses, one

3   of those businesses being Mr. Justin's business, It's A Secret

4   Med Spa.

5   Q.   So laundering the money through businesses.  And you've

6   mentioned one of Justin Magnuson's businesses, It's A Secret

7   Med Spa.

8        Can you describe to us how the defendant used his

9   business, It's A Secret Med Spa, to launder the money for the

10  organization?

11  A.   He would take in cash from codefendants, and once he

12  received that cash, he would give them back shares in It's A

13  Secret Med Spa.

14  Q.   Okay.  And the cash that he took in was from the proceeds

15  from the distribution of the marijuana?

16  A.   Yes, ma'am.

17  Q.   So they drove it, they flew it, and the defendant Justin

18  Magnuson laundered money?

19  A.   Yes.  He also facilitated a separate money laundering

20  through a bar.

21  Q.   When you say "facilitated a separate money laundering

22  through a bar," that's again using a business to launder the

23  drug money; is that right?

24  A.   Correct.

25  Q.   And can you describe for the Court how he did that?

1    A.    Through friends of his.  He basically took in cash and was

2    giving shares to the bar.

3    Q.    Okay.  What bar was that?

4    A.    I believe it's Vice Park.

5    Q.    Pardon?

6    A.    Vice Park, I believe.

7    Q.    Vice Park?

8    A.    Yeah.

9    Q.    Okay.  Is that here in --

10   A.    It's part of Clutch.  It's owned by the same people.

11   Q.    In Dallas?

12   A.    Yes.

13   Q.    Now, you've touched on this, but let's focus on an

14   overview of events in the investigation that relate, not just

15   to the organization, but also to these defendants.  You talked

16   about a seizure of about half a million dollars.

17              Can you tell the Court when that happened and what

18   happened?

19   A.    Happened in what?  2019.  I don't know the exact date off

20   the top of my head.

21   Q.    Around February of 2019?

22   A.    Yeah.  Early 2019.  We received information of a possible

23   load traveling back from Austin to California.  We actually

24   went down -- myself and the case agent went down, and we

25   observed that load being unloaded.  And with the help of Austin

1    DEA, they were able to follow that back to a possible stash

2    house, watch some boxes get loaded back into the trailer; and

3    then we followed that trailer as it went northbound and stopped

4    it in Abilene, Texas.

5    Q.    Okay.  So, again, the sophistication of the organization,

6    they've got a stash house located where?

7    A.    In Austin, Texas.

8    Q.    And so the stash house would be used for what?

9    A.    Storing the marijuana before it can be distributed out.

10   Q.    Okay.  And then the proceeds would be picked up from the

11   previous load and taken back to California?

12   A.    Correct.

13   Q.    And at this point the driver is stopped in Abilene, Texas,

14   and has about half a million dollars?

15   A.    Correct.

16   Q.    And that's cash?

17   A.    Yes.

18   Q.    So fast-forward to September of 2019.

19         Was there another opportunity to interdict some money

20   related to the organization?

21   A.    Yes.  Very similar situation.  We were able to follow that

22   trailer as it went through, I believe, Seymour, Texas, and a

23   state trooper stopped it in Seymour, Texas, and it was just

24   under a million dollars at that time.

25   Q.    Okay.  So at this point, February of 2019, September of

1   2019, there is $1.5 million that's been seized from the

2   organization?

3   A.   Correct.

4   Q.   And it's from one of their money transporters?

5   A.   Correct.

6   Q.   Okay.  In total, about how much money during the

7   investigation was seized from the organization?

8   A.   I'd say a little over $5 million --

9   Q.   Okay.

10  A.   -- in cash.

11  Q.   And that's just what was seized; is that right?

12  A.   Correct.

13  Q.   $5 million cash?

14  A.   Yes, ma'am.

15  Q.   Now, that doesn't account for the value of the properties

16  that were involved in the manufacturing, the transportation;

17  the cars that were being used, the planes that were being used.

18  This is just cash proceeds that was seized during the

19  investigation from the organization.

20  A.   Yes, ma'am.

21  Q.   Okay.  So estimating the amount of money a year that the

22  organization was profiting, what would you say?

23  A.   I'd say straight profit you're looking between 3 and $6

24  million depending on the -- how the year went, the price of

25  marijuana.  Then you're going to have expenses, and all that's

1  just going to be paid out before you have your straight profit.

2  Q.   But definitely a million-dollar operation?

3  A.   Yeah.  Multimillion-dollar operation.

4  Q.   So there were these seizures -- $5 million -- and you've

5  outlined two of them for the Court.

6         There were also wire intercepts, recordings; is that

7  correct?

8  A.   Correct.

9  Q.   In August of 2020, which would be this month, were search

10  warrants executed?

11  A.   Yes.  We executed three search warrants.

12  Q.   Okay.  And will you describe what happened at those for

13  the Court?

14  A.   All right.  I'm going to start with the search warrant of

15  Justin's house.  We executed a search warrant at Justin's

16  house.  He was taken into custody outside the residence.  Made

17  entry.  Once we made entry, we cleared the house, started doing

18  a cursory search, and found weapons everywhere inside his

19  house.

20         There was a locked closet in the spare bedroom.  We

21  made entry into that closet, had to force entry into there.

22  Inside that closet was, I would say, approximately 20 firearms

23  inside there, body armor, camouflage clothing, go-bags.  Yeah.

24  Everything you'd need was --

25  Q.   An arsenal?

1    A.    Yeah.

2    Q.    Now, you said that the search warrant was executed at

3    Justin Magnuson's house.  This isn't just any house.  This

4    isn't a tract house in Carrollton, Texas.

5          Can you describe his house?  Where does he live?

6    A.    Downtown Dallas, 2200 Victory Avenue.  It's a penthouse.

7    It's the top floor.  It's half the top floor.  It's two

8    stories; has a pool, like an infinity edge on the roof, three

9    balconies; got two bedrooms, giant closet, bathroom.  Massive

10   property.

11   Q.    Now, the -- the location that you described where the

12   defendant lives, where he's got the arsenal and the go-bag, had

13   this location been used during the commission of the crime and,

14   if so, how?

15   A.    Several occasions money was taken to that location.  Also

16   meetings took place there.

17   Q.    When you say money was taken to the location, do you mean

18   proceeds from the drug business, cash proceeds from the drugs?

19   A.    Yes, ma'am.

20   Q.    Can you give the Court an idea of what that was?  What

21   happened?

22   A.    U.S. currency was taken to that, drug proceeds were taken

23   to that location.  One occasion it was to pay Justin.  I

24   believe the other occasion they counted the money.  Some of the

25   money left the location; some of the money stayed there.

1  Q.   Were there also occasions when the organization would have

2  meetings at Justin's house to discuss business for -- within

3  the organization?

4  A.   Yes.

5  Q.   Like, what would happen there?

6  A.   They would discuss money laundering activities.  They'd

7  also talk about their marijuana grow businesses as well as how

8  distribution's going and how the business is being run.

9  Q.   So at Justin Magnuson's apartment, you've described the

10 arsenal that you located.

11        Was there also a large amount of U.S. currency there?

12 A.   There was, I believe, approximately 25- -- $30,000.  I

13 don't have the exact count.

14 Q.   What about currency from other countries?

15 A.   Yes.  Several different countries.  I believe, like, five

16 or six different countries.

17 Q.   Okay.  Jewelry, valuable jewelry, receipts for jewelry --

18 can you describe that?

19 A.   Yeah.  We found an insurance paperwork saying that

20 Mr. Magnuson owns approximately $850,000 in jewelry.

21 Q.   And what about credit cards?  Anything?

22 A.   One thing that stuck out is he had an AMEX Black Card.  So

23 that's a credit card that really has no spending limit.  So

24 kind of stuck out because that card can be used to buy

25 anything.

1    Q.    Now, what about a search warrant at Clay Magnuson's

2    residence?

3    A.    So a similar search warrant was run at Clay's residence.

4    His residence isn't a penthouse.  It really isn't anything all

5    that special.  It's a nice apartment complex, still high-end,

6    just not the level of Justin's.  One-bedroom apartment.  Clay

7    was stopped as he left the location.  Officers approached his

8    vehicle.  There was a firearm, a rifle, in the back seat.  He

9    also had a backpack with a pistol, and inside that backpack, I

10   believe, he also had his passport, which struck me as a little

11   unusual.  Most people don't carry around their passport with

12   them everywhere they go.  When they made entry into the

13   residence, they located some U.S. currency and I believe four

14   other firearms were inside there.

15   Q.    Okay.  What about another search warrant during the same

16   time period, August of 2020, in California?

17   A.    Agents went to Scenic Drive, which is one of the grow

18   properties out in California, owned by Mr. Magnuson.

19   Q.    Which -- which Mr. Magnuson?

20   A.    Sorry.  Justin.

21   Q.    Justin Magnuson --

22   A.    Yeah.

23   Q.    -- one of the properties -- the grow properties,

24   manufacturing properties -- that he owns in California?

25   A.    Correct.  At that property, we believe Clay lives at that

1  property during the growing season.  It's come to our attention

2  that Justin sent his brother Clay out to learn how to grow

3  marijuana.  He hired people to actually teach him and show him

4  how to grow marijuana, harvest marijuana -- the whole

5  operation.  So we believe Clay lived at that house when he was

6  out there.  When they served the search warrant out there, I

7  believe they found approximately 35 pounds of processed

8  marijuana at the location, as well as a shotgun used for

9  protection.

10  Q.   Okay.  So this is a property that's owned by Justin

11  Magnuson in rural California, but it's occupied by Clay

12  Magnuson?

13  A.   Correct.

14  Q.   And when the search warrant's executed, who's there?

15  A.   No one's at that house.

16  Q.   Okay.  But drugs and a firearm, a weapon, were found?

17  A.   Correct.

18  Q.   What was the staging of the weapon?

19  A.   I believe it was -- as in most of the firearms in this

20  case, most of them were loaded.  Several of them had rounds in

21  the chamber.

22  Q.   Okay.  Now, that -- that's an overview of the

23  organization, the crime scheme, some of the events that took

24  place.  Let's focus now, specifically, on Clay Magnuson.

25          Do you see him in the courtroom and can you identify

1    him?

2    A.   Yes, ma'am.  That's going to be him right

3    here (indicating).

4         MS. RATTAN:  Your Honor, may the record reflect the

5    witness identified the defendant Clay Magnuson?

6         THE COURT: Sir, can you identify an additional

7    article of clothing that might be different for Mr. Justin,

8    just so the record will clearly reflect?

9    A.   All right.  We'll go with the blue face mask.

10        THE COURT: All right.  With that clarification, the

11   Court will have the record reflect that the witness has

12   identified Mr. Clay.

13        MS. RATTAN:  Thank you, Your Honor.

14   Q.   (BY MS. RATTAN)  Now, you've just talked about executing a

15   search warrant at his house here in Dallas and the location

16   where he lives and is responsible for manufacturing in

17   California.  Let's focus on the -- the bag that you found in

18   his car when he was arrested in August of 2020.

19        Exactly what were the contents and why did you find

20   them concerning?

21   A.   So the bag was located, I believe, in the front seat of

22   his vehicle, and there was a firearm in there.  Firearm was

23   loaded with one in the chamber.  It was a pistol.  There was a

24   rifle in the back seat.  I believe it was unloaded because I

25   think he stated he was taking it to a gunsmith to get worked

1   on.  Inside the backpack was a passport.  I found that highly

2   unusual because most people don't carry their passport with

3   them everywhere they go.  It's -- to me, that's concerning

4   because it's all it would take for them to make a phone call

5   and get on a plane; he could leave the country.  I don't know

6   why anybody would carry their passport with them 24/7.

7   Q.   Well, does that indicate to you that he's a flight risk?

8   Does that concern you, that he might try to flee?

9   A.   Very much so.

10  Q.   You've been a police officer for many years, a narcotics

11  officer for many years.  Is it unusual, in your experience, for

12  someone to have their passport with them?

13          MR. SHAPIRO:  Judge, I'm going to object to

14  speculation at this point as to why he may have had his

15  passport.  I don't think it's relevant.

16          THE COURT:  I'm going to allow the question.

17          You may proceed, sir.

18  A.   Yes.  We usually do not run into people that carry their

19  passport on them.

20  Q.   (BY MS. RATTAN)  And then the number of firearms, in terms

21  of danger to the community, how many firearms did you find that

22  you were specifically and directly able to link to this

23  defendant, Clay Magnuson?

24  A.   I believe there were four firearms at his house.  There

25  was a loaded pistol in his vehicle, a rifle, and then a shotgun

1   at the house in California.

2   Q.   Okay.  So that'd be four, five, six -- seven firearms that

3   are linked directly to him?

4   A.   Yes, ma'am.

5   Q.   And at least one of them loaded, within arm's reach when

6   he was arrested?

7   A.   Yes.

8   Q.   Now, can you tell the Court what his role was in the

9   organization?

10  A.   I believe his role in this investigation is -- he's going

11  to be a marijuana grower.  He's also going to be a facilitator

12  where his brother would send them down on one occasion, down to

13  Austin, to go pick up a large amount of U.S. currency and

14  transport it back to Dallas, TX, back to Justin and where he

15  met Justin at his house, where they counted that money.

16  Q.   Okay.  So pretty close, trusted role; is that right?

17  A.   I would say very much so.  I would believe he's a party to

18  the whole investigation.

19  Q.   Responsible for being trained to manufacture and

20  coordinate the transportation but then also trusted on the

21  money side; is that right?

22  A.   Correct.

23  Q.   Okay.  What about his role in laundering the money?  How

24  was he involved in that?

25  A.   He would -- like I said, he would pick up U.S. currency

1    and take it to Justin where Justin could launder it or do

2    whatever he needed to do with that bulk currency.

3    Q.   Did he have responsibilities in Austin and in Dallas?

4    A.   I mean, just picking up money in Austin, I believe, was

5    his role in Austin.

6    Q.   When you say "picking up money in Austin," can you give us

7    an idea of the amounts of money that he would be picking up?

8    A.   It would be hundreds of thousands of dollars at a time.  I

9    believe the last occasion was $100,000.

10   Q.   Okay.  Once he picked up the drug proceeds, what would he

11   do with them?

12   A.   He would take them to his brother.  They went to the -- on

13   the last occasion, they went to the penthouse, and in the

14   penthouse they counted out the money; and then Clay actually

15   drove that money and gave it to an undercover agent.

16   Q.   And about how much money was that?

17   A.   He gave the undercover agent approximately $50,000.

18   Q.   Have you looked into -- you've described his illegal

19   employment.  But have you looked into any legitimate employment

20   history that Clay Magnuson has by checking Workforce

21   Commission?

22   A.   Yeah, I believe he had, maybe, a job in high school.  I

23   think it was like 2008.  I would assume that's probably going

24   to be in high school, judging by his age.  And, then, since

25   then, nothing until the second quarter of this year, he filed

1  taxes working for his brother's company.

2  Q.   Given that, that he didn't really have any legitimate

3  employment, did he have a lifestyle that seemed to exceed

4  what -- what legitimate money he would have maybe had?

5  A.   Yeah.  He had a lifestyle which exceeded my own for not

6  having any employment.

7  Q.   Was he leasing a Mercedes?

8  A.   Correct.

9  Q.   What -- what type of Mercedes was that?

10 A.   C-Class.

11 Q.   And then his rent at his apartment.  Was that about $1500

12 a month?

13 A.   Yeah.

14 Q.   What about access to his brother's money?  Access to the

15 ability to flee through money that his brother might have --

16 Justin.

17 A.   So from what we've understood and what we've found is

18 Justin pays pretty much all of Clay's bills, pays for

19 everything for Clay.

20 Q.   Okay.  Continuing even into this case -- is that right? --

21 where he is paying for his attorney's fees?

22        MR. SHAPIRO:  Judge, I'm going to object to that as

23 being irrelevant, and there's no basis in it whatsoever.

24        THE COURT:  Let's go ahead and move along.

25 Q.   (BY MS. RATTAN)  But he pays for everything for his

1  brother?

2  A.   Yes, ma'am, everything.

3  Q.   What about travel outside of the country related to Clay?

4  A.   I believe he's traveled outside of the country

5  approximately 45 times, from what we've been able to locate.

6  Q.   Can you give the Court an idea of the types of locations

7  where he travels outside of the country?

8  A.   All over the world.  Mexico, most recently.

9  Q.   Africa?

10  A.   Africa.

11  Q.   When you say "most recently," what is his most recent

12  international travel?

13  A.   I believe to Cabo, Mexico, just a few weeks ago.

14  Q.   Okay.  And you've mentioned some signs of overt wealth.

15  You've talked about his apartment, driving the Mercedes.

16       What about jewelry?

17  A.   I believe he has several Rolexes or a Rolex and another

18  high-end watch.  I don't -- I'm not a big watch guy; so I don't

19  know the name of the other watch.  But I think they're --

20  Rolex, for sure, and another watch that's valued in 30-,

21  $40,000 range.

22  Q.   Based on what you know about this defendant, Clay

23  Magnuson, do you believe that he's a flight risk?

24  A.   Yes.

25  Q.   And why is that?

```
 1   A.   Because he's -- knows the entire operation, how

 2   Mr. Magnuson operated.  I think he would be able to give the

 3   full picture of this investigation.  He also has access to his

 4   brother's money.  We believe his brother pays his credit cards.

 5   I believe that he can get on a private jet and disappear, just

 6   like his brother could.

 7   Q.   Well, you mentioned his brother.  Let's focus now on

 8   his brother, Justin Magnuson.

 9        Can you give the Court an overview of what Justin

10   Magnuson's role was in the organization?

11   A.   He's the owner of, we believe, two grow properties out in

12   California, not three.  And he was also a money launderer and

13   used for transportation.

14   Q.   Let's talk about the manufacturing, the ownership of two

15   properties.

16        Can you tell the Court the size of those properties?

17   A.   Rather large.  We're talking several acres -- 30 acres to

18   maybe 40 acres or so, most of these properties are.

19   Q.   And did those properties have not just outdoor but also

20   indoor grow operations?

21   A.   Yes.  They had greenhouses on them, which we consider an

22   indoor grow operation.

23   Q.   And were both of those properties used by Justin and the

24   organization to manufacture and distribute the marijuana?

25   A.   Yes.
```

```
 1   Q.   So you said Justin is -- is a manufacturer and a

 2   distributor but also is involved in the money laundering.

 3           How so?

 4   A.   Correct.  He would take in the U.S. currency, as we

 5   discussed earlier, and put them into businesses that he owns or

 6   friends own.

 7   Q.   And what about wealth that Justin has been able to amass

 8   and other crimes that he may be involved in?  Do you have

 9   information about that?

10   A.   Yes.  He sold a company for millions of dollars, and

11   there's a current health care fraud investigation --

12           MR. UHL:  Your Honor, I'm --

13   A.   -- ongoing --

14           MR. UHL:  Pardon me.  We're going to object to this

15   line of questioning as outside any relevancy -- there's no

16   indictment out of the Southern District of Texas that we're

17   aware of.  And I think this goes against certain departmental

18   policies that can't go into things that people aren't indicted

19   for.

20           THE COURT:  I'm going to allow the testimony in.  I

21   think the Court's permitted to consider all the circumstances

22   in making a detention decision.

23   Q.   (BY MS. RATTAN)  So you're familiar that he's at least

24   under investigation in a large-scale fraud case; is that right?

25   A.   That's correct.
```

1   Q.   Have you spoken to the investigator in that case?

2   A.   I have and it's an ongoing investigation.

3   Q.   The lead agency and the lead agent conducting the

4   investigation, who are they with?

5   A.   IRS.

6   Q.   And, in fact, is there a special prosecutor from the

7   Department of Justice who's working with the Southern District

8   of Texas, in Houston, investigating fraud related to --

9   large-scale fraud related to the company that this defendant

10  sold, Alliance Corporation?

11  A.   I believe so, yes.

12  Q.   What about other wealth that he's accumulated?  You've

13  talked about the penthouse in Dallas.  What other things can

14  you describe that he has?

15  A.   Several properties throughout the country.  He also -- and

16  large amounts of jewelry, a Ferrari, two airplanes, and the

17  list goes on.  And it's a ton of wealth that's attributed to

18  him.

19  Q.   So he's got two private airplanes?

20  A.   Correct.

21  Q.   One that he owns personally?

22  A.   Correct.

23  Q.   The second one, he owns a one-third interest in?

24  A.   Correct.

25  Q.   Now, the one that -- the airplane that he personally owns,

1    has that airplane been seized?

2    A.   It has.

3    Q.   Now, the airplane that he still has access to, that he has

4    a one-third interest in, what's the status of that airplane?

5    A.   It's subject to seizure.  I'm not sure if it's actually

6    been seized at this point.

7    Q.   It's not in custody?

8    A.   It's not that I know of.

9    Q.   So he's got the properties in Colorado, Los Angeles, Costa

10   Rica, Houston, Dallas; is that right?

11   A.   Yes, ma'am.

12   Q.   And do those things give you concern that he could flee?

13   A.   Yes, ma'am.

14   Q.   And why is that?

15   A.   He could flee inside of the United States and hide out at

16   one of the properties.  Also with his travel record outside the

17   country and places he's traveled, as well as foreign bank

18   accounts that we believe he has, definitely worried about him

19   fleeing.

20   Q.   Well, let's talk about his travel outside the United

21   States.

22          Did you look at that, border crossings, international

23   border crossings outside the United States?

24   A.   Yeah, I believe that he's traveled 251 times overseas.

25   Q.   Outside of the United States?

1  A.   Yes, ma'am.

2  Q.   And can you give the Court an idea of the countries that

3  he's traveled to?

4  A.   Like his brother, just a little bit more expansive, all

5  over the world:  Europe, Asia, Africa, Central America, Mexico,

6  I believe Canada.

7  Q.   Was there a statement that he made during the

8  investigation to anybody -- a co-conspirator, cooperator --

9  about his ability to flee?

10  A.   He made a statement that he could be in Mexico in two

11  hours.

12  Q.   And you said he has accounts in other countries.

13       Can you explain that?

14  A.   Yes, ma'am.  We're not able to confirm some of these

15  accounts because some of the countries aren't very cooperative

16  with the United States, but it's believed, through interviews,

17  that he possibly has bank accounts in Switzerland, Saint Barts,

18  Maldives, Mexico, possibly a few others.

19  Q.   Okay.  What about a personal banker at Chase?  Does he

20  have that?

21  A.   Yeah.  He has a banker he can call 24/7 and talk to,

22  transfer money, move money, whatever he needs to do

23  banking-wise.

24  Q.   Now, while we're talking about the ability to flee, he's

25  got access to all these things; he made the statement about how

1   quickly he could leave the country.  You also mentioned in the

2   search of his penthouse, finding a go-bag.

3          Can you explain what that is and what was in it?

4   A.   Yeah.  So he had a backpack that was loaded and ready for

5   him to flee, for lack of a better word, or to hide out.  Inside

6   the backpack, he had survival guides, SAS book --

7   Q.   What's an SAS book?

8   A.   Like, special warfare book about, like, surviving.  He

9   had, like, parkas, fire starter, shovel.  He actually had

10  amphetamine pills that were prescribed to him in that backpack

11  so he could stay up.  Had a -- I think it had a bulletproof

12  plate in the back of it, change of clothes, that kind of stuff.

13  Basically, where he could grab that bag, go into the woods and

14  be okay.

15  Q.   What about a separate bag that had firearm, laptop, that

16  sort of thing?

17  A.   Yeah, he had a backpack in the kitchen by the door that

18  had a rifle/pistol, basically a short-barrel rifle with a

19  pistol stock on it; a suppresser; and his laptop all in there.

20  Q.   So do you believe that he had contemplated fleeing and

21  that he would be able to quickly?

22          MR. UHL:  Objection, Your Honor.  That calls for

23  speculation as to what he was thinking.

24          THE COURT:  I'm going to allow the witness to answer

25  the question.

1   A.   Yeah.  So the presence of the backpack loaded with the

2   rifle, ready to go, laptop ready to go, and the go-bag,

3   definitely.  Nobody has a go-bag unless you're going to --

4   think you're going to need it at some point.

5   Q.   Going to leave?

6   A.   Yeah.

7   Q.   Going to go?

8   A.   Yep.

9   Q.   Okay.  And you've referenced the firearms.  Let's focus

10  specifically on the firearms that Justin Magnuson had.

11         Can you give the Court an idea of what the arsenal

12  included?

13  A.   Several weapons -- like short-barrel rifles, pistol

14  rifles, shotguns, shotgun pistol, and a plethora of other

15  pistols.  There was pistols found by the safe.  There was a

16  pistol found in the bedroom and then several pistols in the gun

17  locker, for lack of a better term.  Rifles that were in there,

18  that were loaded and ready to go.

19  Q.   When you say "rifles," what types of rifles?

20  A.   AR-15, platform rifles, and AK-47-style rifle.

21  Q.   Okay.  What about body armor?

22  A.   I think he had five sets of, like, body armor, and he also

23  had plates that can go in backpacks and stuff like that.

24  Q.   Okay.  Is this unusual for you to find something like

25  that?

A.   Yeah.  Extremely unusual to have five sets of body armor
when you only have two people living at the house.
Q.   So he's got ten rifles, ten pistols.  Multiples are
loaded; is that right?
A.   Correct.  I believe the pistol in the bedroom was loaded.
The pistol in -- by the safe was loaded.  Several firearms in
the gun room were loaded, including one AR-15-style rifle.
Q.   Now, the location where this arsenal was found, this is
the penthouse and it had been used during the commission of the
crime.  Money had been counted there.  Money had been delivered
there, and we're talking about large amounts of U.S. currency?
A.   Yes, ma'am.  Meetings also took place there.
Q.   Okay.
        MS. RATTAN:  Now, Your Honor, I'd request the Court's
permission to present the witness with page 4 of defendant
Justin Magnuson's bond report that includes a summary of the
defendant's assets.
        THE COURT:  Is there any objection?
        MR. UHL:  No, Your Honor.
        THE COURT:  You may proceed, Ms. Rattan.
        MS. RATTAN:  May I approach the witness?
        THE COURT:  You may.
Q.   (BY MS. RATTAN)  Let me show you.  It's page 4, it's been
removed from the defendant's bond report, and it's only page
4 --

1    MS. RATTAN:  And, Your Honor, I will not mark or

2    offer this as an exhibit.  I'll just ask the witness to review

3    it with the Court's permission.

4    THE COURT:  Thank you.

5    Q.  (BY MS. RATTAN)  Let me hand you page 4 of Justin

6    Magnuson's bond report.  I'll ask you to look that over.  This

7    is a listing that the defendant has provided to the United

8    States Probation Department of his assets.

9    Can you review that list of assets and tell me

10   whether the defendant has neglected to tell the probation

11   department, not mentioned any of his assets?

12   A.  Yes.  He's left off several assets.

13   Q.  First, during your testimony, you talked about the

14   defendant's ownership of one airplane and his ownership

15   interest in a second airplane.

16   Do you see either one of those airplanes listed here

17   on the defendant's assets that he reported to the United States

18   Probation Department?

19   A.  I do not see either one of those.

20   Q.  Now, the airplane that the defendant owns, what's the

21   value of that airplane?

22   A.  $3.8 million.

23   Q.  And then the second airplane that the defendant has a

24   one-third interest in that's not listed on his assets, what

25   would his value of his interest be?

1    A.    Say 300,000 to $400,000.

2    Q.    Now, there's also a property that the defendant owns in

3    California on Scenic Drive.

4          Is that one of the manufacturing properties?

5    A.    It is.

6    Q.    Do you see that property listed here?

7    A.    It is not.

8    Q.    Now, there's real estate in California, but that's in Los

9    Angeles and that's the 3.4 million-dollar real estate; is that

10   right?

11   A.    Yes, ma'am.

12   Q.    But the grow property that's in California, that's in

13   rural north California isn't here?

14   A.    I don't see it here.

15   Q.    What's the approximate value of that property?

16   A.    I'd say between 700,000 and $1 million.

17   Q.    Okay.  So he's left off a 3.8 million-dollar plane, his

18   ownership interest in the second plane, a 700,000-dollar

19   property; and, of course, the airplane was involved in the

20   crime and then the property in California was involved in the

21   crime, and both of them have been left off.

22   A.    Yeah, I believe there's a second property in California

23   that's not on here.  It's a grow property as well.  It's on

24   Tyler Foote.

25   Q.    Okay.  So there's another property that he's left off as

1  well?

2  A.  Yes, ma'am.

3  Q.  And that's also a grow property in California?

4  A.  Correct.

5  Q.  What's the address of that property?

6  A.  I don't have the numbers off the top of my head, but it's

7  off of Tyler Foote Drive.

8  Q.  Okay.  Tyler Foote Drive.  And what's the approximate

9  value of that?

10  A.  I'd say a half a million dollars-plus.

11  Q.  So he left off two grow properties, one worth $700,000 and

12  one worth $400,000?

13  A.  Yeah.

14  Q.  What about jewelry?  Did he estimate or report his jewelry

15  or the value of the jewelry?

16  A.  I do not see that on here.

17  Q.  And does he have a Tesla that he's involved with?

18  A.  I believe he leases a Tesla.

19  Q.  And that's not listed on here?

20  A.  I don't see that on here.

21  Q.  Now, under -- on the second, there's a block of assets and

22  then a block of monthly income.  Under the second block, it

23  says "other income, bar and restaurant management group."

24      Do you know what that is?

25  A.  It's probably going to be the second business I discussed

1   that they put money in, but I don't know for sure just because

2   it's pretty vague.

3   Q.   Okay.  So it's just vague, but there was a business that's

4   related to a bar and restaurant group that money was laundered

5   through?

6   A.   Correct.

7   Q.   And that money laundering was done by this defendant,

8   Justin Magnuson?

9   A.   Yes.  He facilitated it.

10  Q.   Okay.  Now, as you review the list of assets, do you see

11  anything else that he's left out?  Two airplanes, two

12  properties, the jewelry, the Tesla's not mentioned.  Anything

13  else?

14  A.   No foreign bank accounts are listed on here.

15  Q.   Okay.  So the foreign bank accounts would be the ones that

16  you listed earlier?

17  A.   Correct.

18  Q.   Have you interviewed someone who's familiar with the

19  defendant's assets, and did they report to you that there were

20  foreign bank accounts?

21  A.   Yes, ma'am.

22  Q.   Okay.  Would you hand me that?

23  A.   Yes, ma'am.

24         MS. RATTAN:  May I return, Your Honor?

25         THE COURT:  Thank you.

| | |
|---|---|
| 1 | MS. RATTAN:  Let me -- if I could approach again, |
| 2 | Your Honor? |
| 3 | Q.   (BY MS. RATTAN)  Let me show you this.  Then I'll mark |
| 4 | this, with the Court's permission, as Government's Exhibit |
| 5 | Number 3.  This says "Justin," and then it has a phone number. |
| 6 | If you'll look at that phone number and tell me whether that's |
| 7 | a phone number that this defendant, Justin Magnuson, used |
| 8 | during this crime. |
| 9 | A.   Yes, ma'am. |
| 10 | Q.   And that's (214)435-0470? |
| 11 | A.   Yes, ma'am. |
| 12 | Q.   Okay. |
| 13 | MS. RATTAN:  May I return, Your Honor? |
| 14 | Q.   (BY MS. RATTAN)  Now, did you bring some photos that show |
| 15 | the things that you've described to the Court:  the execution |
| 16 | of the search warrants, the thing that -- things that you found |
| 17 | when you executed the search warrants?  Have you reviewed those |
| 18 | photos, and do those accurately reflect the things that you |
| 19 | saw? |
| 20 | A.   Yes, ma'am.  We took hundreds of photos.  I just took a |
| 21 | small sample of those photos. |
| 22 | Q.   But you didn't bring hundreds here? |
| 23 | A.   No. |
| 24 | Q.   Just a few? |
| 25 | A.   Just a few. |

```
1              MS. RATTAN:  Your Honor, we'd offer, as Government's
2    Exhibit Number 3 [sic], the photos, and request the opportunity
3    to publish them if they're admitted.
4              THE COURT:  Has counsel for defense had an
5    opportunity to review the photos?
6              MR. SHAPIRO:  We have, Your Honor, no objections.
7              MR. UHL:  And we have, Your Honor, no objections.
8              THE COURT:  And let me just confirm before we press
9    forward.  Ms. Rattan, you're moving as well to admit the phone
10   number; is that correct?
11             MS. RATTAN:  Yes.  And that's Government's Exhibit
12   Number 3, please.
13             THE COURT:  And then the photos will be Government's
14   Exhibit Number 4 --
15             MS. RATTAN:  1.
16             THE COURT:  -- or Number 1?
17             MS. RATTAN:  Sorry.
18             THE COURT:  Okay.  So I'm just going to confirm at
19   this time, counsel for the defense, there's no objection to
20   either Government's Exhibit Number 1 or 3.  Is that correct?
21             MR. UHL:  Correct, Your Honor.
22             MR. SHAPIRO:  Correct, Your Honor.
23             THE COURT:  All right.  Those shall be admitted at
24   this time.
25             (Whereupon, Government's Exhibits 1 and 3 offered and
```

1   admitted into evidence.)

2        THE COURT:  And, Ms. Rattan, you may proceed as it

3   relates to the photos.

4        MS. RATTAN:  Okay.  Thank you.  If we could just

5   publish those.

6   Q.   (BY MS. RATTAN)  Okay.  If you could just tell us what

7   this is, and we'll just go through them.  This is the first

8   one.

9   A.   This is a firearm belt that you can just put on over your

10  pants with a loaded 17 Glock pistol that was inside, and

11  several magazines.

12  Q.   Where was that found?

13  A.   In Clay's residence.

14  Q.   Clay Magnuson's residence?

15  A.   Yes, ma'am.

16  Q.   Okay.  Next photo.  What is this?

17  A.   This is the backpack that was located at Clay's residence

18  next to the bed, I believe, with a loaded pistol inside of it.

19  Q.   Okay.  Next photo.

20  A.   This is the safe in Clay's residence showing U.S.

21  currency.

22  Q.   Okay.  About how much money, U.S. currency, did Clay have?

23  A.   I don't know the exact amount.  I think it's approximately

24  $10,000 or so.

25  Q.   Okay.  Next.

1   A.   This is going to be the wall of the gun locker at Justin

2   Magnuson's house, showing all the firearms and bulletproof

3   helmet and some body armor.

4   Q.   Okay.  Next.

5   A.   Just another overview of that room.  Again, showing some

6   of the pistols on the wall, rifles on the wall.  In the

7   background, you can see body armor hanging up.

8   Q.   Okay.  Next.

9   A.   This is going to be some of the items that were located

10   inside the go-bag:  map of Texas, survival guide, and the SAS

11   survival handbook.

12   Q.   And that's the go-bag that was located in Justin

13   Magnuson's penthouse?

14   A.   Correct.

15   Q.   Next.

16   A.   It's just a picture of the go-bag being opened up.

17   There's some duct tape that's been removed.

18   Q.   Next.

19   A.   Some more of the contents:  change of clothes, wool socks,

20   a multi-tool, compass, a saw.

21   Q.   Okay.  So he's got property in Colorado.

22        Do you think, based on what you found there, that it

23   would be possible for him to just hide out in Colorado?

24   A.   It could be.  I mean, all those items could be used there.

25   The only thing that would give me pause is the Texas map that

1  he had there to where he could hide in Texas as well.

2  Q.   Next.

3  A.   Just some more of the items:  hand warmers, the shovel,

4  gloves.

5  Q.   Next.

6  A.   This is a picture of the amphetamine pills prescribed to

7  Justin.  These were used commonly in the past in militaries to

8  keep operators awake.

9  Q.   Next.

10  A.   This is some of the foreign currency that was located in

11  the safe.  He had several envelopes.  That's just some of them.

12  And then high-end jewelry and then the black Amex card, as well

13  as the U.S. currency that was seized out of the safe.

14  Q.   And, again, how much approximately was the U.S. currency?

15  A.   I believe between $35- and $40,000.

16  Q.   Next.

17  A.   Just more pictures of the -- different U.S. currency.

18  Q.   Different currency from other countries?

19  A.   Yeah.  Correct.

20  Q.   And, of course, we don't know how much that is?

21  A.   No.  And we -- at DEA, our policy is that we don't seize

22  foreign currency.  So I've never seized foreign currency being

23  at DEA.

24  Q.   Next.

25  A.   A picture of some of the body armor that was there.

1   Q.   Next.

2   A.   This is going to be the backpack for Clay that was located

3   in his vehicle with the loaded firearm.  And that was also the

4   backpack that had his passport inside it.

5   Q.   Next.

6   A.   There's the backpack and the rifle.

7   Q.   Next.

8   A.   That's the rifle that was in his vehicle.

9   Q.   Now, when you say, "his," you're talking about --

10  A.   Clay's.  Sorry.

11  Q.   Thank you.  Next.

12  A.   This is going to be the shotgun that was located at Clay's

13  residence out in California, which is owned by Justin.

14  Q.   Okay.  So it's owned by Justin but managed by Clay --

15  A.   Yes.

16  Q.   -- and when you went in on the search warrant, there was

17  marijuana there and this shotgun close to the marijuana and

18  ready to be used?

19  A.   Correct.

20  Q.   Okay.  Next.

21  A.   It's a picture of the tubs full of marijuana.

22  Q.   And that's at the location in --

23  A.   In California.

24  Q.   -- California?  The search warrant that we just talked

25  about?

1    A.   Yes, ma'am.

2    Q.   Okay.  Next.

3              Okay.  And that's it?

4    A.   Yes, ma'am.

5    Q.   Based on the information that you've presented to the

6    Court, do you believe that each one of these defendants is a

7    risk, a danger to the community and, also, a flight risk?

8    A.   Yes, ma'am.

9    Q.   And it's based on the reasons that you've previously

10   provided for the Court?

11   A.   Yes, ma'am.

12             MS. RATTAN:  Your Honor, I'll pass the witness.

13             THE COURT:  Thank you.

14             MR. UHL:  May we approach briefly, Your Honor?

15             THE COURT:  You may.  The Court's going to stand in

16   recess for a period of five minutes, at which point in time we

17   will return for cross-examination of the Government's witness.

18             Thank you, everyone.

19             (Whereupon, a recess was had.)

20             THE COURT:  At this time the Court returns to Cause

21   Number 4:20-CR-64, the United States of America versus Justin

22   Luke Magnuson and Clay Everett Magnuson, after taking a short

23   recess.  We are reconvening to begin further examination of the

24   Government's witness, Agent Slicker.

25             I'll just confirm, does the Government have any

1   further questions for this witness?

2          MS. RATTAN:  Not at this point.

3          THE COURT:  All right.

4          I'll allow cross-examination.

5          Mr. De La Garza, you may proceed.

6          MR. DE LA GARZA:  Thank you, Your Honor.  May it

7   please the Court.

8                    **CROSS-EXAMINATION**

9   **BY MR. DE LA GARZA:**

10  Q.  Do you go by Special Agent?  Do you go by Task Force

11  Agent?  How do -- how would you like me to address you?

12  A.  You can just call me Investigator Slicker.  I'm not an

13  agent.

14  Q.  Okay.  Investigator Slicker.

15          All righty.  We got a lot -- little bit of ground to

16  cover.  You mentioned this thing, in your opinion, this

17  conspiracy, started way back in 2009; is that correct?

18  A.  I believe we went back to 2010.  I mean --

19  Q.  2010?  And your investigation included people like Ben

20  Hart (phonetic), Caleb Thompson (phonetic), Christopher

21  Landon [sic]; is that correct?

22  A.  Some of those names don't sound familiar.

23  Q.  In fact, they're cooperating with you; isn't that true?

24          MS. RATTAN:  Your Honor, I object.  It's not

25  appropriate at this point, and under *United States versus*

1    *Revario,* we'd object to this line of questioning.

2              THE COURT:  Counsel, can y'all approach?

3              (Bench conference.)

4              THE COURT:  Mr. De La Garza, you may proceed.

5              MR. DE LA GARZA:  Thank you, Your Honor.

6    Q.   (BY MR. DE LA GARZA)  Investigator Slicker, those

7    individuals that I mentioned, you'd agree that they are out on

8    pretrial release at the present time?

9    A.   Can you mention the names, again?

10   Q.   Ben Hart?

11   A.   Yes, he's on pretrial.

12   Q.   Caleb Thompson?

13   A.   Yes.

14   Q.   And what about Christopher Landon?

15   A.   I don't know a Christopher Landon.

16   Q.   London.  I'm sorry.  Christopher London.

17   A.   He is not indicted.

18   Q.   Now, at what point in time did Justin come into the

19   picture -- because that's what we're here about, at least I'm

20   here about, is on -- on Justin.  So at what point in time did

21   he come into the picture?

22   A.   I would say a couple years ago when we located the grow

23   properties out in California.

24   Q.   And if I recall, on direct examination, there might be

25   some question right now whether the properties in California

1   had a grow license or they were able -- or they had a

2   transportation license.

3           Is that fair enough?

4   A.   I don't believe any properties that we investigated out in

5   California actually had a grow license during the

6   investigation.

7   Q.   Okay.  Now, let's talk about for a moment the go-bag that

8   you mentioned that you found over at Mr. -- at Justin's place.

9   Okay?

10  A.   Yes, sir.

11  Q.   You'd agree with me, right now in our political climate

12  for the past several years, there's many gun enthusiasts, many

13  individuals that have what we call prep bags, you know, if --

14  if it hits the fan, they want to be ready to go and defend

15  themselves, defend their family.  Would that be a fair

16  statement?

17  A.   There's probably some people out there that are like that.

18  Q.   And it'd be those individuals that might have a little bag

19  that might have some survival stuff if they go hiking.  Would

20  that be a fair statement?

21  A.   Yeah.  I wouldn't describe that bag like that, though.  I

22  wouldn't --

23  Q.   Okay.  I understand --

24  A.   -- describe it as a hiking bag.

25  Q.   -- you wouldn't.  But -- let -- I'm going to ask you some

1  questions.  Okay?

2  A.  Sure.

3  Q.  And if you don't understand my question, will you be kind

4  enough to let me know and I'll be happy to rephrase my

5  question.  Fair enough?

6  A.  Yes, sir.

7  Q.  Okay.  Would you agree with me there's individuals out

8  there that have what -- for lack of a better word, the terms

9  that y'all used, get-out bags or go-bags, that individuals can

10  use to survive in the wilderness, whether it's for a short-term

11  or a long-term?

12  A.  Yes.

13  Q.  Would you find it unreasonable for individuals to have gun

14  collections?

15  A.  No.

16  Q.  Would you find it unusual for individuals to have -- who

17  may have some wealth -- to have watches?

18  A.  No.

19  Q.  Black Amex cards, if they qualify for it?

20  A.  If you qualify for it.

21  Q.  Okay.  Now, your -- one of your major concerns, I'm

22  assuming, was that he might be a flight risk.

23       Fair enough?

24  A.  Correct.

25  Q.  And you understand this Honorable Court has many things at

1  her disposal in order to determine whether someone can be out

2  on bond with certain restrictions; correct?

3  A.   Correct.

4  Q.   Now, you being an investigator with the Irving Police

5  Department and also hanging out as a task force officer with

6  DEA, I'm sure a lot of you-all talk from time to time about

7  what y'all are going to do when you get to retirement.

8          Would that be a fair statement?

9  A.   I'm a long way away from that.

10  Q.   All right.  But would you be -- would you say it's a fair

11  statement that sometimes that's a point of conversation amongst

12  law enforcement?

13  A.   I would say so.

14  Q.   Would you agree with me that, among law enforcement, upon

15  retirement, some law enforcement officers go into the private

16  investigative business?

17  A.   Some do.

18  Q.   Okay.  And would you agree with me that individuals that

19  go into -- with prior federal law enforcement or state law

20  enforcement background go into security businesses?

21  A.   They could.

22  Q.   And would you agree with me that there could be things

23  that will be done -- that can be done, like having double ankle

24  monitors on Mr. Justin to ensure he doesn't leave where --

25  anyplace that he's told to stay?

```
1    A.   I mean, you can put three or four on, it's -- I mean --
2    Q.   That's right.  It really depends on what he's going to do;
3    right?
4    A.   Yeah.  Correct.
5    Q.   But if you have two on them, you have a higher probability
6    that two are going to stay on, not one's going to get cut off
7    and then we don't know what happens to them.
8    A.   I mean, you cut one or two, it's the same -- I don't think
9    it would make that big of a difference if you had one or two.
10   Q.   And if he has 24-hour personal surveillance on him, lack
11   of a better word, security detail, keeping an eye on him for 24
12   hours a day, it would be kind of hard for him to cut off his
13   leg monitors and flee with retired law enforcement officers
14   keeping an eye on him?
15   A.   I mean, if you're paying somebody to keep an eye on
16   yourself, what's to say you're not paying them to help you
17   escape?  I mean --
18   Q.   So your --
19   A.   -- it doesn't make sense.
20   Q.   So your -- is it your position that former law enforcement
21   officers are going to allow someone to flee?
22   A.   They have no reason -- I mean, they're -- they're a
23   private sector.  They're not -- no longer law enforcement.
24   Q.   Okay.  You mentioned something about meetings that were
25   being held at Justin's home?
```

1   A.   Correct.

2   Q.   Were those conversations recorded?

3   A.   I believe so.

4   Q.   Okay.  "Believe so" meaning that they -- you think they

5   were, or they were recorded?

6   A.   Oh, we had -- there were meetings that took place that

7   weren't recorded between just Clay and Justin.  Then we have

8   other meetings that were recorded.  So I mean, some were and

9   some weren't.

10  Q.   Okay.  And the meetings that were recorded, you obviously

11  have those recordings and those are preserved, and I'm sure

12  they'll be part of our discovery packet in the near future?

13  A.   Correct.

14  Q.   Was his phone number, the one that y'all showed or any

15  other phone number that belongs to Justin, were any of those

16  part of a Title III Wiretap?

17  A.   I would consider one a consensual Title III.

18  Q.   And was that for 30 days?  Longer?  How long --

19  A.   I would say lo---

20  Q.   -- wiretap?

21  A.   I would say longer.

22  Q.   Okay.  So y'all went through all the hoops that y'all have

23  to do for those.

24       Were other phones being wiretapped or recorded that

25  my client may have called into that is -- was not his phone

1    that was recorded?

2    A.   There were several recordings made, conversations from

3    your client that were with several other people.  So I'm not

4    sure what you mean.

5    Q.   Okay.

6    A.   Like, we have recorded phone calls with your client --

7    Q.   Okay.

8    A.   -- from several --

9    Q.   Okay.

10   A.   -- different phones.

11   Q.   From his phone and then from other phones that were

12   recorded?

13   A.   Correct.

14   Q.   During the course of your investigation, were y'all ever

15   able to trace any of the money you-all mentioned that was being

16   paid for shares of his stocks that went into his business?

17   A.   I'm sorry.  Can you repeat that question?

18   Q.   The money that you say --

19   A.   Uh-huh.

20   Q.   -- that he was given for shares of his company --

21   A.   Uh-huh.

22   Q.   -- were y'all ever able to trace that money actually going

23   into those companies?

24   A.   I don't think we traced any U.S. currency going into

25   actual bank accounts, if that's what you're asking.

1    Q.    That's what I'm asking.

2    A.    No.  We don't have the U.S. currency deposits.

3    Q.    Okay.  Were y'all ever able to trace any money that

4    you-all had placed into his airplane that actually ended up in

5    California?

6    A.    Yes.  Several -- millions of dollars, I think, of that

7    money that flew on that plane, we had at the beginning, before

8    it got on that plane, we had after it got on that plane.

9    Q.    Okay.  And out of that money that you're saying got on the

10   plane and went, do you have any recordings to show that my

11   client was actually aware that that money was on that plane at

12   that point in time?

13   A.    Yes.  I believe so.

14   Q.    And do you have any recordings to show that my client knew

15   that that money that was placed into the airplane, that those

16   funds came from the sale of marijuana?

17   A.    Yes.  We do.

18   Q.    Do you have any specific information from any recordings,

19   jailhouse recordings, any type of recordings right now that

20   would lead you to believe that my client has a specific plan in

21   place to go if he were to be released?

22   A.    I'm not sure if they're recorded, but we have a statement

23   saying that he can get to Mexico within two hours if he needs

24   to.

25   Q.    Well, thank you for reminding me of that.

1        Wouldn't you agree that anybody that boards a direct

2   flight to Mexico can be in Mexico in two hours?

3   A.   I've never been able to get on a plane in that time frame.

4   So, no, I don't think you could get on a commercial plane

5   within two hours of booking a plane and getting on a plane,

6   getting out.

7   Q.   Was the question about him going to Mexico and being there

8   in two hours, was that, in response to a direct question of him

9   fleeing, or was that just part of conversation, "Hey.  I've got

10  a private jet.  I don't have to go through all the red tapes,

11  and I can have my pilot take me to Mexico, and I can be there

12  in two hours"?

13  A.   I can't recall the exact predicate, but I would assume

14  it's probably going to be the latter that you said.

15  Q.   He could just get there in two hours, but not in response

16  to any plan that he has to flee?

17  A.   Yeah.  I don't remember him actually talking about a

18  plan --

19  Q.   Okay.

20  A.   -- with those words being used.

21  Q.   Now, being out in the country over in California -- I saw

22  that pistol grip shotgun -- I mean, there's more use for the

23  shotgun for individuals that live out in the country, you know,

24  varmint control, et cetera.  It's not just necessarily

25  protection.

1          Wouldn't you agree?

2    A.    That style, make, and model of shotgun, I would not agree

3    that that's -- being a hunter myself, I would not agree that's

4    a make or model that would be used for anything other than,

5    like, home protection.

6    Q.    What about the -- the pistols, you know, he can -- it's

7    not illegal to be a gun fanatic, is it?

8    A.    It's not.

9    Q.    It's not illegal to be in possession of body armor or

10   anything along those lines as preppers do.

11   A.    It's not.

12   Q.    And you'd agree with me that not too long ago we had a

13   bunch of riots in downtown Dallas with this Black Lives Matter

14   movement that was going on.  You'd agree with me on that?

15   A.    Correct.

16   Q.    And you'd agree with me that -- and we had that couple

17   over in -- in I believe it was Kansas City that was concerned

18   with rioters, et cetera.  And they were out in the front lawn

19   trying to protect their homestead?

20   A.    I don't remember the particulars on that case but sounds

21   familiar.

22   Q.    And just to be clear, you're not aware of any specific

23   information at this present time that my client has any plans

24   to flee this country -- flee the jurisdiction of this Court; is

25   that correct?

```
 1   A.   Specific, at this moment that he's planning on doing it,
 2   no.  The ability, yes, definitely.
 3   Q.   Well, the ability would be if he has access to his money;
 4   correct?
 5   A.   Correct, he does.
 6   Q.   If he is willing to defy the court order --
 7   A.   Correct.
 8   Q.   -- just to stay either in the Northern District or the
 9   Eastern District; correct?
10   A.   Correct.
11   Q.   Evade 24-hour supervision from his own detail; correct?
12   A.   Yeah, that's -- still doesn't make sense to me, but okay.
13   Q.   Well, you've only been at this -- what?  About five years;
14   right?
15   A.   I've been in law enforcement for almost 13 years now.
16   Q.   Okay.  And his desire to cut off an ankle monitor and
17   leave.
18            Would that be a fair statement?
19   A.   Correct.
20   Q.   All right.
21            MR. DE LA GARZA:  Pass the witness, Your Honor.
22            THE COURT:  Thank you.
23            Mr. Shapiro.
24            MR. SHAPIRO:  Thank you, Your Honor.
25            Judge, may I approach the witness briefly?
```

1        THE COURT:  You may.

2                   CROSS-EXAMINATION

3  BY MR. SHAPIRO:

4  Q.   Officer, I'm going to show you something that I'm not

5  planning on introducing as an exhibit, but I'd like for you to

6  take a look at that and then be able to answer a few questions

7  about it from there.

8            Do you know what that is?

9  A.   It's a license to carry.

10 Q.   Okay.  Whose picture's on that license to carry?

11 A.   Clay.

12 Q.   Okay.  Clay Magnuson, here in the courtroom today;

13 correct?

14 A.   Correct.

15 Q.   Okay.  And through your investigation of Clay and of

16 Justin, were you able to ascertain that Clay has a valid Texas

17 license to carry?

18 A.   Yes.

19 Q.   You were able to ascertain that?

20 A.   Yes.

21 Q.   Did you know that, prior to making your arrest on -- what

22 was that?  Ten days ago? -- were you aware that he had a

23 license to carry?

24 A.   I believe so.

25 Q.   Okay.  So when you pulled him over -- or when y'all took

1   him into custody and then searched his -- searched his

2   apartment, you were well aware that he had the right to have

3   weapons in his vehicle; correct?

4   A.   Yes.  I think it's not a crime in the state of Texas to

5   have a firearm in a vehicle.

6   Q.   I agree with that, but even to a -- to even of a -- more

7   extent, he even had a concealed license to carry a handgun;

8   correct?

9   A.   Correct.

10   Q.   So when you testified earlier about the things that were

11   found in his vehicle when he was arrested, there was nothing

12   illegal or even close to illegal about what he had in that car;

13   correct?

14   A.   No, sir.

15   Q.   Okay.  So they didn't find anything in the vehicle that

16   would -- would be considered illegal at the time; right?

17   A.   No, sir.

18   Q.   Because you've highlighted a few different times now, both

19   by testimony and by photo of what was in his car when he was

20   arrested; correct?

21   A.   Correct.

22   Q.   As if there was something wrong with him carrying a pistol

23   or a rifle or his passport of -- as if there was a -- some sort

24   of criminal offense taking place at that time.

25   A.   Yeah, I don't think I ever said there was a criminal

1  offense taking place, just notating what was located at the

2  scene that was significant.

3  Q.  I mean, the purpose of notating that for the judge is so

4  she would consider it when determining whether or not to

5  release him today; correct?

6  A.  Correct.

7  Q.  Okay.  So, obviously, you're trying to insinuate that

8  there was something wrong about him having guns and a passport

9  in his car when he was arrested; correct?

10          MS. RATTAN:  I object.  Argumentative.

11          THE COURT: I'm going to allow it.  You may proceed,

12  Mr. Shapiro.

13  A.  Can you repeat the question?

14  Q.  (BY MR. SHAPIRO)  I mean, you -- you brought it up because

15  you want the judge to take note of it when considering whether

16  or not to release him; is that right?

17  A.  Yes.

18  Q.  So, obviously, in your mind there was something wrong with

19  him having legal weapons in the vehicle and his

20  government-issued passport with him when he was arrested;

21  correct?

22  A.  I think I was just making notes of it.  I don't

23  necessarily think there's something wrong with it, but I think

24  that, by having a backpack with a firearm in it and your

25  passport in it, it's kind of unusual to have your passport.

1  That's kind of where I was getting at.  And then a loaded
2  firearm, while you're in the commission of committing these
3  offenses, is something that is wrong.  I mean, he's --
4  Q.  Okay.
5  A.  -- obviously has a loaded firearm, even if he has a
6  concealed carry weapon, but he's going down to Austin to pick
7  up $100,000 in U.S. currency with a loaded firearm.  Then
8  you've got bigger issues there.  So it's just adding to that.
9  Q.  Okay.  All I'm asking about is the day you arrested him.
10          He wasn't headed to Austin that day, was he?
11  A.  He was not.
12  Q.  He was coming out of his apartment to go to work; correct?
13  A.  I don't know where he was going.  I thought he said he was
14  going to a gunsmith.
15  Q.  Okay.  So the passport, did you take custody of that
16  passport?
17  A.  I don't think we did.
18  Q.  You left it in the car?
19  A.  Yeah.  We usually don't take passports, documents like
20  that.
21  Q.  Okay.  And the -- you then went inside the house and found
22  some other weapons inside his home; correct?
23  A.  Yes.  Other agents went inside the house and located the
24  other firearms.
25  Q.  And you guys had been watching Clay and Justin for quite

1   some time; is that right?

2   A.   Yes.

3   Q.   Safe to say, both of them have an interest in weapons, in

4   guns, in firearms -- things of that nature; correct?

5   A.   Yeah, I would say so by the quantity of weapons that they

6   had.

7   Q.   And with regard to -- only with regard to Clay, since

8   that's my interest in this situation specifically, tell us what

9   weapons were found inside the home.

10  A.   I believe four pistols.

11  Q.   Four pistols?

12  A.   I believe so.

13  Q.   Again, nothing illegal about having those guns in your

14  house; correct?

15  A.   No --

16  Q.   Okay.

17  A.   -- nothing illegal about that.

18  Q.   And you mentioned something about some currency being

19  found in his safe; is that right?

20  A.   Correct.

21  Q.   Do you know how much exactly you found?

22  A.   I don't know how much exactly was found.

23  Q.   Okay.  Again, you brought this up to the judge.  You

24  showed a picture of it, and you're making an insinuation that

25  there's something wrong with having U.S. currency inside a

```
1   safe, inside your own home, but yet, you don't know the amount
2   that he had; is that right?
3   A.   We have to get it counted at Limas (phonetic), and I just
4   hadn't got the count sent to me on exactly what it was that was
5   in there.  That U.S. currency was seized, but it is unusual
6   that he has a stack of U.S. currency in his possession because
7   he doesn't have a -- really a valid job.  He's only filed taxes
8   in the second quarter.  So, yeah, it was significant to take a
9   photograph of a stack of bills for somebody that we didn't
10  believe had -- really had a job.
11  Q.   One of the reasons why you brought up the idea of the
12  passport in the car -- and I believe you mentioned this in your
13  testimony -- was it made it seem as if Clay could take off and
14  leave in a moment's notice; is that right?
15  A.   Yeah.  I don't know why you would carry your passport
16  around with you --
17  Q.   Okay.
18  A.   -- everywhere you go.
19  Q.   Certainly wasn't -- didn't have the accessories that his
20  brother Justin did, but in your opinion, having that passport
21  was curious to say the least; is that correct?
22  A.   Yeah, I would definitely say curious.
23  Q.   He had no way of knowing that you were surveilling him,
24  watching him, tailing him, about to arrest him on that
25  particular morning; right?
```

1   A.   I don't know that for a fact because, before we hit

2   Justin's house, I think Justin probably knew we were coming

3   because of the management there.  So if -- he may have

4   contacted his brother prior to that, but I don't know.  We

5   don't have the phones downloaded yet; so...

6   Q.   Okay.  Well, you had a wiretap on both these guys;

7   correct?

8   A.   No.

9   Q.   Did you have a wiretap on Justin?

10  A.   We had consensual -- what we call consensual wiretap.

11  Q.   Okay.  Did you have any indication that he made a call to

12  Justin that morning -- excuse me -- to Clay or a text message

13  or anything saying, "Grab your guns, grab your passport, and

14  get ready to run at a moment's notice"?

15  A.   Not at this point, no.

16  Q.   Okay.  So you mentioned that this investigation with the

17  individuals that are involved in this indictment had been going

18  on for ten years; correct?

19  A.   That's the span of our indictment that we did was ten

20  years.

21  Q.   Okay.  Ten years is the number that you mentioned earlier

22  during your direct testimony; correct?

23          MS. RATTAN:  I object.  That's confusing.  The

24  organization's been in operation for ten years.  The

25  investigation's been two years.

1   A.   Yeah.

2   Q.   (BY MR. SHAPIRO)   Okay.

3   A.   Sorry.

4   Q.   You mentioned ten years to start off.

5          And you understand that Clay's 26 years old; right?

6   A.   Yes.

7   Q.   Okay.  So ten years ago he was a 16-year-old high school

8   junior; right?  Make sense?

9   A.   Yeah, that makes sense.

10  Q.   Did you look into his background at all?

11  A.   I mean, not in-depth, like, back into high school-type

12  stuff.

13  Q.   Okay.  To -- to make very clear to the judge, when you

14  referred to the number of ten years, you weren't referring to

15  Clay's involvement in this conspiracy ten years ago; correct?

16  A.   No.  We're just saying that this marijuana operation has

17  been operating for, we believe, ten years.

18  Q.   And with regard to Clay Magnuson, how long do you believe

19  he's been involved in this?

20  A.   I would say since he purchased the properties out in

21  California, started growing marijuana on them.  I don't have

22  the exact dates on hand for that.  Sev---

23  Q.   Okay.  When you --

24  A.   -- several years.

25  Q.   I'm sorry.  When you say he purchased the properties, Clay

1    doesn't own those properties.

2    A.   No, he does not.  I believe his brother owns those

3    properties.

4    Q.   Okay.  So you're saying his brother owns the properties.

5    I'm asking you, specifically, when Clay's involvement began in

6    this conspiracy.

7    A.   When he started going to California to grow marijuana.

8    Q.   When was that?

9    A.   I believe a couple of years ago.

10   Q.   Okay.  You've got to give us something a little more

11   specific than a couple years ago.

12   A.   I don't have the -- like I said, the exact date.  I would

13   say two years.  When -- maybe three, because it's whenever the

14   purchase of Scenic took place, Clay started going out there and

15   learning how to grow, and they started leveling the properties

16   and putting greenhouses on it and all that stuff.

17        So like I said, I mean, it -- we know they've been

18   growing for two years, but it could have been longer than that

19   since they bought the property and started prepping it and all

20   that stuff.

21   Q.   Okay.

22   A.   So I can't give you an exact date right at this moment.

23   Q.   And with regard to this particular case and the -- during

24   direct testimony you mentioned the thousands of pounds of

25   marijuana, the hundreds of acres, the tens of millions of

1   dollars produced.

2         You cannot tie any of that to Clay Magnuson in this

3   case; correct?

4   A.   Can you repeat that?

5   Q.   Sure.  I mean, you -- the Government asked you questions

6   about the scope of this investigation, the scope of the

7   conspiracy.

8   A.   Yep.

9   Q.   None of these proceeds, the get-rich part of any this, can

10  be tied back to Clay Magnuson; correct?

11  A.   I definitely don't think he's nearly as wealthy as his

12  brother, if that's what you're getting at.  I think he

13  benefitted from going out there and growing this marijuana.  He

14  was paid to do so by his brother.  So I mean, yeah, he profited

15  from it.

16  Q.   How do you know he was paid to do this by his brother?

17  What information do you have that he was paid?

18  A.   His brother pays his bills, his living expenses and all

19  that stuff out there.

20  Q.   You understand that he worked for Med Spa; correct?

21  A.   Clay?

22  Q.   Yes.

23  A.   I believe he -- all we found in Texas Workforce was the

24  second quarter of this year that he's been working for Med Spa.

25  So that wouldn't really encompass the last growing season or

1     any of that.

2     Q.   Okay.  With regard to -- again, just to Clay's involvement

3     in this, you mentioned that you only had information that he

4     had worked in high school; correct?

5     A.   The only other Texas Workforce -- don't hold me to it --

6     but I think it said 2008 was the only other thing that popped

7     up.  So I would think that would be when he's in high school.

8     Q.   Okay.  And you'd agree with me that, just because it's not

9     listed in the Texas Workforce records, doesn't mean somebody

10    doesn't have a job; correct?

11    A.   It means that, yeah, they're not filing in Texas.

12    Q.   Okay.  Are you aware that Clay went to work for Deloitte

13    right out of graduate school at SMU?

14    A.   I'm not.

15    Q.   You guys have been following these guys around for a

16    while, tapping their phones, watching everything that they're

17    doing.  You didn't know that he went to work for Deloitte after

18    he got his master's in accounting at SMU?

19    A.   Nope.  It didn't pull up on Texas Workforce or our

20    records.

21    Q.   So that's all you're relying upon with regard to his

22    employment is what pulled up on Texas Workforce?  You don't

23    have any independent knowledge of what he was doing for work

24    after he graduated from graduate school?

25    A.   That's our starting point.  We also have IRS investigators

1    that are involved in this case, and they dig a lot deeper into

2    that stuff, which I don't really get involved in.  That's kind

3    of the IRS's business.

4    Q.   Do you know when he graduated from SMU?  Do you know when

5    he received his degree, his master's in accounting?

6    A.   No.  I wasn't interested in when he got degrees.

7    Q.   Not interested in his educational background at all?  Do

8    you --

9    A.   Just the criminal.  I mean --

10   Q.   Okay.

11   A.   -- we're doing a criminal investigation.  That's what

12   we're looking into.

13   Q.   Well, I mean, it would have some relevance as to the time

14   frame in which you believe he was involved in this.

15           Wouldn't you agree?

16           MS. RATTAN:  I object.  Argumentative.

17           THE COURT:  I'm going to allow it.

18   A.   Can you repeat the question?

19   Q.   (BY MR. SHAPIRO)  Yeah, I mean, don't you think --

20   A.   Sorry.

21   Q.   -- don't you think it would have some relevance with

22   regard to the time frame in which you believe he was involved

23   in this conspiracy, to know when he was in school or where he

24   graduated from school?

25   A.   We kind of had a time frame when we knew he was --

1          MR. SHAPIRO:  Objection.

2    A.   -- out there growing marijuana.

3          MR. SHAPIRO:  Nonresponsive, Your Honor.

4          THE COURT:  Allow the witness to answer the question,

5    please.

6    A.   We had our time frame that we knew he was out growing

7    marijuana.  So, prior to that, when he was in college and stuff

8    like that, to me, I mean, looking at it now, I don't really see

9    the relevance.  We knew when he was doing the criminal

10   activity.  Like we said at the beginning of this, I don't think

11   he was involved ten years ago when he was 16 years old.  We

12   have our time frame that we know Clay was involved.

13   Q.   (BY MR. SHAPIRO)  Okay.  You mentioned this house in

14   California.  We saw some photos of it with the tubs of

15   marijuana, as well as the shotgun that you said was used for

16   protection; correct?

17   A.   Correct.

18   Q.   And that was from one of the properties that Justin owns

19   that you're alleging was an illegal grow field; is that

20   correct?

21   A.   Correct.

22   Q.   And you believe through your investigation that -- excuse

23   me -- that Clay lived in this house as part of his job

24   description to learn the grow business; is that right?

25   A.   That's correct.

1    Q.   When is the last time that you know that he lived in that

2    home?  Better yet, when was the last time you know that he was

3    there?

4    A.   I know he should have been there right now for -- because

5    they're trying to get permitted.  So he was supposed to be

6    there, actually, right now to do all this.  Prior to that, we

7    know he was there last growing season; so --

8    Q.   Okay.  When was last growing season, since we're -- I

9    don't really know --

10   A.   Okay.  So most growing seasons will start kicking off

11   March, and they'll go all the way until the first freeze.  So

12   they'll start in March.  They'll start with greenhouses.

13   You'll start growing your marijuana in the greenhouses early.

14   Then you'll start with your outdoor grows once it warms up.  So

15   you get the temperatures above a certain temperature, I would

16   say, you know, you don't want your nights getting down near

17   freezing.  So once you start with your warmer nights, you're

18   going to start with your outdoor grow.  That's going to go all

19   the way through your first frost.  So depending on when that

20   is, you could go as late as, you know, maybe October, November

21   area.

22   Q.   Okay.

23   A.   And then, like, at that point, you're going to be

24   harvesting in between all that time period.  And then at that

25   point, at the end, you're going to harvest your last crop,

1  process your last crop.  So you -- it's going to take a little

2  bit of time for all that to get done.

3  Q.   So your contention is he was -- the last time he was there

4  was sometime last grow season, which would have been 2019;

5  correct?

6  A.   Yeah.  I would say the fall of 2019.

7  Q.   So do you have any information that indicates that Clay

8  Magnuson was in that home anytime after fall of 2019?

9  A.   Man, I don't -- I'd have to -- I can't say no and I can't

10  say yes.  I'm not for sure.  I'd have to go through and look.

11  Q.   You'd have to go through and look at what?

12  A.   DEA-6's, reports, phone calls that we have and all that

13  stuff, just to kind of narrow down where --

14  Q.   Okay.  As you sit here testifying today in this hearing,

15  you have no knowledge that he was anywhere near that house in

16  the last eight, nine, ten months; correct?

17  A.   Yeah.  I can't recall the exact date the last time he was

18  there.

19  Q.   Okay.  You mentioned that the weapon that was found inside

20  that home and tubs of marijuana that were found inside that

21  home.  If he hadn't been there since October/November of 2019,

22  he has no idea what's going on inside that house in the last

23  eight, nine, ten months.

24          Wouldn't you agree with that?

25          MS. RATTAN:  Calls for speculation.  Objection.

1        THE COURT:  I'm going to allow it.

2   A.  I would say that no one else lives in that house, that, to

3   my knowledge, no one else goes into that house.  I think it's

4   been a long time since Justin's been to that property, that

5   house.  So I would, yeah, I would definitely say he knew what

6   was in that house and where it was.

7   Q.  (BY MR. SHAPIRO)  Okay.  But, once again, I'm saying that,

8   if Clay had not been there since fall of 2019, you can't say

9   who had been in there or what they had done since he had last

10  been inside that home.

11       Would you agree with that?

12  A.  I would not.  That'd be like saying if I left my house and

13  for a few months and then came back, I would expect somebody to

14  have gone through my house.  That doesn't make sense.  That's

15  his residence out there.  He has access to that residence, and

16  to my knowledge, no one else does.

17  Q.  Okay.  When you say it's his residence, he didn't own it;

18  correct?

19  A.  No.  But he stays there.

20  Q.  Well, he stays there, but you don't know whether or not

21  other people stay there as well.

22       Would you agree with that?

23  A.  I do not believe anyone else stays there.

24  Q.  And do you know that for --

25  A.  I have no knowledge that someone else stays there.

Q.   You mentioned some stuff about Clay's finances and the
lifestyle that he lived; correct?

A.   Correct.

Q.   You testified about -- I think you said his lifestyle
exceeded his employment; is that right?

A.   Yes.

Q.   And you also testified that his rent was $1500 a month; is
that right?

A.   I don't know the exact amount on his rent.  I know he just
moved from one apartment to another.  I believe it's going to
be approximately $1500 a month.

Q.   Okay.

A.   I mean, utilities --

Q.   Do you know anything about --

A.   -- and stuff.

Q.   Do you know anything about his debts?

A.   I don't know anything about his debts.

Q.   You don't know about his 50,000-dollar student loans?

A.   Do not.

Q.   When you talk about somebody's lifestyle exceeding their
employment, shouldn't you pay attention to what their debts are
as well as their assets?

            MS. RATTAN:  Argumentative.  Objection.

            THE COURT:  Sir, you may proceed.

A.   I think that would add to the fact that, if I would have

1    known he had $50,000 in debt, it would have added to the fact

2    that he's living above his means.

3    Q.   (BY MR. SHAPIRO)  Well, my point being he's not exactly

4    rolling in dough.

5              Wouldn't you agree with that?

6    A.   I mean, he seems to be living pretty nice.

7    Q.   In a $1500-a-month apartment?

8    A.   In uptown Dallas, driving a nice Mercedes C-Class,

9    35,000-dollar watches --

10   Q.   Okay.  You --

11   A.   -- stack of cash, and -- yeah, I would say he's living

12   pretty nice.

13   Q.   Mentioning those watches, you have no idea where those

14   watches came from; right?

15   A.   Nope.

16   Q.   They could have been gifts; correct?

17   A.   Correct.

18   Q.   When we're talking about Clay's situation in regards to

19   this investigation and his place in this conspiracy and the

20   purpose of this hearing, all the judge is here to determine is

21   whether or not he's a risk to flee and whether he's a safe --

22   considered to be safe within the community.

23             Wouldn't you agree with that?

24   A.   Correct.

25   Q.   And not his guilt or innocence, not his role, necessarily,

1  in all this, but whether or not he can be released during -- or

2  after this detention hearing; correct?

3  A.   Correct.

4  Q.   And you would agree with me that certain safeguards can

5  easily be put in place to make sure that he cannot flee the

6  jurisdiction and that he is a safe member of the community;

7  correct?

8  A.   That's a long question but, yeah, I think you can

9  put safeguards in effect, but it's all determinant on the

10  defendant, if he's going to abide by the rules.

11  Q.   Okay.  Do you know whether or not Clay Magnuson has any

12  criminal history, ever been in any trouble a day in his life?

13  A.   I don't believe he has criminal history.  I'm not sure

14  about if he's been in trouble, though.

15  Q.   Okay.  He's 26 years old.  When you say if he can follow

16  the rules or not, do you have any information that indicates he

17  can't follow the rules?

18  A.   He's breaking the law by growing marijuana and

19  transporting it; so, yeah, I do have some.

20  Q.   Okay.  I understand what he's accused of, but other than

21  the accusation into why he's here today, do you have any reason

22  to believe that, if the Court issues some significant

23  stipulations on his release, that he won't be able to follow

24  them?

25  A.   Like I said, I can't -- I mean, it's up to the defendant

1  if he's going to flee or not.  I think there is a risk, and

2  I've stipulated my risk earlier that he has access to private

3  jets, he's traveled overseas, and all that.  So I do fear that,

4  if he is released, he does have the opportunity and the means

5  to make it hard for us to get him back.

6  Q.   Okay.  With regard to the access to the private jets,

7  again, y'all have seized those jets; correct?  The jets that

8  Justin owned; right?

9  A.   We seized one.  I think one's still outstanding, to my

10 belief.  And then Justin has friends with private jets as well.

11 Q.   Okay.

12 A.   And, also, pilots that he's friends with.

13 Q.   So we've got Justin's friends that he's got, associates

14 with, but you don't have any information that Clay's got access

15 to the same; correct?

16 A.   Yeah, not to my knowledge, does he have the same friends

17 as Justin.

18           MR. SHAPIRO:  I don't have any further questions,

19 Judge.

20           THE COURT:  Ms. Rattan, anything further for your

21 witness?

22           MS. RATTAN:  Just briefly.

23                    **REDIRECT EXAMINATION**

24 BY MS. RATTAN:

25 Q.   Just because you have a license to carry doesn't mean that

1    you can use a firearm or carry a firearm or possess a firearm

2    in furtherance of a drug trafficking crime; is that right?

3    A.   Yeah.  You cannot.

4    Q.   Was this defendant, Clay Magnuson, a transporter in the

5    organization both of drugs and the proceeds from those drugs?

6    A.   Yeah.  Definitely.  For sure.  Yeah.

7    Q.   Does it concern you when he has the number of firearms

8    that he has, knowing what his role was in the organization?

9    A.   Yes.  Marijuana and marijuana currency is really big, and

10   getting robbed and people robbing people -- see, we end up with

11   a lot of shootings and a lot of murders that are related to

12   marijuana and firearms.

13   Q.   In fact, in the last two years, right across from North

14   Park Mall in Dallas, someone was murdered in a marijuana deal;

15   is that right?

16   A.   Correct.  I think city of Irving, at this point, we

17   believe we have eight or nine murders, the vast majority of

18   those murders are marijuana related.

19   Q.   So the TWC records, the Texas Workforce Commission

20   records, is Deloitte and Touche a company that you would expect

21   to report to TWC?

22   A.   Yes, definitely.

23   Q.   Okay.  And the Texas Workforce Commission records on this

24   defendant from 2008 to 2020 reflect less than $15,000 that this

25   defendant has made?

```
1    A.   Yeah.  That's all we were able to find.

2    Q.   And we're talking about Clay Magnuson?

3    A.   Correct.

4    Q.   So the companies that were laundering money, I'm not sure

5    that -- that was clear.  Was defendant Justin Magnuson

6    accepting drug proceeds and putting them in companies?

7    A.   Yes.

8    Q.   How was that happening?

9    A.   Well, what he was doing is taking the cash from these drug

10   sales and then keeping that cash for himself and giving shares

11   of companies to other codefendants and, also, like, his company

12   and the other company.  So he would keep the cash, and I

13   believe the statement that was made, he can use that for jet

14   fuel, to buy fuel.  So he would keep the cash and then give

15   shares.  It's just a different way of washing money.  Instead

16   of putting it in a bank account, he would use the cash for

17   things you could use cash for and give shares, and then those

18   shares could be cashed in later for U.S. currency.  And that

19   way it would be clean money or appear clean.

20   Q.   Okay.  And Justin Magnuson's 39 years old?

21   A.   Yeah, I believe -- '81 is when he was born.

22   Q.   And then Clay Magnuson's 26, 27 years old?

23   A.   Yes.

24   Q.   Now, the fraud that you discussed or testified to related

25   to Justin Magnuson's business that he sold, Alliance
```

1    Corporation, the large-scale fraud, was that uncovered as part

2    of this case or was that a separate investigation?

3              MR. DE LA GARZA:  Your Honor, I'm going to object.

4    This line of questioning has gone beyond the scope of

5    cross-examination as it relates to Alliance.  I didn't ask him

6    any questions about Alliance, that I recall.

7

8              THE COURT:  I'm going to allow this question to be

9    answered, and then we can move on to a new subject.

10   A.   I believe this investigation's been going on for longer or

11   maybe around the same time as our investigation, separately.

12   We just recently started talking with IRS down in Houston about

13   their investigation.

14             MS. RATTAN:  Okay.  That's all I have, Your Honor.

15   Thank you.

16             THE COURT:  Thank you.

17             Mr. De La Garza, do you have anything further?

18             MR. DE LA GARZA:  Not of this witness, Your Honor.

19             THE COURT:  Thank you.

20             Mr. Shapiro?

21             MR. SHAPIRO:  No, Your Honor.

22             THE COURT:  Thank you.

23             You may step down, sir.  Thank you very much.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  My understanding is the Government has a

1   further witness to present at this time.

2            MS. RATTAN:  Yes, Your Honor.  The United States

3   calls group supervisor Tommy Hale.

4            THE COURT:  Can you ask him to come in from the

5   hallway, please?  Thank you.

6            Sir, if you could come forward to be sworn.

7            (Whereupon, the witness was sworn.)

8            THE WITNESS:  I do.

9            THE COURT:  Sir, once you've had an opportunity to be

10  seated, can you do me a favor and please state your full name

11  for the record as well as spell it?

12           THE WITNESS:  Tommy Hale, H-A-L-E.

13           THE COURT:  Ms. Rattan, you may proceed.

14           MS. RATTAN:  Thank you, Your Honor.

15                       **DIRECT EXAMINATION**

16  **BY MS. RATTAN:**

17  Q.   Tommy Hale is your name; is that right?

18  A.   Yes, ma'am.

19  Q.   And where do you work?

20  A.   I am a lieutenant with Ellis County Sheriff's Office and

21  permanently assigned to DEA.

22  Q.   Okay.  And what do you do with DEA?

23  A.   I'm a group supervisor for HIDTA Group 3, which is

24  stationed in the southern part of the Northern District of

25  Texas.

1   Q.   And the HIDTA, what is a HIDTA?

2   A.   High Intensity Drug Trafficking Area.

3   Q.   How long have you been with DEA?

4   A.   Twenty-eight years.

5   Q.   Can you give the Court an overview of your various

6   affiliations within law enforcement?

7   A.   I started my law enforcement career in 1980 with

8   Waxahachie Police Department.  Went to the Dallas District

9   Attorney's Office where I was originally assigned to DEA.  I

10  retired from there in 2012 and the Sheriff then asked me to

11  come back there as a lieutenant and start a task force down

12  there with DEA, where I currently resi- -- at.

13  Q.   And as the group supervisor over a DEA HIDTA unit, what

14  types of cases and investigations do you oversee?

15  A.   We mainly go after large drug trafficking organizations

16  that are very organized, working both domestic and foreign.  I

17  do a lot of Title III wire intercepts and try to identify these

18  organizations and dismantle them.

19  Q.   In this case have you been asked to testify as an expert

20  witness, and is there a call specifically that you've reviewed?

21  A.   Yes, ma'am, there is.

22       MS. RATTAN:  May I approach the witness, Your Honor?

23       THE COURT:  You may.

24  Q.   (BY MS. RATTAN)  Let me show you what has been admitted as

25  Government's Exhibit Number 3 and ask you if you recognize this

1  phone number as being associated with an intercept that you've

2  reviewed.

3  A.   Yes, ma'am, I do.

4  Q.   Okay.  And as a matter of fact, is that phone number

5  involved in the phone call that you reviewed?

6  A.   It is.

7          MS. RATTAN:  Your Honor, we would offer at this time

8  Government's Exhibit Number 2, which is a phone call that this

9  witness has reviewed.

10         THE COURT:  And I'll just ask at this time, have --

11 defense counsel, have you had an opportunity to hear -- would

12 you like an opportunity to hear it before it's played here in

13 open court?

14         MR. DE LA GARZA:  I haven't heard it.

15         MR. SHAPIRO:  I -- how long is it, Your Honor?

16         MR. UHL:  We haven't heard it.

17         MS. RATTAN:  It's about five minutes.

18         MR. SHAPIRO:  I don't even know who it's with.

19         MR. DE LA GARZA:  We weren't aware of it.  Don't know

20 who's on it.

21         MS. RATTAN:  We can forward it to them.  They can

22 listen to it right now.

23         THE COURT:  Let's go ahead, and we'll take a short

24 recess to allow y'all an opportunity to listen to the call; and

25 then y'all can advise me at the conclusion of that whether you

1    have any concerns about us proceeding to present it in open

2    court.  We'll go off the record at this time for a recess.

3                    (Whereupon, a recess was had.)

4              THE COURT:  All right.  At this time the Court is

5    back on the record.  We took a short recess to allow the

6    Government to provide to opposing counsel the intended

7    recording.  At this time defense counsel has had an opportunity

8    to listen to that recording, which Ms. Rattan would like to

9    discuss with the witness, and I'll inquire.

10             Mr. Shapiro, do you have any objection?

11             MR. SHAPIRO:  I'll defer to my cocounsel here.

12             THE COURT:  So no stated objections at this time?

13             MR. UHL:  No, ma'am.

14             THE COURT:  Mr. De La Garza.

15             MR. DE LA GARZA:  Your Honor, I have several

16   objections.  First off, you know, this was not provided to us

17   ahead of time.  We don't know if this was a consensual

18   conversation or if this was a TIII conversation.  Now we're

19   getting into -- we think we know who it is, but if we know who

20   it is, it was one of the people that we mentioned earlier that

21   the Government didn't want us to get into and their level of

22   cooperation.  I think they're opening up the whole door to all

23   those things they didn't want to get in.  So we object to

24   anything regarding this phone conversation.

25             THE COURT:  Okay.  So let's unpack that,

```
 1    Mr. De La Garza.  You have an objection as it relates to that
 2    you think it potentially gets into other individuals and their
 3    level of cooperation with the Government.  That's your first
 4    objection; correct?
 5              MR. DE LA GARZA:  Correct.  And then for Government
 6    to identify the other person on this phone conversation.
 7              THE COURT:  Let me inquire at this time, Ms. Rattan.
 8    Are you opposed to advising them who the other individual on
 9    the phone conversation is?
10              MS. RATTAN:  I don't think it's important or relevant
11    to this matter.
12              THE COURT:  And, again, it may not be.  My question
13    is are you opposed to doing so?
14              MS. RATTAN:  At this point, we are.
15              THE COURT:  Okay.  And without going into the
16    identity of the individual, is the identity of the individual
17    one of the persons who the Government raised earlier in
18    connection with the case cite about cooperation?
19              MS. RATTAN:  I think it is, but I'm not sure.
20              THE COURT:  Okay.
21              Counsel, why don't y'all approach.  I have one
22    clarifying question I'd like to ask before we proceed.
23              (Bench conference.)
24              THE COURT:  At this time the Court's had an
25    opportunity to further talk with both the Government and
```

1   defense counsels regarding their objections.  The objections

2   relate to the certain identity of the other caller.  The Court

3   finds that for the issue that the Government intends to present

4   the call, that as a result of that, the objection should be

5   overruled and that the Government should be allowed to present

6   the phone call for the purposes that it has advised the Court

7   it intends to present the call for.

8            With that, Ms. Rattan, you may proceed.

9            MS. RATTAN:  Okay.

10           (Whereupon, Government's Exhibit Number 2 offered and

11   admitted into evidence.)

12   Q.   (BY MS. RATTAN)  Before we play the call, with the Court's

13   permission, can you give us an overview, as an expert, of what

14   you're looking for, what you're listening to when you hear this

15   call?

16   A.   Yes.  Listening to the call, it started out with the

17   caller talking to Justin.  Justin's saying that Clay had told

18   him they were having issues.  The call continued to where it

19   appeared that they were trying to collect money, and the caller

20   was having issues getting that money.  They talked about what

21   kind of excuses the people were making.  Went on to talk about

22   Clay and his knowledge of the people they were trying to

23   collect the money from.  Basically, that he knew what was going

24   on and he had been on top of it.

25           They continued to go on and talk about the violence.

1    They talked about bringing muscle to -- providing muscle to go

2    down there to meet with the individual to collect this money.

3    And then went on to say that -- in fact, he was asked, "Are

4    they trying to skirt you?" during that call, and he said

5    they're coming up with all sorts of stuff, basically.  And at

6    that point is when Justin made the statement, "If it's me,"

7    basically, "I'm going to break their kneecaps.  And if you come

8    down here, let me know.  If you want me to send somebody with

9    you, I will."  They also talked about keeping Clay informed of

10   what was going on.

11   Q.   Okay.  So that's just a summary of the call; is that

12   right?

13   A.   That is correct.

14            MS. RATTAN:  Your Honor, may we publish it?

15            THE COURT:  You may.

16            (Whereupon, Government's Exhibit Number 2 played.)

17            MS. RATTAN:  May I proceed, Your Honor?

18            THE COURT:  You may.

19   Q.   (BY MS. RATTAN)  So is it fair to say, in your career,

20   you've listened to thousands of calls related to the drug

21   business?

22   A.   Yes.

23   Q.   Can you characterize this call?  Does this sound like

24   something that you've heard over your career?

25   A.    It is.  It's basically somebody -- they're trying to

 1   collect money and they're trying to -- they're talking about

 2   causing bodily injury to somebody to get that money, if they

 3   don't produce the money in a timely manner.

 4   Q.   Okay.  Does it sound serious to you, like a plan that they

 5   are willing to execute?

 6   A.   I think it's very serious based upon Justin's

 7   conversation.  He was not making it -- he was not laughing

 8   about it; it was not a joking matter.  It was just, per se, "I

 9   will send some -- we -- if it's me, I'm going to send somebody

10   to break his kneecaps."  That's pretty serious and violent.

11   Q.   And then does he talk about how the other person, Clay, is

12   going to be involved or is involved in what's going on?

13   A.   In one part of the call, he specifies, "I will send -- if

14   you need me to, I will send Clay down there."  I don't know

15   what -- I don't know that much about the case, but listening to

16   the phone call, Clay is either a very close associate of

17   Justin, somebody that he trusts, or somebody -- or this person

18   works for Justin -- Clay works for Justin.  So what he's saying

19   is that, "I will -- if you can't do it, basically, I'll send

20   Clay down there to take care of it."

21   Q.   If we can just play Clip A from Government's Exhibit

22   Number 3 [sic].  These are just three -- three clips --

23   three -- it's Clip?

24   A.

25            MS. RATTAN:  I'm calling it Clip A, Your Honor, but

1   it's part of Government's Exhibit Number 3 --

2           THE COURT:  So it's what we've already heard?

3           MS. RATTAN:  We've already heard it.  Oh,

4   Government's 2, rather.  Government's Exhibit Number 3 is the

5   phone number.  So Clip A is from Government's Exhibit Number 2.

6           (Whereupon, Government's Exhibit Number 2 played.)

7   Q.  (BY MS. RATTAN)  So there are three references

8   specifically to Clay in the call.  Once, at the very beginning,

9   where Justin says, "Clay tells me that you're having some

10  issues."

11          So Clay's clearly reported to Justin what's going on

12  in the organization?

13  A.  That is correct.

14  Q.  Okay.  Then, when they discuss that there's problems,

15  that's when Justin says, "I can send Clay down there."

16          So what does that mean to you?

17  A.  To me, that, if he can't take care of it, he'll send Clay,

18  somebody that he trusts to come down there and collect the

19  money.

20  Q.  Okay.  And then at the -- toward the end of the call, the

21  person says, "I'll keep Clay updated.  He's pretty on top of

22  everything."

23          So what does that mean to you?

24  A.  To me, that tells me that caller has had conversation with

25  Clay previously about this debt being owed and that Clay is --

1    has knowledge of it and is -- basically knows the whole story

2    why the debt has not been paid thus far.

3    Q.   Okay.  Now, based on your review of the call, who's the

4    one who suggests using an enforcement tool?

5    A.   Justin.

6    Q.   Okay.  The other person who he's talking to, was it their

7    idea?

8    A.   No.

9    Q.   Did they seem to goad him, push him, come up with it at

10   all?

11   A.   Not at all.

12   Q.   So Justin's the one who brings it up?

13   A.   Justin's the one that brought up the bring -- number one,

14   sending muscle with them and then, number two, causing bodily

15   injury by breaking somebody's kneecaps.

16   Q.   Okay.  So if we can play Clip B on Government's Exhibit

17   Number 2.

18            (Whereupon, Government's Exhibit Number 2 played.)

19   Q.   (BY MS. RATTAN)  So that's where Justin brings it up; is

20   that right?

21   A.   That is correct.

22   Q.   Okay.  And then if we can play Clip C or 3 under

23   Government's Exhibit Number 2.

24            (Whereupon, Government's Exhibit Number 2 played.)

25   Q.   (BY MS. RATTAN)  So who's the one who brings it up?

1    A.   Justin brings it up.

2    Q.   And then --

3    A.   Just --

4    Q.   -- if we -- I'm sorry.

5    A.   Go ahead.  The question was asked, when he talks about

6    sending somebody with him, he says, "What do you mean?"  And he

7    said, "Support," and he says, "No, send" -- basically "send

8    muscle," sending somebody down there to take care of the issue.

9    Q.   Okay.  And then if we can play Clip D, Government's 2.

10           (Whereupon, Government's Exhibit Number 2 played.)

11   Q.   (BY MS. RATTAN)  Again, is that the other guy or is it

12   Justin?

13   A.   That's Justin.

14   Q.   All his idea?

15   A.   It is.

16   Q.   And then, finally, Clip E of Government's Exhibit 2.

17           (Whereupon, Government's Exhibit Number 2 played.)

18   Q.   (BY MS. RATTAN)  So it's your opinion that this is a

19   serious threat.

20           Do you believe that both Justin and Clay would be a

21   danger to the community and, if so, why?

22   A.   I do.  And why it would be, because anybody that's saying

23   they're going to go take care and cause harm to somebody in

24   that manner by breaking their kneecaps, to me, that's pretty

25   serious.

1  Q.  Okay.  If you knew that Justin and Clay, the people who

2  you're hearing on the call had access to multiple firearms,

3  would that concern you even more?

4  A.  Very much so.

5  Q.  And why is that?

6  A.  Because firearms are a danger to society.  I mean, we run

7  into that with drug traffickers all the time where they've got

8  assault rifles, where they've got semiautomatic pistols and

9  they're not -- if they have a lot of them, they're not just

10  there for their protection.  They're usually, in a lot of

11  cases, using them to defend their territory or to protect their

12  drug trafficking methods.

13  Q.  Okay.  And their money?

14  A.  Or/and their money.

15          MS. RATTAN:  I'll pass the witness.

16          THE COURT:  Mr. De La Garza.

17                    CROSS-EXAMINATION

18  BY MR. DE LA GARZA:

19  Q.  Lieutenant Hale, there was no mention on that phone

20  conversation what the money was about, was there?

21  A.  There was no mention, just you could tell that they were

22  collecting money.

23  Q.  Right, but there was no mention what the money was about?

24  A.  That is correct.

25  Q.  And you would agree with me that, before you have anybody

1   as a former investigator, former agent, working with

2   cooperators, if you're working with a cooperator, a cooperating

3   defendant, and you're going to have them take part in a

4   consensual phone conversation, you prep them before that

5   conversation, don't you?

6   A.   Not always.

7   Q.   But you do on occasion?

8   A.   There are occasions.

9   Q.   Especially if there's a motive or an objective you're

10  trying to get out of that conversation; isn't that correct?

11  A.   If there's a motive or what?

12  Q.   If there is a purpose to that call, you know, say, here in

13  this example, Ben Hart is calling Justin about some money that

14  might be at issue.  So you're going to go and talk to your

15  informant, your cooperating defendant, and you're going to say,

16  "See what all you can get out of them.  See if he'll admit to

17  this.  See if he'll admit to that."  Those are some things that

18  you might have conversations about.

19  A.   No, sir, I don't.

20       MS. RATTAN:  Well, I'll object.  It's a confusing

21  question, and it assumes facts not in evidence as well.

22       THE COURT:  Mr. De La Garza, if you'll just rephrase

23  the question, please.

24       MR. DE LA GARZA:  I'll rephrase the question.  It'll

25  be -- simplify it.

1    Q.   (BY MR. DE LA GARZA)  You have a cooperating defendant?

2    A.   Correct.

3    Q.   Who you know is going to make a phone call to, say,

4    someone in the organization where you know there's an issue

5    about trust and money, and you have time to work with this

6    cooperating defendant.  Are there times where you might go over

7    different scenarios on how to handle the conversation with your

8    cooperating defendant?

9    A.   There are.

10   Q.   And you will talk about different scenarios on how to

11   handle this, if this comes up; how to handle why, if why comes

12   up, so that your cooperating defendant doesn't panic or blow

13   the whole operation?

14   A.   What I normally do is I tell the cooperating defendant if

15   we're trying -- for instance, if we're trying to buy drugs, if

16   we're trying to have a meeting; but I don't go into specifics

17   on what that cooperating defendant has to say.  I do tell him

18   our objective today is to go buy a kilo from this subject.  But

19   what is said in between them during the time, there's no way I

20   can stop that conversation and say, "You need to say A, B, and

21   C."

22   Q.   Right.  But here you don't know what happened because you

23   weren't participating in this specific consensual conversation.

24   A.   I was not.

25   Q.   And what you're surmising on is based upon your

1    experience, specifically to your experience?

2    A.   That is correct.

3             MR. DE LA GARZA:  That's all I have, Your Honor.

4             THE COURT:  Thank you, Mr. De La Garza.

5             Mr. Shapiro, sir?

6             MR. SHAPIRO:  Just briefly, Your Honor.

7                         CROSS-EXAMINATION

8    BY MR. SHAPIRO:

9    Q.   Mr. Hale, we don't know what these individuals are talking

10   about the sale of; correct?

11   A.   I do not.

12   Q.   We're not -- there was never a mention of drugs,

13   marijuana, guns, anything illegal is never brought up during

14   that five-minute conversation; correct?

15   A.   Just collecting a debt.

16   Q.   Collecting a debt.  Could be a debt for a car, a tractor,

17   any -- it could be for anything; correct?

18   A.   I have no idea what the debt was for.

19   Q.   Understood.  With regard to Clay, and Clay alone, because

20   that's who I represent in this case, he was not part of this

21   conversation.

22             Would you agree?

23   A.   Was not part of the conversation?  No, sir.

24   Q.   Seemed to be the name Justin, and if we're assuming it's

25   the other Justin involved in this case, Justin and a

1    third-party we have yet to identify; correct?

2    A.   That is correct.

3    Q.   Okay.  And so the discussion focuses on sending some

4    muscle, breaking kneecaps; and your position is to educate the

5    judge from your perspective of how that could be a danger to

6    society; correct?

7    A.   That is correct.

8    Q.   How it sounds like he means business -- "In my experience,

9    I've heard this type of thing and" -- based upon your role as a

10   law enforcement agent; correct?

11   A.   That is correct.

12   Q.   Clay is not a part of those conversations; right?

13   A.   Not a part of the conversation but a subject of the

14   conversation.

15   Q.   Subject of when it comes to keeping Justin updated on

16   what's going on and "I'll talk to Clay" and "Clay will get you

17   information" has nothing to do with Clay breaking anybody's

18   kneecaps; correct?

19   A.   Other than saying, "I can send Clay."

20   Q.   I can send Clay to -- you don't know what for; right?

21   A.   Correct.

22   Q.   No mention of Clay, saying "Clay will set up the violence"

23   or "Clay will get somebody to break somebody's kneecaps";

24   correct?

25   A.   That is correct.

1    Q.   We've got multiple different parties here and,

2    specifically, my question is about Clay Magnuson and what his

3    role in the violence with regard to this phone call was.  And

4    there is none.

5              Would you agree?

6    A.   I would agree that Clay is part of the conversation.  He

7    is a subject of the conversation.  And I'll also agree that,

8    based on listening to it, Clay has knowledge of what's

9    happening, he has knowledge of what the debt's about, and

10   especially the part when he says, "If you need me to send Clay,

11   I will."

12   Q.   Okay --

13   A.   To me, that is referencing that "If you get in trouble and

14   you can't collect this debt, I'll send my guy, Clay, to take

15   care of it."

16   Q.   Okay.  You're making a lot of assumptions --

17   A.   I am.

18   Q.   -- based on that five-minute call; correct?

19   A.   Yes, sir.

20   Q.   Okay.

21             MR. DE LA GARZA:  I have no further questions.

22             THE COURT:  Ms. Rattan, anything further for this

23   witness?

24             MS. RATTAN:  No, Your Honor.

25             THE COURT:  All right.

1          Sir, thank you.  You may step down.

2          THE WITNESS:  Thank you.

3          THE COURT:  Does the Government have any further

4    witnesses to present at this time?

5          MS. RATTAN:  No, Your Honor.  We'll rest.

6          THE COURT:  Okay.  And just to confirm, at this

7    juncture I have three exhibits:  the photos, the phone

8    recording, and the phone number.  Is that correct, Ms. Rattan?

9          MS. RATTAN:  Yes, Your Honor.

10          May Lieutenant Hale be dismissed?

11          THE COURT:  He may.  And just to confirm again, you

12    told me you have no further witnesses.  Is there any further

13    evidence that you have to proffer to the Court at this time?

14          MS. RATTAN:  No, Your Honor.

15          THE COURT:  Okay.  So at this time it's time for us

16    to move to defendants and each of your witnesses.

17          Now, in light of what y'all have represented to me

18    previously, I believe Rafael, on behalf your client, y'all

19    have, you believe, four witnesses; and, Todd, you believe you

20    have one; is that correct?

21          MR. DE LA GARZA:  Yes, ma'am, and one of the

22    witnesses could potentially overlap a little bit or --

23          THE COURT:  What I would propose, even though it

24    would take us somewhat out of order, is, Todd, for you to

25    present your one witness, and then following presentation and

```
 1    cross-examination of your one witness, we'll take a further
 2    break to allow everyone bathroom breaks and otherwise; and
 3    we'll come back and take up Mr. Justin's witnesses at that
 4    time.
 5            Will that work for you, Todd?
 6            MR. SHAPIRO:  Yes, ma'am.
 7            THE COURT:  Okay.  If you'll go ahead and get your
 8    witness, then.
 9            MR. SHAPIRO:  Okay.
10            THE COURT:  You're going to wait right here and she's
11    going to swear you.  All right?
12            (Whereupon, the witness was sworn.)
13            THE COURT:  Ma'am, once you're seated, I'm going to
14    ask a favor of you.  Okay?  If you can do me a favor and state
15    into that microphone your full name, and then I'm going to ask
16    for you to spell it as well.  If you would prefer to keep your
17    mask on, you may do so.  If you would prefer to take it off,
18    you may also do that.  All right?
19            MS. MAGNUSON:  Thank you.
20            THE COURT:  Thank you.  You may go forward.  Tell me
21    your name and spell it.
22            MS. MAGNUSON:  Sally Magnuson; S-A-L-L-Y,
23    M-A-G-N-U-S-O-N.
24            THE COURT:  Thank you.
25            Mr. Shapiro, you may proceed.
```

| | |
|---|---|
| 1 | MR. DE LA GARZA:  Thank you, Your Honor. |
| 2 | **DIRECT EXAMINATION** |
| 3 | **BY MR. SHAPIRO:** |
| 4 | Q.   Good afternoon, Sally.  Would you let the Court know what |
| 5 | your relationship to Clay Magnuson is. |
| 6 | A.   He's my son. |
| 7 | Q.   Okay.  And where do you live, Sally? |
| 8 | A.   Houston, Texas. |
| 9 | Q.   How long have you lived in Houston? |
| 10 | A.   All my life. |
| 11 | Q.   Okay.  And Clay, you said, is your son.  How old is Clay? |
| 12 | A.   Clay's 26. |
| 13 | Q.   And prior to his incarceration in the Fannin County Jail, |
| 14 | where was Clay living? |
| 15 | A.   Dallas. |
| 16 | Q.   How long has he lived in Dallas? |
| 17 | A.   About three years. |
| 18 | Q.   Okay.  So I'd like to go back, you know, in time just a |
| 19 | bit chronologically to give the Court some background on who |
| 20 | Clay is and why you're here today.  Okay? |
| 21 | A.   Perfect. |
| 22 | Q.   So Clay's 26.  And y'all lived in Houston.  What part of |
| 23 | Houston was he raised? |
| 24 | A.   Jersey Village, northwest side. |
| 25 | Q.   Okay.  How many siblings does Clay have? |

1    A.   Clay has one natural sibling, Meredith, and three
2    half-siblings.
3    Q.   And is Meredith here in the courtroom today?
4    A.   She is, in the green jacket.
5    Q.   Okay.  Is Meredith -- Meredith is his one full sibling?
6    A.   Full sibling.
7    Q.   And then he's got some half-siblings; correct?
8    A.   He does, yes.
9    Q.   And is one of the half-siblings Justin as well?
10   A.   He is.
11   Q.   So you've known Justin yourself for a very long time;
12   correct?
13   A.   Since he was nine years old.
14   Q.   Okay.  Are Justin -- or have Justin and Clay been close
15   all of Clay's life?
16   A.   Well, there was an age difference.  So -- but when they,
17   you know, Justin was quite a bit older when Clay was little,
18   but when they became more of the same age, they were very
19   close.
20   Q.   Okay.  What would you -- how would you characterize the
21   way Clay looked up to Justin, maybe even in teenage years all
22   the way up into adulthood?
23   A.   Oh, gosh, I think he has a tremendous amount of respect
24   for him.  You know, for his tenacity, for where he came from,
25   and the man he's made of himself.  I think he has a great deal

1    of respect for him.

2    Q.   They spent a lot of time together, as far as you know?

3    A.   In later years, yes, but, you know, Clay was in high

4    school and playing football and doing those things.  So they

5    were just at different areas of their life.

6    Q.   During the time that Clay was growing up in junior high

7    and high school, was Justin living in the same city?  Or was

8    Justin already living here in Dallas?

9    A.   Oh, gosh, I think Justin moved from my home when he was

10   about 19.  So he -- in the -- he was living in Houston at the

11   time, but he wasn't living with me at that time.

12   Q.   Okay.  So the -- again, the age difference is just about

13   nine or ten years between the two of them; correct?

14   A.   Justin's 39 and Clay's 26.

15   Q.   So even more, 13 years?

16   A.   Yeah.

17   Q.   Okay.  And to be clear, Justin and Clay share the same

18   father; is that right?

19   A.   They do.

20   Q.   What's that father's name?

21   A.   Jim Wayne Mag--- Jimmy Wayne Magnuson.

22   Q.   Okay.  So Clay grew up in your house with Meredith.

23   Meredith is how many years his junior?

24   A.   Five.

25   Q.   And was their father -- or was Jim in the house or was

1   there another father in the home throughout Clay's adolescence?

2   A.   Jim was in the house until 2012.

3   Q.   Until 2012?

4   A.   Uh-huh.

5   Q.   Okay.  My math is terrible.  So how old does that make

6   Clay?

7   A.   Clay had just gone into his freshman year of college.  So

8   was he 19?

9   Q.   Okay.

10  A.   I don't know.  My math is terrible.  Freshman, summer of

11  college.

12  Q.   Got it.  So Jim was there throughout all the formative

13  years; correct?

14  A.   Yes.

15  Q.   Okay.  Tell us a little bit about Clay as a person from

16  a -- from being a kid to teenager and today.  Give us some

17  characteristics of your son.

18  A.   Oh, there's a lot.  I remember so distinctly when Clay was

19  five years old, I took him to a homeless shelter and we had

20  birthday parties for kids there.  And from that point on, it

21  was just innate in him, that he had this love and passion for

22  people that were in need.  And his whole life, I mean, we

23  couldn't drive past a homeless person without him saying, "Mom,

24  they need to be fed."  He still does it today.  I've been with

25  him -- he still does it today.  And I think that's just a

1   redeeming quality.

2          One thing that I think is -- it's just remarkable.

3   One time when he was 15 years old, he was asked to be the

4   varsity quarterback, and he got to be friends with a lot of the

5   older kids on the team.  And he saw a need in these twin

6   brothers, that they didn't have a good home life.  He came to

7   his dad and I and said, "Could they move in with us?" and I

8   said, "Absolutely."  I said, "Why do you ask?"  And he said,

9   "It's because important -- it's important to me, and it's the

10  right thing to do."

11  Q.   Okay.

12  A.   He --

13  Q.   So --

14  A.   -- needed to know they were okay.

15  Q.   Sure.  So these are just a couple examples of the type of

16  person, the giving spirit he had, even as a kid; is that

17  correct?

18  A.   Oh, absolutely.

19  Q.   What kind of student was Clay throughout high school and

20  even into college?

21  A.   Good student.  He was a good, solid B, B-plus student.

22  Q.   And you mentioned that he was asked to be a varsity

23  quarterback as -- even as a -- was he a freshman or sophomore?

24  A.   He was a freshman.

25  Q.   Freshman.

1  A.   Fifteen years old.

2  Q.   So clearly, Clay was a standout athlete in high school; is

3  that right?

4  A.   I think he was a standout athlete, and I think there was a

5  lot that went into that.

6  Q.   Such as?

7  A.   Leadership.  I mean, he -- yes, my son's a very good

8  athlete, but the thing that I was always so proud of is his

9  leadership.  I mean, he just -- he could lead a team.  Those

10 kids followed him out on that field.  They followed Clay

11 Magnuson.

12 Q.   And you mentioned that, if he was asked to start as

13 quarterback as a freshman -- I'm assuming he played quarterback

14 all four years of high school?

15 A.   Oh, yes.

16 Q.   Did he forge a close relationship with coaches and

17 athletic trainers and people within the school?

18 A.   Very much so.

19 Q.   Okay.  And tell us a little bit about some of those

20 relationships.

21 A.   Oh, gosh.  Coach McHouse (phonetic) was like his dad and

22 it was told to me by Coach Stalling, which was one of his

23 coaches, that it is so rare for a young man to have a

24 relationship and to have the respect of the whole entire

25 coaching staff like Clay did.  They said they really never seen

anything like it.  They -- Clay would talk to the coaches and say, "I think you need to make this play," and when Clay was -- they invited him to be the coach of the summer 7-on-7, which if you're from Texas, you know that's a big deal.  They handpicked him to be the coach for 7-on-7.

Q.   Okay.

A.   And he took them to state every time.

Q.   So after high school, he graduated from Jersey Village High School; correct?

A.   He did.

Q.   What year was that?  Do you recall?

A.   2012.

Q.   Okay.  2012.  Where did he go to college?

A.   Trinity University in San Antonio.

Q.   And did he go there just to be a student or was he a student athlete at Trinity?

A.   Student athlete.  He played quarterback.

Q.   Played football at Trinity University?

A.   He did.

Q.   And Trinity's a great school; right?

A.   I believe it is.  It's a very difficult school.

Q.   Sure.  How long did it take Clay to graduate from Trinity?

A.   Four years.  He -- it was something special.  He did it in four years.

Q.   And once he graduated from Trinity -- so that would have

```
 1   been 2016-ish?

 2   A.   '16.

 3   Q.   About four years ago?

 4   A.   Uh-huh.

 5   Q.   Where did he go after he graduated from Trinity?

 6   A.   He went to SMU to get his master's in accounting.

 7   Q.   Do you know what his major was at Trinity?

 8   A.   Business.

 9   Q.   Okay.  So after he graduated from Trinity, he went

10   straight to the master's program at SMU?

11   A.   Yes, sir.

12   Q.   And how long did it take for him to complete that master's

13   program?

14   A.   One year.

15   Q.   So in one year he's got his master's in accounting, he's

16   got his degree from Trinity University, and he's ready to enter

17   the workforce; is that right?

18   A.   Yes, sir.

19   Q.   Is Clay married?

20   A.   No, sir.

21   Q.   Does he have a significant other?

22   A.   He does.  And she's in the courtroom today.

23   Q.   She's in the courtroom here as well?

24   A.   She is.

25   Q.   Do you know where -- what's her name?
```

1    A.    Alex.

2    Q.    Alex.  And how long has Clay and Alex been dating?

3    A.    Oh, gosh, I can't give you -- I'm going to say about a

4    year and four months, but I could be off a month or two or so.

5    Q.    Okay.  So a little bit over a year?

6    A.    Uh-huh.

7    Q.    And do you know where Clay met Alex?

8    A.    They met at Deloitte.

9    Q.    Okay.  When you say the word "Deloitte," what's Deloitte

10   so the judge knows?

11   A.    Deloitte is a worldwide firm for accounting and finances.

12   Q.    Okay.  And Clay had a job with Deloitte?

13   A.    He did.

14   Q.    How long did he work at Deloitte?  Approximate.

15   A.    Approximately six months.

16   Q.    And was that right after he had left SMU?

17   A.    Yes.

18   Q.    Did he have the job waiting for him upon graduation --

19   A.    Oh, he had --

20   Q.    -- as far as you know?

21   A.    -- the job waiting for him as a senior at Trinity.  He

22   interviewed with many of the -- the big four, got offers from

23   several of them.  He chose Deloitte.

24   Q.    Okay.

25   A.    So we knew his senior year where he was going.

```
1    Q.   So after he left SMU, he went to Deloitte, got a job, met
2    Alex; right?
3    A.   Well, they didn't start dating at that time.
4    Q.   Okay.
5    A.   They were just on the same team.  You know, they en---
6    they were in the same class, I think, is what they call it.
7    Q.   So that's where they -- but that's where they met, was at
8    Deloitte?
9    A.   To the best of my knowledge.
10   Q.   Okay.  And how long -- you said Clay ended up working at
11   Deloitte only for about six months; is that right?
12   A.   Approximately.
13   Q.   Okay.  Do you remember -- and, again, I'm sorry with
14   trying to pin you down on years and stuff here --
15   A.   Yeah.
16   Q.   -- but if I told you it was sometime fall 2018 is when he
17   started, does that sound about right?  Or '17, maybe?
18   A.   Okay.  Wait.  He graduated from -- '18, '18.
19   Q.   Okay.
20   A.   It would be about '18.
21   Q.   '18.  And then he stopped working at Deloitte sometime in
22   early 2019; is that right?
23   A.   That sounds right.
24   Q.   Okay.  And could the year be off maybe one year?  Could be
25   2018 that he stopped working?
```

```
 1    A.   He could have stopped Deloitte, like, around December of

 2    2018, possibly.  I mean, we're just talking about a month or

 3    two difference, I think.

 4    Q.   Okay.  So at that point, let's say early 2019, he left

 5    Deloitte.

 6              And why would he leave such a great opportunity at

 7    such a great company?

 8    A.   From what I understand, he just had a better opportunity.

 9    Q.   Okay.  And what was that opportunity?

10    A.   Working for his brother, his half-brother Justin.

11    Q.   I'm sorry.  Say that one more time.

12    A.   Working for his brother Justin.

13    Q.   So Justin, as far as you know, offered him a job; correct?

14    A.   Yes.

15    Q.   Now, at this point, of course, you're still living in

16    Houston; right?

17    A.   Of course.

18    Q.   And Clay is up here in Dallas; correct?

19    A.   Yes.

20    Q.   And like any good mother, I'm sure you check up on your

21    son as much as possible; right?

22    A.   Yes.

23    Q.   But he's got a busy life; correct?

24    A.   Yes.

25    Q.   Got a lot going on, new girlfriend, life's good.  I'm
```

1   assuming he probably doesn't tell you everything; is that

2   correct?

3   A.   No.   He's a grown man.

4   Q.   Okay.  So when he goes to work for Justin, did you find

5   out what his role was or what he was going to be doing for

6   Justin?

7   A.   I knew he was going to be working at the med spa.

8   Q.   Okay.  Tell us a little bit about the med spa, of what you

9   know about that place.  What is it?

10  A.   Oh, I just know it's a place where, like, ladies can go

11  get facials, skin treatments, you know.  It's a ladies', like,

12  day spa.

13  Q.   Okay.  And as far as you know, how long did Justin own the

14  med spa or how long did he have that business?

15  A.   I don't have any recollection.  I just --

16  Q.   Don't know?

17  A.   Huh-uh.

18  Q.   Okay.  But you know that he offered Justin -- or -- excuse

19  me -- Clay a job to come work for him at the med spa?

20  A.   Yes.

21  Q.   Did you know what Clay's role was going to be working at

22  the med spa?

23  A.   I think that he did some accounting.  I think that he did

24  some -- you know, they were building out, maybe he was helping

25  with, like, the new -- overseeing of build-outs; and now, from

1   what I understand, he is a recruiter there.

2   Q.   Okay.  So you think he was using his degrees from Trinity

3   and from SMU to take to the company and improve the business

4   atmosphere there at Med Spa; is that right?

5   A.   Yes.

6   Q.   Now, of course, you understand that we wouldn't be here

7   talking about him if he wasn't sitting here in handcuffs and

8   this outfit; correct?

9   A.   I can't even look at him.

10  Q.   I'm sure you can't.

11  A.   I'm so sorry.  I'm just having to look at you.

12  Q.   That's okay.

13  A.   I can't.

14  Q.   I'm sure as a mother it's very difficult for you to be

15  talking about your son in these terms in this courtroom, as

16  opposed to giving a toast at his wedding; correct?

17  A.   Yes, it is.

18  Q.   I'm sure it is.

19  A.   Very difficult.

20  Q.   Are you aware of the -- his role or what he was doing with

21  regard to growing marijuana in California, from what you

22  believe to be legally?

23  A.   I have no direct knowledge of any day-to-day.

24  Q.   Okay.  Do you know whether or not that's what he was doing

25  for his brother, or do you know anything about this operation

1    that they were trying to put together?

2    A.   I just know that he was there in a legal capacity and they

3    were growing marijuana.

4    Q.   Okay.  What about his travel?  Did he travel and see

5    different places around the world?

6    A.   He did.  He has.

7    Q.   How often did that happen?

8    A.   I can't tell you how often.

9    Q.   Okay.

10   A.   He's seen a lot of great places.

11   Q.   Did he travel with his brother Justin all the time?

12   A.   A lot of times.

13   Q.   Was he given an opportunity to do stuff with Justin that a

14   lot of people probably his age can't do because of Justin's

15   wealth?

16   A.   Yes.

17   Q.   And they were very close on top of that; correct?

18   A.   Yes --

19   Q.   Do you --

20   A.   -- they have a very good bond.

21   Q.   Do you think that Clay ever took advantage of Justin's

22   wealth in that way?

23   A.   Absolutely not.

24   Q.   Okay.  So did Clay live a modest lifestyle, or did he live

25   some high-flying, highfalutin lifestyle that money was no

1  object?

2  A.   I think he lives a pretty modest lifestyle.  He's --

3  Q.   You've been in his apartment?

4  A.   I have.

5  Q.   How many bedrooms does it have?

6  A.   One.

7  Q.   Has Clay always been interested in weapons, in guns --

8  things like that?

9  A.   I can't answer how long he's had an interest or -- I mean,

10  I don't -- I don't know if I can answer that.

11  Q.   Okay.  I mean, let me rephrase it.

12       Do you know if he has an interest in handguns and

13  rifles and weapons and things along those lines?

14  A.   I think he does.

15  Q.   Okay.  Do you know whether or not he's got his concealed

16  to carry -- or his concealed handgun license?

17  A.   He does.

18  Q.   Are you aware of when he got that?

19  A.   I am not.

20  Q.   Okay.

21       MR. SHAPIRO:  May I approach the witness, Your Honor?

22       THE COURT:  You may.

23       MR. SHAPIRO:  Thank you.

24  Q.   (BY MR. SHAPIRO)  Sally, I'm showing you a stack of

25  letters here and -- or some documents that are all

1  paper-clipped together and I marked as Defense Exhibit 1.

2  Will you take a look at those?

3  A.  Sure.

4  Q.  Do you recognize all those documents?

5  A.  I do.

6  Q.  And I included them all together because they,

7  essentially, are for the same purpose.

8  Can you tell the judge a little bit about what you

9  read in these documents?

10  A.  Each of those letters were primarily from Clay's coaches

11  in high school and college, and just basically talking about

12  his remarkable character and what a leader he was and the

13  respect that they had for him.  I mean, Clay led by example.

14  Q.  Okay.  So did these letters give a little bit of a glimpse

15  into the type of person your son is?

16  A.  Oh, yes.

17  Q.  Do you think that they would be helpful to the judge -- to

18  educate the judge, a little bit, about who Clay is and the type

19  of person that he his?

20  A.  Yes, sir.

21  Q.  Okay.  And the letters are photocopies; correct?

22  A.  Yes, sir.

23  Q.  You've seen the originals; right?

24  A.  Yes, sir.

25  Q.  And do these photocopies all depict exactly what the

1    originals look like?  They haven't been changed or altered or

2    deleted in any way; correct?

3    A.   No, not at all.

4            MR. SHAPIRO:  Your Honor, I've tendered to the

5    Government prior I'm going to now offer Defense Exhibit Number

6    1.

7            THE COURT:  Ms. Rattan, any objection?

8            MS. RATTAN:  I don't think so.  No objection.

9            THE COURT:  It shall be admitted.

10           (Whereupon, Defense Exhibit Number 1 offered and

11   admitted into evidence.)

12           MR. SHAPIRO:  Thank you, Your Honor.

13   Q.   (BY MR. SHAPIRO)  Now, Sally, you understand that the

14   purpose of our hearing today is not to establish Clay's guilt

15   or innocence in this case; correct?

16   A.   Yes, I do.

17   Q.   And you understand, by United States law, he is presumed

18   innocent of all the charges against him in this indictment;

19   correct?

20   A.   Yes.

21   Q.   However, what we're here to decide, or at least the judge

22   is here to decide, is whether or not Clay should be released

23   from custody while these cases are pending.

24           You understand that; correct?

25   A.   Yes, sir.

1  Q.   Is that right?  You got --

2  A.   Yes.  Yes.

3  Q.   Yes?  Okay.  We've had a lot of discussions about this in

4  preparation for today; correct?

5  A.   Yes.

6  Q.   And the two main issues are going to be, one, that Clay

7  does not flee the jurisdiction, meaning he stays local and

8  shows up for all court appearances and eventually his trial.

9           You understand that; right?

10 A.   Yes.

11 Q.   And the second is that he's not a danger or threat to

12 society in general.  Okay?  Do you believe that, if the judge

13 tells him to stay local and stay here, that he will abide by

14 that condition, by that rule?

15 A.   Absolutely.

16 Q.   Do you think he would have any problem following the rules

17 or guidelines of the Court?

18 A.   None whatsoever.  My son does the right thing.

19 Q.   Okay.  Prior to being arrested for this incident about ten

20 days ago, had, to your knowledge, Clay ever been in any trouble

21 at all before?

22 A.   Never.

23 Q.   Never with the law?

24 A.   No, sir.

25 Q.   Never with school, discipline at school?

1    A.   No, sir.

2    Q.   Okay.  Never been disciplined by his coaches or anything

3    along those lines?

4    A.   No, sir.

5    Q.   He's always been a rule follower; correct?

6    A.   Yes, sir.  Yes.

7    Q.   Okay.  So if the Court were to give him specific

8    guidelines on what he could and couldn't do with regard to his

9    release here, you believe he could follow it; correct?

10   A.   Absolutely.

11   Q.   Okay.  With regard to being a danger to the community, you

12   believe that he is safe to be released back into the community?

13   A.   Oh, with every fiber of my being.

14   Q.   Okay.  You don't have any concerns about him being a

15   danger to anyone else?

16   A.   No, sir.

17   Q.   Okay.  I'm going to let the Government ask you a few

18   questions here.

19        Is there anything else that you want to tell the

20   judge that I forgot to ask you?

21   A.   I mean, I just --

22   Q.   Or have we covered all of it?

23   A.   I would just want to tell you that my son is an incredible

24   person with a tremendous heart and humility, and he's just --

25   he's a really wonderful person.

1          MR. SHAPIRO:  Thank you, Sally.

2          I'll rest, Your Honor.

3          THE COURT:  Ms. Rattan?

4          MR. SHAPIRO:  Pass the witness.

5          THE COURT:  And, well, actually, before I ask

6    Ms. Rattan -- Mr. De La Garza and I know that you indicated

7    that y'all might have some overlapping witnesses.  Is this a

8    witness that you would have indicated that there would be

9    overlap on?

10          MR. DE LA GARZA:  No, Your Honor.

11          THE COURT:  All right.

12          Then, Ms. Rattan, you may proceed.

13          MS. RATTAN:  Thank you, Your Honor.

14                          **CROSS-EXAMINATION**

15   BY MS. RATTAN:

16   Q.   The letters that were just presented to the Court,

17   did you provide those to Mr. Shapiro?

18   A.   Yes.

19   Q.   And there's about probably seven of them; is that

20   right?

21   A.   I didn't count.

22   Q.   Okay.  Ish --

23   A.   Ish, yes.

24   Q.   -- five to seven.

25   A.   One per person.

```
 1    Q.   And each of those letters has a date on them; is that
 2    right?
 3    A.   It should.
 4    Q.   All right.  And those letters date from 2011 to
 5    2012.
 6              They are eight years ago; is that right?
 7    A.   I would have to see the letters again to see the date.
 8    Q.   Well, if I just looked at them and I'm telling you they
 9    are 2011, 2012, does that seem right?
10    A.   Yes.
11    Q.   And that's eight years ago; is that correct?
12    A.   Yes.
13    Q.   Do you have any information or letters that you could
14    present in those eight years?
15    A.   Well, just from his college coach, but he got injured and
16    he had to quit playing in college.  So, no, I don't have
17    anything from his college coach.
18    Q.   Okay.  And you've testified that -- that he's very
19    charitable and when he sees anybody who's homeless or appears
20    to need help, you've seen him want to help them; is that
21    correct?
22    A.   Yes.
23    Q.   Now he was making a good deal of money.  He was driving
24    this C-Class Mercedes, living in uptown Dallas in a nice
25    apartment.
```

1              So he's making money; is that right?

2    A.   I don't have any idea of his income.

3    Q.   Okay.  Well, you knew he was driving a Mercedes.

4    A.   Yes, I knew he was driving a Mercedes.

5    Q.   And, of course, like all of us, you've -- you pay taxes;

6    is that right?

7    A.   Yes, ma'am.

8    Q.   And you know that you report any charitable contributions

9    on your taxes because those are tax deductible; is that

10   correct?

11   A.   Yes.

12   Q.   Well, did -- did you know that on -- on his tax returns

13   that there are no charitable contributions on -- that's he's

14   reported on his tax returns?  So he's maybe concerned about

15   people but doesn't contribute any money to any charitable

16   organizations.

17              Does that surprise you?

18   A.   Well, I think feeding the homeless is charitable.

19   Q.   Well, did he provide money to feed the homeless?  How did

20   he feed the homeless?  What did he do?

21   A.   I would imagine he gave them food.

22   Q.   Okay.  Were you there?  Do you know?

23   A.   I have seen.  Yes, ma'am.  I have.

24   Q.   How recently was that?

25   A.   The last time that I was with him in that situation was in

```
 1    Houston at Whataburger over by NRG Stadium.
 2    Q.   So he saw someone in the parking lot that looked hungry
 3    and he bought them a burger?
 4    A.   To the best of my knowledge, yes.
 5    Q.   Now, do you know or can you tell the judge about his
 6    drug abuse?
 7    A.   Drug abuse?
 8    Q.   What illegal drugs does he use?
 9    A.   He doesn't use illegal drugs.
10    Q.   Has he ever used illegal drugs?
11    A.   Not to my knowledge.
12    Q.   Has he ever smoked or abused marijuana?
13    A.   I have no direct knowledge.  I've never seen him do that.
14    Q.   Well, would it surprise you to learn that he was
15    interviewed by the United States Probation Department and he
16    reports at least once a month since he was 18 years old he's
17    abused marijuana?
18                MR. SHAPIRO:  Judge, I'm going to object.  I think
19    this witness just testified that she had no knowledge of him
20    using illegal drugs.  So it's just assuming facts that are not
21    in evidence at this point.
22                THE COURT:  I'm going to let her ask the question of
23    the witness.
24    Q.   (BY MS. RATTAN)  Did you know anything about that?
25    A.   I have never seen him do that.  I have no direct
```

 1   knowledge.  I've never seen him do marijuana.

 2   Q.   Okay.  But he himself has reported that he does at least

 3   once a month since he was 18.  So that's 26 -- 8 years.  He's

 4   been using marijuana for eight years and you had no idea?

 5   A.   I've never seen him do it.  He hasn't lived in my home

 6   since he was 18 years old.

 7   Q.   Okay.  Now, the firearms that he has, do you know

 8   what firearms that he has?

 9   A.   No, I do not.

10   Q.   Okay.  Have you ever seen him with a firearm?

11   A.   No, ma'am.

12   Q.   Have you ever been in his apartment and seen a firearm?

13   A.   No, ma'am.

14   Q.   In his car, never?

15   A.   No, ma'am.

16   Q.   But you do know that he has a license to carry?

17   A.   Yes, ma'am.

18   Q.   So you know that he has his permit, but you don't know

19   anything about the firearms that he's purchased and amassed.

20   A.   No, ma'am, I do not.

21   Q.   Okay.  How many times has he traveled out of the country

22   in the last five years?

23   A.   Oh gosh.  I -- I don't have an exact number for that.

24   Q.   Would you say that is a few times a year?  How would you

25   characterize it?  Just estimate.

1   A.   A few times a year.

2   Q.   And he travels usually with Justin?

3   A.   Many of the trips have been with Justin.

4   Q.   Okay.  And they go to just different places

5   internationally?

6   A.   Yes.

7   Q.   Who's paid for it?

8   A.   I don't ask those questions.  I don't know.

9   Q.   In terms of his lifestyle, is it fair to say that he had a

10  job for six months with an internationally recognized firm and

11  he left that firm to go to work with Justin?  Is that right?

12  A.   Yes, ma'am.

13  Q.   Okay.  And how long did he work for Justin?

14  A.   Well, I mean, I would have to look back at the dates but

15  if we said it was 2018.

16  Q.   So for about two years?

17  A.   Yes.

18  Q.   And you knew about marijuana growing in California.

19       What did you know about that?

20  A.   I don't know anything about it.

21  Q.   Never heard of it.  Don't know anything about it.

22       No one ever mentioned it to you?

23  A.   I knew that they were in a marijuana growing business in

24  California.

25  Q.   Okay.  Well, then, you do know something.

1    A.   That's all I know.

2    Q.   Okay.  That's all you know?

3    A.   That's all I know.

4    Q.   When you say, "they were in a marijuana growing business

5    in California," who do you mean by "they"?

6    A.   He and Justin.

7    Q.   Do you know anyone else that was involved?

8    A.   I do not.

9    Q.   Did you ever see Clay with large amounts of cash?

10   A.   No, ma'am.

11   Q.   Did you know whether he was collecting debts for the

12   organization based on marijuana distribution?

13   A.   No, ma'am.

14   Q.   You didn't know anything about any of that?

15   A.   No, ma'am.

16   Q.   Well, let's talk about his relationship with Justin.

17        Has Justin ever provided him with large amounts of

18   money?

19   A.   No, ma'am.  I have no direct knowledge of that.

20   Q.   Has Justin ever provided any large amounts of money to

21   benefit Clay or help Clay?

22   A.   Not that I know of.  No, ma'am.

23   Q.   Now, hold on a minute.  Have you been talking to Clay

24   since he's been in jail?

25   A.   We talk on the phone.

1   Q.   And do you talk about money?

2   A.   No.

3   Q.   Never.  No money, no attorney's fees -- nothing like that?

4   A.   Not that I can recall.

5   Q.   Okay.  Are you aware of whether Alex has talked to Clay

6   about money on the phone?

7   A.   I would have no knowledge of that.

8   Q.   Okay.  So you are saying that you have never talked to

9   Clay on the phone about how his lawyer was going to be paid for

10  and where he was going to get money to pay lawyer's fees?

11          MR. SHAPIRO:  Your Honor, I'm going to object.  I

12  believe that this infringes the providence of the

13  attorney/client privilege, and I don't believe that this is

14  relevant to this hearing.

15          THE COURT:  And, Mr. Shapiro, you will have to

16  clarify for me how you believe it invades the providence of the

17  attorney/client privilege.

18          MR. SHAPIRO:  Well, I --

19          THE COURT:  If it's a conversation between your

20  client, his mother...

21          MR. SHAPIRO:  How I have been paid or how his

22  attorney has been paid to be retained on this case simply is

23  not a relevant issue in this hearing.  I don't see how that has

24  anything to do with anything, and I think it is starting to

25  infringe upon the attorney/client privilege.

| | |
|---|---|
| 1 | THE COURT:  Well, I think, at this juncture, |
| 2 | Ms. Rattan is trying to use it as it relates to the credibility |
| 3 | of the witness. |
| 4 | So Ms. Rattan, I'll allow you to proceed. |
| 5 | Q.  (BY MS. RATTAN)  You need to tell us what you know about |
| 6 | the money. |
| 7 | A.  I -- I truly -- I'm trying to recall -- I don't have any |
| 8 | recall -- |
| 9 | Q.  Okay. |
| 10 | A.  -- of the money. |
| 11 | Q.  Okay.  So you don't know where Clay's attorney's fees came |
| 12 | from? |
| 13 | A.  No. |
| 14 | Q.  You've never discussed with Clay what his attorney's fees |
| 15 | would be? |
| 16 | A.  I have no idea what the attorney's fees are. |
| 17 | Q.  Okay. |
| 18 | MS. RATTAN:  Okay.  I'll pass the witness. |
| 19 | THE COURT:  Thank you. |
| 20 | Mr. Shapiro, any further questions for this witness? |
| 21 | MR. SHAPIRO:  No, Your Honor.  I'll rest. |
| 22 | THE COURT:  Thank you.  You may step down. |
| 23 | Mr. Shapiro, do you have any further witnesses to |
| 24 | present or evidence to proffer on behalf of your client at this |
| 25 | time? |

1           MR. SHAPIRO:  Not at this time, Your Honor.

2           THE COURT:  Okay.  All right.

3           So here's what we're going to do, as we're at

4    1:00 o'clock.  We're going to go ahead and take a five-minute

5    recess.  During that recess, if I could have counsel approach

6    so we can talk about kind of where we are, and then at the

7    conclusion of the recess, we'll go ahead and take up

8    Mr. De La Garza's witnesses.

9           (Bench conference.)

10          (Whereupon, a recess was had.)

11          THE COURT:  All right.  At this time we're going to

12   go back on the record in Cause Number 4:20-CR-64, the United

13   States of America versus Justin Luke Magnuson and Clay Everett

14   Magnuson.  We've reconvened here today for the purposes of

15   conducting a detention hearing.

16          At this time the Government has presented each of its

17   witnesses, and Mr. Todd Shapiro has presented his witnesses on

18   behalf of Mr. Clay Everett Magnuson.

19          We're going to turn at this time to the presentation

20   of Mr. Justin Luke Magnuson's witnesses.

21          Mr. De La Garza, you may proceed.

22          MR. DE LA GARZA:  Thank you.

23          We call Eric Yepez.

24          (Whereupon, the witness was sworn.)

25          THE WITNESS:  I do.

1          THE COURT:  Sir, once you're seated, if you could

2    please speak into that microphone.  Tell me your full name as

3    well as spell it.

4          THE WITNESS:  Eric Ryan Yepez.  E-R-I-C; Ryan is

5    spelled R-Y-A-N; Yepez is Y-E-P-E-Z.

6          THE COURT:  Thank you.

7          You may proceed, sir.

8          MR. DE LA GARZA:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. DE LA GARZA:

11   Q.   Mr. Yepez, if you're more comfortable, you're more than

12   welcome to remove your face cover.

13          Mr. Yepez, could you please tell us how you are

14   currently employed?

15   A.   I am currently employed through Magnuson Capital.  I am a

16   general counsel for It's A Secret Med Spa.

17   Q.   Okay.  And what capacity are you general counsel for It's

18   A Secret Med Spa?

19   A.   Operation side.

20   Q.   How many employees does It's A Secret Med Spa have?

21   A.   We have approximately a hundred employees.

22   Q.   And can you let the Court know basically a range of the

23   responsibilities of the variety of, in category-wise, the

24   different types of employees you have?

25   A.   Sure.  So in the corporate office, we have about 17

1    employees.  That varies from recruiting, social media

2    marketing.  We have a small accounting group.  We have a

3    corporate nurse practitioner as well.  IT department, one IT

4    gentleman at each location -- we have approximately ten

5    locations in ten different cities.  In our med spas we provide

6    aesthetics, injectables, laser hair removal, and the like.  At

7    those locations we employ nurses, aestheticians; we also employ

8    laser technicians as well.

9    Q.    Mr. Yepez, with the number of employees that you have, can

10   you put in categories, are most of the employees women? men?

11   A.    Sure.  Of the approximately 100 employees, about 90

12   percent are female.

13   Q.    And are many of them single mothers?

14   A.    A lot of them are single mothers, yeah.

15   Q.    With respect to the company, how critical is it that

16   Justin Magnuson be able to get back to the company to

17   effectively run the company?

18   A.    It's -- it's very critical.  There isn't anyone at the

19   company who has any more than a year's experience managing a

20   med spa.  You know, Justin has been in the health care industry

21   as an executive for well over nine years.  He built our med spa

22   to what it is today.  It's still a start-up.  We do have an

23   executive team.  They were named in May but even then no more

24   than a year's experience.  We lean on Justin for our day-to-day

25   decision-making.

1  Q.   And when you say you lean on Justin for your day-to-day

2  operations, can you elaborate on why is it he is so important?

3  A.   Sure.  I mean, he is hands on with every decision that's

4  made in this new normal that we live in now.  You know, we deal

5  with problems with people contracting COVID or even getting

6  symptoms of COVID-19.  We have to act fast.  We have to make

7  determination as to contra--- contact tracing.  We have to

8  determine if we need to contact patients who potentially were

9  at risk, other employees who potentially are at risk; if we

10  have to close down any locations.  You know, we have patients

11  that we have to transfer to other locations.  You know, Justin

12  is heavily involved with making those determinations along with

13  myself and any guidance that we can get from the CDC and very

14  critical in that fashion.

15  Q.   If Mr. Magnuson, Justin, was not able to be released from

16  custody, what would the viability of It's A Secret Med Spa be a

17  month from now? two months from now? three months from now?

18  A.   It would be a crap shoot.  Like I said earlier, we don't

19  have anyone that has the experience running a med spa.  We are

20  heavily regulated in each of our jurisdictions that we're in.

21  He has the business acumen to make the decisions to ensure that

22  we are profiting, we're not losing any money anywhere.  If --

23  if a decision has to be made regarding sales, marketing,

24  advertising, he makes real-time decisions.  If something is

25  trending in a negative fashion, if we're behind on goals, he's

1   the one that steps in and makes those tweaks to ensure we are

2   viable and -- and we maintain our viability.

3           We've already lost two locations due to COVID.  We

4   had two locations in Arkansas; those have been shut down

5   permanently.  People lost their jobs.  You know, like we

6   mentioned earlier, 90 percent of our employees are -- are

7   women.  Since we've come back from -- from the COVID

8   furlough -- we were furloughed for approximately three months

9   from March to May.  It's been difficult.

10          We have all of these challenges.  We can't stay at

11  100 percent capacity like we were before COVID hit.  We have to

12  be very careful with the amount of patients that we see.  You

13  know, social distancing, we can no longer take walk-ins.  So we

14  are very limited in what we can do and what we can make.  And

15  it's very critical for someone with the business acumen that

16  Justin has to make the right decision in real time to ensure

17  that the company stays viable.

18  Q.   And there's no one that can step in his place to do that?

19  A.   Absolutely not.  No.  No one who has anywhere near the

20  experience in our company that can make those decisions.

21  Q.   Thank you.

22          MR. DE LA GARZA:  I'll pass the witness.

23          THE COURT:  Thank you.

24          Ms. Rattan.

25          MS. RATTAN:  Thank you, Your Honor.

1          CROSS-EXAMINATION

2     BY MS. RATTAN:

3     Q.   Mr. Yepez, how long have you known Justin Magnuson?

4     A.   I've known Justin since April of this year.  That's when I

5     was hired.

6     Q.   So April of 2020.  You've known him for three months.

7     A.   Make that March.  I apologize.  I met him in March.  So

8     since March, yeah.

9     Q.   And what do you do there at the med spa?

10    A.   Sure.  As general counsel, typically, dealing with labor

11    and employment issues.

12    Q.   So you are a lawyer?

13    A.   Correct.  Yes, yes.

14    Q.   Okay.  And you work for Med Spa?  Are they your only

15    client?  Or is this just one of your clients?

16    A.   I'm not sure actually what you mean by client.  I'm

17    employed by Magnuson Capital.

18    Q.   Okay.

19    A.   But my -- the breadth of what I do is for It's A Secret

20    Med Spa, the corporation.

21    Q.   Okay.  Okay.  So you're employed by Justin Magnuson;

22    that's your boss?

23    A.   Correct.

24    Q.   What's your salary?

25    A.   My salary is currently $117,000 a year.

```
 1   Q.   Okay.  And you report directly to Justin Magnuson.

 2   A.   Correct.

 3   Q.   Have you ever ridden on the airplane with him?

 4   A.   Negative.

 5   Q.   Okay.  Did you know that he had an airplane?

 6   A.   I had heard that he did have an airplane, yes.

 7   Q.   But you had never been on it?

 8   A.   No.

 9   Q.   So you make $117,000 and he pays you and you're here to

10   testify that he has to get out of jail or the company is going

11   to fail?

12   A.   Absolutely.

13   Q.   So he's your boss.  He pays your salary, and that's what

14   you're here to tell the Court?

15   A.   Absolutely.

16   Q.   He has two master's degrees, one in entrepreneurship --

17   they're both in business.

18             Is that your understanding?

19   A.   That's my understanding.

20   Q.   So he's built a company of a hundred employees that,

21   without one person present, it's going to fall?

22   A.   I -- I would agree with that, yes.

23   Q.   That's the kind of company that a person with two master's

24   degrees in business is going to build?

25   A.   We are a start-up.  So I would definitely say start-ups
```

1    definitely need the guidance of the CEO.  This is what he's

2    built.  We have a growth plan.  We want to scale.  He's put

3    some people around him that are going to help this for the

4    future.  They don't have the experience to run it like Justin

5    does.

6    Q.   Okay.  So in 4 months, you know all 100 employees and you

7    know each one of the businesses even though you are not in

8    business.  You're the lawyer.

9         You're advising on legal issues; is that right?

10   A.   I advise on legal issues.  I also advise on things dealing

11   with location leases, vendor agreements --

12   Q.   Law stuff, contracts.

13   A.   Correct.  Yes.

14   Q.   How did you meet Mr. Magnuson?

15   A.   I was contacted by one of his colleagues who was an

16   attorney of a former company who --

17   Q.   Sara (phonetic)?

18   A.   No.  Pam Wagner (phonetic), I believe.

19   Q.   Oh, Pamela?

20   A.   Yeah.

21   Q.   Okay.  Pamela represented Alliance and Pamela is a

22   personal friend, also a lawyer, and she contacted you.

23   A.   I don't know that I agree with all those statements.  I

24   don't know her personally at all.

25   Q.   Okay.

1   A.   She found me on -- on Indeed, gave me a phone call, and we

2   had a couple of conversations, brought me in.

3   Q.   How often would you say you've talked to Justin?

4   A.   Every day.

5   Q.   How -- like five times a day?

6   A.   I mean, his office is a stone's throw away; so, you know,

7   pretty regularly he's either calling me, sending me e-mails,

8   or, you know, I'm in his office, he's in my office.

9   Q.   Okay.  Have you heard his voice over the phone?

10  A.   Have I heard his voice over the phone?

11  Q.   Yeah.

12  A.   Yes.

13  Q.   Talk to him on the phone?

14          MS. RATTAN:  Your Honor, may we publish Government's

15  Exhibit Number 2?

16          THE COURT:  You may.

17  Q.   (BY MS. RATTAN)  I'm going to ask you to listen to this

18  and tell me whether you recognize the voice.

19  A.   Sure.

20          (Whereupon, Government's Exhibit Number 2 played.)

21          MS. RATTAN:  No.  The first part of it.  Play 2.

22          (Whereupon, Government's Exhibit Number 2 played.)

23          MS. RATTAN:  Okay.  If we can stop it.

24  Q.   (BY MS. RATTAN)  Do you recognize that voice?

25  A.   It appears to be Justin.

1    Q.   That's Justin?  You've talked to him on the phone and

2    that's Justin?  Plus it said, "Hey, Justin."

3    A.   Yeah, I mean, I wouldn't -- wouldn't disagree with you.

4    Q.   Well, let me play Government's Exhibit Number 2.  If we

5    could play Clip D.

6             (Whereupon, Government's Exhibit Number 2 played.)

7    Q.   (BY MS. RATTAN)  Could you recognize that voice?

8    A.   It sounds familiar.

9    Q.   Who is it?

10   A.   It sounds like Justin.

11   Q.   Okay.

12             MS. RATTAN:  I'll pass the witness.

13             MR. DE LA GARZA:  Nothing on redirect, Your Honor.

14             THE COURT:  Thank you.

15             Sir, you may step down.

16             THE WITNESS:  All right.  Thank you.

17             THE COURT:  Thank you.

18             MR. DE LA GARZA:  May this witness be excused, Your

19   Honor?

20             THE COURT:  Yes.

21             Thank you, Mr. Yepez.

22             Your next witness.

23             MR. UHL:  Mark Weinhardt, Your Honor.

24             THE COURT:  Thank you.

25             MR. UHL:  Esquire.

1          (Whereupon, the witness was sworn.)

2          THE WITNESS:  I do.

3          Your Honor, is it the Court's preference that I take

4     the mask off or have it on?

5          THE COURT:  It is up to you.  Entirely your

6     discretion.  Whatever you feel most comfortable with now that

7     you are seated.  But I will ask if you can state your full name

8     into that microphone and spell it for me as well, please, sir.

9          THE WITNESS:  Certainly.  It's Mark with a K,

10    Weinhardt, W-E-I-N-H-A-R-D-T.

11         THE COURT:  Thank you.

12         You may proceed.

13         MR. UHL:  Thank you, Your Honor.

14         THE COURT:  Thank you so much.

15                    **DIRECT EXAMINATION**

16    BY MR. UHL:

17    Q.   How are you employed?

18    A.   I'm an attorney in Des Moines, Iowa.

19    Q.   Are you licensed in Iowa?

20    A.   I am.

21    Q.   Are you licensed elsewhere?

22    A.   No.

23    Q.   Are you -- do you practice in federal court in Iowa and

24    elsewhere?

25    A.   So yes.  I have my own law firm of five lawyers.  My

1    practice is split evenly between complex business litigation

2    and white-collar criminal defense.  My criminal practice is

3    almost entirely in federal court.  It is largely in Iowa, but

4    I've handled criminal matters in probably a dozen other states.

5    Q.   All right.  Would you consider yourself to have

6    extensive experience in federal criminal matters?

7    A.   Yes.  I've been a lawyer since 1985.  I was a prosecutor.

8    I was in private practice in Chicago for three years.  And then

9    I was a prosecutor for three years in Rockford, Illinois.

10   Since 1991 I have been in private practice in Iowa and other

11   places and I've defended hundreds of federal criminal cases

12   over that time.

13   Q.   You know what we're doing here today?  It's a detention

14   hearing regarding Justin Magnuson; correct?

15   A.   Yes.

16   Q.   We brought you here today to talk about your experience in

17   a case that I'll call *U.S. versus Mo* and -- and in relation to

18   that the steps that you took along with Alan Steuart to ensure

19   that your client was -- was there and in the Court's

20   jurisdiction when the Court required his presence.

21        Do you understand that's why you're here today?

22   A.   Yes.

23   Q.   Could you tell the Court a little bit about this *Mo* case

24   without going into everything, but give us some flavor of what

25   this case was about?  And then I'm going to turn to your

1    experience with Mr. Steuart.

2    A.    Sure.  My client was a Chinese national who resided in

3    Florida.  He was an employee of a large Chinese agricultural

4    conglomerate, and he was accused of conspiracy with some other

5    Chinese nationals to steal high-tech trade secret seed corn

6    from some places in Illinois, Indiana, and Iowa from companies

7    then known as Pioneer and Monsanto.  And I was lead counsel for

8    the defense of that case.  It was prosecuted in the Southern

9    District of Iowa working also with a very large firm from

10   California.

11        Because our client was not a United States citizen,

12   had extensive family in China, was employed by a Chinese

13   employer, and because his brother-in-law was the CEO of -- of

14   his employer, which was a very large conglomerate -- his

15   brother-in-law was literally a billionaire -- and that the case

16   had substantial international implications, Main Justice came

17   to help prosecute it.  He was considered to be a very, very

18   substantial flight risk.  And so we worked in several different

19   ways to try to figure out a way that we could get him not

20   incarcerated but in a situation of sufficient security so that

21   the Government and the Court could be confident that he would

22   appear in court.

23        And so after initially being incarcerated for the

24   first four months of the case, the remainder of the case, which

25   was over two-and-a-half years, he was out of custody in a

1    couple of different circumstances, first in Iowa but then, when

2    he was diagnosed with cancer, here in Texas near the M.D.

3    Anderson Cancer Center in Houston and then after nine months of

4    treatment there back home with his family in Florida.  And to

5    fast-forward, I got to know Mr. Steuart because, when we had to

6    move him from Iowa to Houston, we wanted to employ a Texas

7    security company in order to provide monitoring of him there.

8    And so we had Mr. Steuart's company, IronHorse Security,

9    provide the monitoring of him throughout the time that he was

10   in Houston, and that worked so well that, when we moved our

11   client to Florida, we continued to use Mr. Steuart's company.

12   And so all told, Mr. Steuart's people were watching our client

13   for over 18 months.

14   Q.   Mr. Steuart's got an extensive law enforcement experience.

15   He'll testify to that on his own.  But as part of the process

16   of having a Court approve Mr. Steuart and his company,

17   IronHorse, did you have him and his company vetted by the U.S.

18   Attorney's office, the FBI, and the U.S. Marshals?

19   A.   We did with all of those agencies as well as the probation

20   department in the Southern District of Texas and then the

21   probation department in the Southern District of Florida.

22   Q.   And as part of the vetting by the probation department,

23   did Mr. Steuart and IronHorse perform other functions,

24   including put on their own ankle monitor on Mr. Mo separate

25   from what probation had done so that they had -- they had a

1  little bit better equipment, I think, is a nicer way to put it.

2  So it was better -- easier to keep track of Mr. Mo than

3  probation?

4  A.   So that's correct.  During the entirety of the time that

5  IronHorse was watching Mr. Mo, he wore two ankle bracelets.  He

6  wore an ankle bracelet from probation, and then he wore an

7  ankle bracelet that was monitored by IronHorse.  IronHorse had

8  a more sophisticated system that was able to draw a more

9  precise geographical boundary around where Mr. Mo was so that,

10  if he went outside of that boundary, the IronHorse people would

11  know right away about that and be able to respond to it.

12         And, actually, there were times -- and we found out

13  about this from probation.  There were times when the probation

14  system failed or had gaps and they would call the IronHorse

15  people to say, "We've lost our signal on him.  Do you know

16  where Mr. Mo is?" and the IronHorse people always did.

17  Q.   Mr. Weinhardt, we're -- we're proposing for the Court that

18  Mr. Steuart be a third-party custodian.  As an officer of the

19  Court, as a practitioner, as somebody that's been through this

20  system before, do you have any qualms about recommending him to

21  the Court as a third-party custodian for Justin Magnuson?

22  A.   No.  And I want to clarify my background for this.

23  Mr. Steuart and I worked together on that one case very

24  extensively.  We did not work with each other face to face.  We

25  probably talked on the phone a hundred-plus times over the

1    course of this work, but I literally met him face to face for

2    the first time today.  I feel I know him quite well, but I

3    don't want to over-claim how well I know him.

4         But I did have a lot of face-to-face interactions

5    with the people in his firm because I would always be around

6    them whenever I was having the attorney/client visits that I

7    would have with Mr. Mo, and there were hundreds of hours of

8    those.  I found them to be consistently professional and

9    consistently well trained.  And I -- and I believe that

10   Mr. Steuart ran a good operation and was a very competent and

11   faithful administrator of it.

12   Q.   And they never lost Mr. Mo?  Mr. Mo ended up going where

13   he was supposed to go when the Court told him?

14   A.   No.  There was never an untoward event with Mr. Mo at the

15   time of the supervision.  There -- there were some issues with

16   the earlier Iowa-based security company that we had used.  I

17   hold the Iowa-based company responsible for that.  But, no,

18   there -- there were not problems during Ironhorse's

19   supervision.

20        MR. UHL:  Thank you.  We pass the witness.

21        THE COURT:  Ms. Rattan.

22                      CROSS-EXAMINATION

23   BY MS. RATTAN:

24   Q.   Was the Government objecting to Mr. Mo bring released?

25   A.   So, initially, the Government sought detention and he was

1   detained.  Then the Government agreed to an initial set of

2   supervision conditions after about four months of his

3   incarceration, and this was before Ironhorse's involvement.  We

4   then --

5   Q.   Thank you.  Was Mr. Mo cooperating at that point with the

6   Government?

7   A.   You mean in terms of -- as a cooperating witness?

8   Q.   Yes?

9   A.   He was never a cooperating witness.

10  Q.   Did he ever cooperate with the Government in any way?

11  A.   Not in the sense of being a cooperating witness, no,

12  never.

13  Q.   Did Mr. Mo sign a plea agreement before he was released?

14  A.   No.  He -- we -- he reached a plea agreement, but that was

15  almost two years after his release.

16  Q.   Okay.  Now, the system that you are proposing where

17  somebody is able to hire private security to monitor them

18  versus somebody who doesn't have the money to hire private

19  security who has to remain detained -- it looks like there is

20  two systems of justice, one for the wealthy and one for the

21  poor.  If you're wealthy enough to hire private security to

22  monitor you, then you can be released.  If you don't have that

23  money, if you're poor, then you have to remain detained.

24         Is that the -- essentially what you are proposing or

25  what happened in Mr. Mo's case?

1   A.   I'm not here to propose anything.  I'm -- I'm telling you

2   what happened in our case.  And, indeed, it was the case in the

3   Mo case where we had 24/7 personnel keeping tabs on Mr. Mo, but

4   I'm not proposing that that be done here.  Whatever the Court

5   and counsel are able to work out, if they reach an agreement,

6   what I would say that I think would be relevant to this

7   proceeding is, number one, my experience with Mr. Steuart and

8   my belief in him as being competent --

9   Q.   It worked out fine.  That's what you're saying.

10  A.   Yes.  It worked out fine.  And --

11  Q.   Let me ask you --

12  A.   -- sure.

13  Q.   Let me ask you about the relationship that you have with

14  IronHorse.

15           Who was paying them?

16  A.   The -- so all of the attorney's fees were paid by the

17  Chinese corporation.  And that included the expenses for the

18  monitoring.

19  Q.   Okay.  So Mr. Mo was the employee for a Chinese

20  corporation.

21  A.   Yes.

22  Q.   And the corporation hired lawyers and IronHorse for him?

23  A.   So --

24  Q.   So the Chinese paid for it?

25  A.   So I should be -- to be technical, I believe it was -- it

1   was his family that hired the lawyers but -- and so the family

2   also paid for the monitor.

3   Q.   Okay.  So Mr. Mo had enough money, his family had enough

4   money, somebody who loved Mr. Mo wanted to pay to get him out

5   of jail and they hired the IronHorse company is what you are

6   saying?

7   A.   Yes.

8   Q.   Well, what is your hourly fee?  What do you charge?

9   A.   $550 an hour.

10   Q.   So are you charging $550 an hour to fly down here and wait

11   to testify all morning and then testify this afternoon?  What

12   are you getting paid to come here and vouch for IronHorse?

13   A.   I communicated with Mr. Uhl about this and was told to

14   send an invoice for my time and expenses.

15   Q.   So will that be for your flight time, for your time

16   sitting outside?  You're going to charge $550 an hour for how

17   many hours?  What is your estimate right now?

18   A.   Maybe between 10 and 15.  I mean, to the degree that I

19   have traveled, time that I can spend working on some other

20   case --

21   Q.   You're not going to double-bill.

22   A.   Yeah, I'm not going to double-bill.  But to the degree

23   that I am not able to do anything else productive and my time

24   is devoted to this, then I'm going to invoice that time.

25   Q.   Okay.  So $5,000, looks like, right now, plus they are

1   going to pay for your travel?

2   A.   Well, and I did spend probably three or four hours

3   reviewing --

4   Q.   Prepping.

5   A.   -- materials from the Mo case so my memory was fresh about

6   the details of that.

7   Q.   So 5,$000-plus plus your travel.

8   A.   In that -- in that ballpark.

9   Q.   So, again, a defendant who has money, a defendant who is

10  wealthy and can pay for a lawyer to come vouch for a company

11  who can watch over him whereas a defendant who doesn't have

12  that kind of money is just going to remain incarcerated?

13  A.   I think you're raising a much broader question --

14  Q.   I'm just asking you a question.

15           MR. UHL:   And, Your Honor, could he be allowed to

16  finish his answer?

17           THE COURT:   He may be allowed to finish his answer.

18           MR. UHL:   Thank you.

19  A.   I think you are raising a much broader --

20           MS. RATTAN:   I object.   Nonresponsive.

21           THE COURT:   Ms. Rattan, I am going to allow him to

22  answer the question.

23           MS. RATTAN:   Yes, Your Honor.

24           THE COURT:   I think he's trying to give you the

25  response.

1    A.   I think you are raising a much broader question about how

2    resources or lack of resources for criminal defendants affect

3    their path through the system.  I've been on the CJA Panel

4    since 1992 and I've represented people like Mr. Mo.  I am

5    acutely aware of that.

6              MS. RATTAN:  That's all I have, Your Honor.

7              Thank you.

8              MR. UHL:  Nothing else.  May he be excused?

9              THE COURT:  Yes.  Thank you, sir.  You may step down.

10             THE WITNESS:  Thank you, Your Honor.

11             (Whereupon, the witness was sworn.)

12             THE COURT:  Sir, once you are comfortably seated, if

13   you like, you may take your mask down while you are testifying.

14   If I could ask if you could please state your full name for the

15   record as well as spell it, sir.

16             THE WITNESS:  William Alan Steuart.  And the spelling

17   on that is S-T-E-U-A-R-T.

18                       **DIRECT EXAMINATION**

19   **BY MR. UHL:**

20   Q.   How are you employed?

21   A.   I am the CEO of IronHorse Security and Investigations.

22   Q.   And what is IronHorse?

23   A.   IronHorse is a security company based out of Houston,

24   Texas.

25   Q.   How long have you owned or operated IronHorse?

1    A.   Since 1995.

2    Q.   What did you do prior to owning or operating IronHorse?

3    A.   I was a special agent with the Drug Enforcement

4    Administration.

5    Q.   Where were you assigned when you were an agent with the

6    DEA?

7    A.   I started out in the Little Rock office and then was

8    transferred to the Houston office.

9    Q.   How long were you in the DEA?

10   A.   Eight years.

11   Q.   And what did you do prior to joining the DEA?

12   A.   I was a park ranger and I worked construction with my dad,

13   but I was park ranger with the U.S. Army Corps of Engineers.

14   Q.   As part of your functions with IronHorse, have you had an

15   occasion to participate in guarding or providing security for

16   lots of different people, celebrities and lots of other people?

17   But I want to start with the Mo case.

18        Would you just kind of briefly discuss your work in

19   the Mo case up in Iowa -- that started in Iowa and went down to

20   Houston and then Florida?

21        MS. RATTAN:   I'm going to object to relevance, Your

22   Honor.

23        THE COURT:   I'm going to allow it.

24        MS. RATTAN:   Okay.

25        THE COURT:   You may proceed, sir.

1    A.   Thank you.  I was contacted by an attorney, a local

2    attorney, Phil Hilder, who was a former prosecutor or a former

3    assistant United States attorney in -- in the Southern

4    District, which I worked -- I did a lot of work for Phil.  And

5    he had told me that he had a particular detail that he was

6    looking at trying to hire somebody on and it was going to be

7    out of Iowa, but the defendant at that time was a Chinese

8    national who had stolen trade secrets from the U.S. Government

9    on converting corn into ethanol and was actually going to go

10   through cancer treatments at M.D. Anderson.  And he asked me

11   could I put a security proposal together to actually work with

12   Robert Mo on a 24/7 basis.

13        So I put a proposal together.  That proposal went to

14   the U.S. Attorney's office in the Eastern District of Iowa.  It

15   was looked over by the FBI in Iowa.  It was looked over by the

16   U.S. Marshals Service along with the district judge in Iowa.

17   And they approved my proposal.

18   Q.   And U.S. Probation looked at it also, I think?

19   A.   Yes, sir, they did.

20   Q.   As part of your proposal, did you supply or IronHorse

21   supply your own ankle monitor to Mr. Mo so that, if probation's

22   ankle monitor failed, you had your own?

23   A.   Absolutely.  And that was something that -- that I had

24   come up with on my own, and this is just because I'm so

25   knowledgeable in GPS tracking, that I felt like, if we had our

1    own on Robert Mo, I would feel more comfortable knowing where

2    he was at at all times versus depending on the Marshal service

3    or probation to -- to tell me if he were to get away.  But --

4    and it really worked well for us because, the way it's set up,

5    I could set geofences, because they allowed Robert Mo to

6    continue to go to work.  They allowed him to visit with his

7    family.  And he took his daughter to school every day.  But it

8    allowed me to set geofences around him to alert me, even though

9    we were with him, I was alerted if he ventured outside of any

10   of those geofences.

11   Q.   You never lost Mr. Mo while he was in Ironhorse's custody?

12   A.   For 22 solid months, he was never out of my custody.

13   Q.   Do you know who Justin Magnuson is?

14   A.   Yes, sir, I do.

15   Q.   How do you know him?

16   A.   Justin is my stepson.

17   Q.   And explain that relationship.  How long have you

18   known him?  Did you help raise him?

19   A.   I've known Justin since he was 12 years old.  I've been

20   divorced from his mother for the last 15 years.

21   Q.   So you are somewhat his former stepfather, but you

22   still --

23   A.   Yes.

24   Q.   -- consider yourself involved in his life.

25   A.   I feel like I was very instrumental in his raising.

1    Q.    Okay.  And where do you live?

2    A.    I live in Houston, Texas.

3    Q.    You know that we are proposing that you act as a

4    third-party custodian, which would mean that you've got to be

5    responsible for Justin, his appearance in court, his day-to-day

6    activities, he stays out of trouble, he complies with all

7    conditions that the judge sets; correct?

8    A.    Yes, sir, I do.

9    Q.    What kind of assurance can you give the Court about you

10   performing that function, basically being his guardian angel?

11   A.    First and foremost, Your Honor, I'd like to tell you I am

12   a patriot.  And I believe in the criminal justice system.  And

13   I would never allow him to walk away from his responsibilities

14   with this court.  I would assure that, and I will put myself

15   out there to make sure that he does that.  And I -- I just --

16   Q.    And are you willing to live with him here in Dallas if the

17   Court says --

18   A.    Yes, sir.

19   Q.    -- he's got to stay in Dallas and you've got to move up

20   and move in with him?

21   A.    Yes, sir, I am.

22   Q.    And you'd be there 24/7?

23   A.    Yes, sir.

24   Q.    If -- if you need a break to go back to Houston to do

25   whatever you have to do -- I realize you still have some family

1   and friends down there -- is there other people or another

2   person that you could propose to the Court that could be vetted

3   that would make sure that, while you're not there, the person

4   that's 24/7 with Justin is going to perform the same functions

5   as a third-party custodian?

6   A.   I would propose three people.  First, would be John

7   Peoples, who is a former deputy administrator of the Drug

8   Enforcement Administration who is employed by IronHorse.  I

9   would propose Daniel Sheldon (phonetic), who is a former IRS

10  agent who works for IronHorse.  I would propose Mike

11  Moriyear (phonetic), who is a former Jefferson Parish deputy.

12  And I would also propose Scott Darlow (phonetic), who is a

13  retired Harris County deputy.

14  Q.   Now, I've got your resume here and I'm not going over it

15  because, if the Court allows it, to have you vetted, this is

16  something that we could give to pretrial for them to make sure

17  that you are who you are and you've done these things with law

18  enforcement for years and the honorable things that you did

19  with the DEA.

20        Would -- would you -- would you have anything else

21  that you would want to tell the Court about your promise to

22  make sure Justin complies with the rules if you're chosen as

23  the third-party custodian?

24  A.   I would just like to add this, and this is most recent.

25  I've been vetted by the Department of Homeland Security.  When

1   the Prince of Saudi Arabia came to Houston, I was the one that

2   set up his safe house while he was in Houston.  I've been

3   vetted while I was in Afghanistan because I was the CEO of USPI

4   Servcore.  I was vetted by Interpol in Afghanistan.  I worked

5   hand in hand on a daily basis at the U.S. Embassy in Kabul,

6   Afghanistan.

7           I can sit here and go on and on as far as the

8   celebrities and people like that that have vetted for me over

9   the years.  I was with Evander Holyfield for eight years during

10  his heavyweight championship reign and was sitting in on

11  meetings in Las Vegas as well as New York, wherever these

12  flights were, sitting right there with Secret Service, the New

13  York Police Department, Las Vegas Metro.  I -- I have been

14  vetted over and over again as far as my credibility on what

15  I've always done with all of my principals when I worked with

16  them.

17          I realize that it may look different to the Courts

18  because I have been Justin's stepfather, but first and

19  foremost, I feel that these allegations are not -- not true and

20  that he needs to fight for this case.  And the best way that he

21  can fight for it is to be out so that he can, and if that takes

22  me moving in with him, I'm willing to do that.

23  Q.   Mr. Steuart, you realize that, if you're chosen as a

24  third-party custodian and Justin does something contrary to

25  what this judge says he can do or should do as a condition,

 1   your first phone call is to the U.S. Marshal?

 2   A.   Absolutely.

 3   Q.   And say this -- this -- this guy is gone.  Here he goes.

 4   We've got to go get him.  It's not to him.  It's to the system;

 5   correct?

 6   A.   Correct.

 7   Q.   Under oath?

 8   A.   Under oath.

 9   Q.   Your obligation is going to be to this Court and reporting

10   Justin if he does something that he shouldn't do?

11   A.   Absolutely.

12           MR. UHL:  Pass the witness.

13           THE COURT:  Thank you, sir.

14           Ms. Rattan.

15                     CROSS-EXAMINATION

16   BY MS. RATTAN:

17   Q.   So Mr. Uhl just talked to you about being under oath.  Of

18   course, you know that.  You've testified, I'm sure, many times?

19   A.   Yes, ma'am.

20   Q.   Can you tell the Court what LEO retirement is?

21   A.   Say that again.

22   Q.   LEO -- LEO retirement.

23   A.   LEO retirement.

24   Q.   L-E-O, LEO retirement.

25   A.   Law enforcement retirement.

```
1   Q.   What is that?  What does that mean to you?

2   A.   Somebody that's done their 20-year career and retired.

3   Q.   It's a 20-year retirement; is that right?

4   A.   That's correct.

5   Q.   So after 20 years as a federal agent and retires with full

6   federal retirement.  You've got your medical benefits; you've

7   got your everything; is that right?

8   A.   Under the system after Ronald Reagan was President, that

9   all went out the window.  Anybody that came on to the federal

10  system came under the FERS system, and so they weren't

11  considered a -- a civil service anymore.  So no, you're not --

12  you're not under full-time medical benefits.  You're not under

13  any type of retirement.  If you didn't pay into FERS, you're

14  not getting anything.

15  Q.   Well, there's two systems, one pre and one post.  But both

16  of them have a 20-year rule; is that right?

17  A.   Right.

18  Q.   So if -- if you retire after 20 years as a federal agent,

19  you're going to get benefits; is that right?

20  A.   Right.

21  Q.   Okay.  You were a federal agent with DEA; is that correct?

22  A.   That's correct.

23  Q.   But you don't have LEO retirement because you didn't serve

24  20 years; is that right?

25  A.   Correct.
```

```
 1    Q.   In fact, like we said -- you're under oath, of course --
 2    you served eight years; is that correct?
 3    A.   Yes, ma'am.
 4    Q.   And then you separated service with DEA?
 5    A.   Yes, ma'am.
 6    Q.   Can you explain to the judge the awkward circumstances
 7    under which you left DEA?
 8    A.   I resigned for personal reasons.
 9    Q.   Will you describe to the judge what those personal
10    reasons were?
11    A.   Well, they wouldn't be personal if I describe them now,
12    would they?
13         MS. RATTAN:  Your Honor, we'd ask that the witness be
14    directed to answer.
15         THE COURT:  Sir, please answer the question.
16    A.   I can tell you exactly why I left DEA.  My father was
17    killed that year.  I was in the middle of a divorce and there
18    were -- and I had a shoulder separation from when I was
19    rapelling out of a helicopter in Muskogee, Oklahoma.  There was
20    a lot of things weighing on my mind at the time.  I ended up
21    leaving.  I took a full workers' comp payment out of that, and
22    I left the agency.
23    Q.   (BY MS. RATTAN)  Now, you're under oath.
24    A.   Yes, ma'am.
25    Q.   Would you give us all the reasons why you chose to leave?
```

```
1   A.   I just did.

2            THE COURT:  Will counsel approach, please?

3            (Bench conference.)

4            THE COURT:  All right.  At this time the Court is

5   coming back on the record in Cause 4:20-CR-64.  We were in the

6   midst of the Government presenting -- or excuse me -- not the

7   Government.  We were in the midst of Mr. Justin Luke Magnuson

8   presenting a witness, Mr. William Alan Steuart.

9            At this time it is my understanding, Counsel, that

10  you have advised the Court that you desire to pull the witness

11  and no longer proffer them as a third-party custodian; is that

12  correct, sir?

13           MR. UHL:  Yes, Your Honor, that is correct.

14           THE COURT:  All right.

15           So, Mr. Steuart, in light of the fact that you are no

16  longer being proffered as a third-party custodian, sir, I'm

17  going to advise you at this time you may step down.  Thank you

18  very much, sir.

19           THE WITNESS:  Thank you, ma'am.

20           THE COURT:  Mr. Uhl, do you have any further

21  witnesses to proffer to the Court at this time?

22           MR. UHL:  Your Honor --

23           MR. DE LA GARZA:  Your Honor, I have an additional

24  witness to call as another third-party custodian.

25           THE COURT:  All right.  Can you please --
```

1          MR. DE LA GARZA:  Can I get them?

2          THE COURT:  Absolutely.  Thank you very much, sir.

3          (Whereupon, the witness was sworn.)

4          THE WITNESS:  Yes.

5          THE COURT:  Sir, once you are comfortably seated, you

6    may feel free to take your mask off, if you would like.  If you

7    can do me a favor and state your full name for the record and

8    spell it for me as well, please.

9          THE WITNESS:  Matthew Martinez; M-A-T-T-H-E-W,

10   M-A-R-T-I-N-E-Z.

11         THE COURT:  Thank you.

12         Mr. De La Garza, you may proceed.

13         MR. DE LA GARZA:  Thank you.  May it please the

14   Court.

15                     **DIRECT EXAMINATION**

16   BY MR. DE LA GARZA:

17   Q.  Mr. Martinez, can you please let us know where you live

18   and how you know Mr. Magnuson?

19   A.  Yes.  I live in Dallas, Texas.  And we've been friends for

20   about five years.

21   Q.  Can you tell us specifically where in Dallas, Texas?

22   A.  Yes, Preston Hollow, Northwood Road.  6823 Northwood Road.

23   Q.  And your relationship with Mr. Magnuson is based

24   on what?

25   A.  His friend and I'm also his insurance broker.

1  Q.  Do you know why you're here?  We're offering you as a

2  third-party custodian.  As a third-party custodian, you have to

3  let this Court know that you are ensuring that Mr. Magnuson

4  complies with all the rules and orders from this Court on

5  whatever it may be:  where he can be, where he can't go, other

6  obligations that he might have showing up for court, where he

7  has to live -- basically babysitting Mr. Magnuson.

8         Do you understand that?

9  A.  Yes, sir.

10  Q.  And you mentioned to me that the other individuals that

11  live in your home is your wife and your two-year-old son; is

12  that correct?

13  A.  Correct.

14  Q.  And do you have any quarrels or issues with Mr. Magnuson

15  living with you at your home, if so directed by this Court?

16  A.  Not at all.

17  Q.  And would you be willing to ensure and let this Court know

18  that you have no issues whatsoever in making sure that

19  Mr. Magnuson make any and all court appearances as requested?

20  A.  Not at all.

21         MR. DE LA GARZA:  May I have one moment, Your Honor?

22         THE COURT:  You may.

23         MR. DE LA GARZA:  Thank you, Mr. Martinez.

24         I'll pass the witness.  The Government will ask you

25  some questions.

```
 1              THE COURT:  Ms. Rattan.
 2              MS. RATTAN:  Thank you, Your Honor.
 3                      CROSS-EXAMINATION
 4    BY MS. RATTAN:
 5    Q.   Mr. Martinez, your relationship with Justin Magnuson is a
 6    business relationship?
 7    A.   Both.
 8    Q.   Okay.  So you are an insurance --
 9    A.   -- broker.
10    Q.   -- broker?
11    A.   Yes.
12    Q.   So what do you cover for him?
13    A.   Basically all his assets:  his house, cars, jewelry --
14    everything.
15    Q.   So $850,000 worth of jewelry?
16    A.   Uh-huh.
17    Q.   And all of his houses?  He's got the penthouse, the 4
18    million-dollar penthouse.  He's got the $1.5 million in
19    Houston, Costa Rica, Breckinridge, Colorado, Los Angeles; the
20    properties in California.  You cover all of those?
21    A.   Everything except for Costa Rica, I believe.
22    Q.   Okay.
23    A.   Yes.
24    Q.   The airplanes?
25    A.   Yes.  One.
```

1   Q.   The one airplane?

2   A.   Correct.

3   Q.   Well, how much money would you say that you profit off of

4   his business?

5   A.   How much do I profit?

6   Q.   Yes, sir.

7   A.   Maybe two grand?

8   Q.   Two grand --

9   A.   Annually.

10   Q.   That's it?

11   A.   Uh-huh.

12   Q.   Just -- just $2,000 a year.

13   A.   Yes.  It's based -- it's a percentage based off the total

14   premium.

15   Q.   So you -- you cover all of these properties and you

16   only make $2,000 a year off of them?

17   A.   Yes.  It's a personal lines account.  Most of my accounts

18   are large commercial accounts.  But I do personalized insurance

19   for friends and family.

20   Q.   Is there any life insurance, anything beyond the property

21   insurance and the airplanes that you cover?

22   A.   No, ma'am.

23   Q.   Okay.  And you live in about a 2.5 -- 2.6 million-dollar

24   house there on Northwood?

25   A.   1.5, to be exact.

1    Q.   Oh, 1.5.   A 1.5 million-dollar house there on Northwood

2    with your wife.

3              And how old is your child?

4    A.   He's two.

5    Q.   And you're inviting Justin Magnuson to come live there

6    with you?

7    A.   Correct.

8    Q.   Okay.

9              MS. RATTAN:   I don't have any further questions, Your

10   Honor.

11             THE COURT:   Thank you.

12             Mr. De La Garza, any further questions for this

13   witness?

14             MR. DE LA GARZA:   Not at this time.   But he will be

15   available to talk at pretrial if need be, Your Honor.

16             THE COURT:   All right.

17             Thank you, sir.   You may step down.

18             THE WITNESS:   Thank you.

19             THE COURT:   Mr. Uhl, Mr. De La Garza, do you-all have

20   any further witnesses to present to the Court at this time?

21             MR. DE LA GARZA:   No additional witnesses at this

22   time, Your Honor.

23             THE COURT:   Do you have any additional evidence to

24   offer to the Court at this time?

25             MR. UHL:   Your Honor, I could proffer to the Court

1    the following:  that I have been in contact with a California

2    lawyer who helped a company named Telemantis get licenses to

3    grow marijuana and transport.  And as I understand the

4    California system, from what she has explained to me, are there

5    are two licenses.  A grow or cultivation is the same thing and

6    then a transportation.  I have provided the Government with a

7    copy of a temporary cannabis cultivation license, which a

8    period of time is included in the time period in the

9    indictment.  And it's issued to Telemantis in Nevada County,

10   which is the property that the Government has alleged in their

11   indictment to be seized.

12        The lawyer in California is helping nail all this

13   down for us; so I don't have a copy of the license that was

14   issued as the temporary license, which I understand is called a

15   provisional medicinal mixed license, but I have a computer

16   printout that shows that it was in effect from January of '20

17   to January of 2021.

18        I bring this up, Your Honor, only to ask the Court to

19   consider that, when the agent testified that there were no

20   licenses, we just don't believe that to be correct, with all

21   due respect to the agent.

22        Beyond that, Your Honor, as I mentioned before at the

23   bench, there is a Ninth Circuit case that prohibits the Justice

24   Department from prosecuting people in federal court, if -- if

25   the participants strictly complied with California law.  And

1    that's a burden that we would have to bear in a hearing.  So

2    the -- the Ninth Circuit cases talk about a rider that was put

3    on at appropriations for the Justice Department which said the

4    Justice Department cannot spend money on marijuana prosecutions

5    in states where it's legal to grow and cultivate.  Now, there's

6    lots of things we would have to prove in a hearing, and if we

7    get to there, we'll accept that burden as it will be by a

8    preponderance of the evidence.

9           So the Court's thinking, "Well, that's Ninth Circuit.

10   How does that get here to Sherman?"  And as I mentioned to the

11   Court -- I'll mention it publicly now -- we've hired a

12   constitutional lawyer that's researching and drafting a motion,

13   the outcome of which we think will be it's an equal protection

14   issue.  How can a U.S. citizen not be prosecuted for activities

15   that would get him prosecuted in a district other than one of

16   these districts or in Ninth Circuit.

17          Beyond that, I have other things to comment on in

18   closing argument, but I proffer that for the Court because we

19   think that that's important for the Court to gauge the

20   Government's evidence based on what the agent said.

21          THE COURT:  And I'll just ask at this time,

22   Ms. Rattan, is there any objection to the presentation to the

23   Court of the provisional license?

24          MS. RATTAN:  The only thing that we would request is

25   the name of the lawyer who has provided the information.

1          MR. UHL:  I'll provide that to them, Your Honor.

2          MS. RATTAN:  Thank you.  Your Honor, we don't object.

3          THE COURT:  All right.  Then it shall be admitted.

4          (Whereupon, Defense's Exhibit Number 2 offered and

5    admitted into evidence.)

6          THE COURT:  And, Karen, can you remind me, is that

7    Defense Exhibit Number 2, the one that Mr. Uhl's going to be

8    proffering at this time?  We have Shapiro 1; so this will be --

9    all right.  We'll have it marked as Exhibit 2, and the Court

10   will accept it.

11         Mr. Uhl, anything further, sir?

12         MR. UHL:  That's all we have for proffer and

13   testimony.  So we rest.

14         THE COURT:  All right.  In light of the fact that

15   this is a presumption case, I will entertain argument from

16   defense counsel first.  Having said that, if you need a few

17   minutes in order to prepare, I am more than willing to allow

18   you that, unless if you do not require an opportunity to

19   prepare.

20         Then, Mr. Uhl, I'm prepared to hear an argument from

21   you.

22         MR. UHL:  I'm prepared to go forward, Your Honor.

23         THE COURT:  All right.  And please proceed, sir.

24         MR. UHL:  We accept what the pretrial services report

25   has said about the conditions that would ensure the defendant's

1    appearance.  We're comfortable with the unsecured bond amount.

2    I have the defendant's passport with me.  I also have the

3    defendant's fiancée's passport with me.  She is willing to

4    surrender hers either to my trust account or Mr. De La Garza's

5    or the Court.  The Court knows from the pre-sentence -- or I

6    mean from the pretrial services report, they were going to get

7    married.  That would be a further incentive for Justin to --

8    not to leave the jurisdiction.  We're comfortable with the

9    travel restrictions.  We were comfortable with an ankle monitor

10   or whatever other monitoring devices the Court would impose.

11        We would propose, in addition to what the pretrial

12   services proposes, a third-party custodian, and the Court heard

13   from -- from one potential person today.  Happy to get him

14   vetted by pretrial.  And if that person doesn't work out, then

15   there's certainly others, including the defendant's mother

16   that's in Houston.

17        Your Honor, the defendant has a little bit of

18   criminal history.  That's when he was 18 years old.  That was

19   20 years ago, nothing recent.

20        He obviously owns an ongoing business.  If he's not

21   released, the business is going to go under.  People are going

22   to be unemployed.  He has property.  He has bank accounts.  He

23   has ties to the community.  He's hired two lawyers to fight

24   this case.  He's not going anywhere.  You can tell from our --

25   our excitement in this that Mr. De La Garza and I intend to

1    fight for him because we don't think the Government can or will

2    prove this beyond a reasonable doubt.

3          There was a tape recording that -- I guess

4    demonstrated that he was threatening breaking some knees.  That

5    can be looked at in two different ways.  One, it's just

6    somebody venting because somebody owes him money.  It's not

7    clear from the tape what the money's for.  It's certainly not

8    clear from the tape that it's drug dealing.  I would remind the

9    Court there is nothing illegal about transporting money to

10   California or to Texas.  And so I understand where the

11   Government's going with that, but it doesn't mean that that is

12   an indication that he's a threat to society.

13         Reluctantly, I'm going to comment on the Southern

14   District case, Your Honor, even though I don't think the

15   Government should have mentioned that, in public, because he's

16   not charged.  He's not arrested.  He has the -- he hasn't even

17   been questioned by law enforcement.  I would say this, though:

18   He and his lawyer have known about that investigation.  It's

19   gone on for about two years, and he hasn't fled.  He has a

20   lawyer in that case that he has hired.

21         And so in summary, Your Honor, I think there are

22   conditions or a combination that the Court could set that would

23   reasonably assure that Justin would appear.  There's no

24   guarantee.  But certainly with the conditions that pretrial has

25   mentioned, along with the ones that we're offering, we think

1    that is sufficient for the Court and we ask the Court to

2    consider those.

3            THE COURT:  Thank you, sir.

4            Mr. Shapiro?

5            MR. SHAPIRO:  Thank you, Your Honor.  Your Honor, I

6    would certainly dovetail on many of the comments that Mr. Uhl

7    made in regard to Justin Magnuson, but Clay's in a completely

8    different position.  I think it's very clear from the evidence,

9    at least in this hearing that's been presented, that you're

10   talking about two different scenarios and two different sets of

11   circumstances.  Although these two young men are very close --

12   they're stepbrothers and have worked together, been together

13   for many years -- I don't think there is any question that Clay

14   is in a different spot in his life than Justin is.  And I don't

15   have to stress to the Court the difference between the two and

16   that the Court's going to view each case individually even

17   though we're hearing this hearing today together.

18            The first thing I would like to point out or at least

19   emphasize to the Court certainly would be the presentence

20   report, pretrial services report that was provided to us today

21   based upon information gathered by that department.  And

22   certainly the recommendation is that Clay be released on a

23   personal recognizance bond with conditions.  I will be the

24   first to tell you from conversations with my client and his

25   family -- his girlfriend, his sister, his mother -- that,

1   whatever the conditions the Court deemed to be appropriate, he

2   will do.  If he needs to report on a daily basis, if they need

3   him to drug test every day, if he needs to make a phone call,

4   if he needs to wear an ankle monitor, if he needs home

5   arrest -- whatever it may be, we want him out of custody to

6   prepare for this trial.

7          Clearly, this is going to take quite some time for

8   this case to make itself into the courtroom, into the light of

9   day, and there are many concerns about Clay being in custody.

10  Number one, the young man's never been arrested a day in his

11  life, and we have concerns about his safety inside that jail.

12  Number two, I don't have to stress to the Court enough the

13  environment that we live in today with the coronavirus that I

14  know every jail that I have been associated with is doing

15  everything it can to get people out of the jail unless the ones

16  that absolutely need to be there.  Clay Magnuson does not

17  absolutely need to be in the Fannin County Jail awaiting his

18  trial.  If the pretrial services department believes that a

19  personal recognizance bond would be appropriate, I don't

20  believe there's been any evidence that's been presented today,

21  in front of you, that would change that opinion.

22         We had two witnesses that the Government presented.

23  The first one, the most extensive one, was the DEA Agent Ryan

24  Stickler -- Slicker -- Ryan Slicker -- sorry, Judge.  And

25  through my cross-examination, I think it's very apparent he

1    doesn't know much about Clay at all.  He didn't know when Clay

2    had been back to California.  He didn't know a lot about -- a

3    lot of information about Clay:  where he went to school, what

4    his degree was in.  He didn't even know that he had worked at

5    Deloitte. And we clearly had Clay's mother testify that he went

6    to work for Deloitte right after SMU for six months.  The

7    amount of information that they have on Clay and his

8    involvement in this situation is very, very small.

9         They testified that it was a ten-year investigation.

10   My client was 16 years old when that happened.  The last two

11   years is when he -- even less than two years is when he's

12   worked for his brother, worked for Med Spa, and certainly was

13   out in California trying to get the grow business started as

14   well.  And, again, as I said, I dovetail on what Mr. Uhl said,

15   that we will fight to the very bitter end that what they were

16   doing out there was in fact legal.

17        Your Honor, I'm asking you today to release my client

18   from detention, give him the opportunity to prepare for his

19   case and his trial outside of custody with whatever conditions

20   the Court deems fit.  I didn't get into the custodian issue

21   with his mother, Sally, but since then we have had discussions

22   about her ability to either move to Dallas and serve as a

23   third-party custodian with her son, or if the Court deems it

24   more appropriate, to order Clay to move back to Houston into

25   her home with whatever conditions the Court determines.  He

1    will be here for every hearing.  He is not a flight risk.  He

2    is not a danger to this community, considering he has no

3    criminal history and there is just really no reason why he

4    should not be let out.

5            So at this point we're asking the Court to release

6    him from custody.  Thank you.

7            THE COURT:  Thank you, Mr. Shapiro.

8            Ms. Rattan?

9            MS. RATTAN:  Of course, as the Court noted at the

10   beginning, this is a presumption case.  It's a presumption case

11   as to both of the defendants, and neither one of them has

12   rebutted the presumption.  What's the evidence here?

13           Well, starting with Clay Magnuson, what he does, his

14   role in the organization.  It may be a ten-year organization

15   that's been in existence, but certainly the investigation has

16   been for the last 2 years, and it's shown that his role is to

17   manufacture, transport, deliver drugs, and then pick up the

18   money and take it back.  So maybe they do have a license.

19   We'll see how this turns out.  But under what set of laws is it

20   legal to have a license in California and distribute outside of

21   the state of California?  Even if you are legal in the State of

22   California, the minute that you cross that border with

23   marijuana, it's illegal.  It's a crime.  And certainly you

24   can't transport it to Nevada, New York, Texas.  It's a crime.

25   It's not just any crime.  It's a large-scale crime with a lot

1   of economic motive, greed; and both of them are involved in it.

2          So what's unique to each of them as well?  What do

3   they both have?  And when do you ever see this evidence?  Each

4   of them has a go-bag.  Justin's was more sophisticated than

5   Clay's was, but each of them have something that they can grab

6   and go and get out quickly.  Clay's got a backpack that has got

7   his passport and a firearm.  And Justin has in his apartment

8   the survival bag that you could grab and go at any time.

9   They've got firearms; and of course the point's been made and

10  it's true:  Having a firearm is not illegal.  When it becomes a

11  problem and when it becomes an illegal is when you combine it

12  with the drugs or with the proceeds.  And certainly they have

13  combined them with the proceeds in this case, and that is a

14  concern.

15         The firearms also become a concern when you listen to

16  Government's Exhibit Number 2.  If you listen to that phone

17  call, it's all Justin's idea.  He's the one suggesting it.

18  He's the one that is talking about muscle.  When he brings up

19  muscle, who's the first name he brings up?  "I can send Clay."

20  These are the things that they're talking about.  And clearly,

21  Justin is upset about someone not paying him money.  And we're

22  talking about large amounts of money here.  So that's when the

23  firearms become a concern and their access to them.

24         And it's not just a couple of firearms.  You've got

25  multiple firearms with Clay, and you've got an arsenal with

1   Justin.  So yes, in comparison to Justin, the situation is

2   different from Clay.  But if you view the evidence on Clay just

3   in a vacuum and you assume we're having just a presumption

4   detention hearing on Clay, you've got the go-bag; you've got

5   multiple firearms in his car, in his apartment; you've got him

6   delivering, picking up, and manufacturing drugs and it's across

7   multiple states.

8           So on Justin, as well, you've got an additional

9   concern in terms of his candor with the Court.  The United

10  States Probation Officer, of course, is an arm of the Court,

11  represents the Court, and asks him, "Tell me what all your

12  assets are."  And interestingly, he's not candid.  He leaves

13  out four assets that are noteworthy.  Two of them are flight

14  risks, because he's got airplanes.  He's got an airplane that

15  he used to transport the proceeds back to California, and if

16  you look at Page 4, it's not listed here.  He doesn't say

17  anything to the probation officer about either one of his

18  airplanes.  And then the two properties, the grow properties

19  that he's got in California, that he's not trying to hide

20  because he's got a license; this is all straight-up legitimate.

21  They're not on the bond report.  When the probation officer

22  says, "Tell me all of your properties," he lists, very

23  carefully, Los Angeles, Houston, Costa Rica.  The properties

24  that he leaves out are the California properties.  So he leaves

25  out the two planes and the two properties.  All of those things

1   are the items that are involved in the crime.

2            So both of them have go-bags.  One has an arsenal;

3   one has multiple firearms.  There's Government's Exhibit Number

4   2 where Justin is coming up with the idea of using muscle to

5   collect money from a witness.  When my guy shows up at the

6   door, they need to know to have the money.  Threats.  The

7   presumption certainly hasn't been rebutted, and we would ask

8   the Court to enforce it and detain the defendants based on the

9   evidence.

10            THE COURT:  Mr. Uhl, any further remarks or

11   Mr. De La Garza?

12            MR. UHL:  Yes, Your Honor, if I may.  In response to

13   the Government's argument, Your Honor, there's a couple of

14   things I would like to point out.  First thought, this was a

15   consensual phone call.  Maybe, in other words, a set-up phone

16   call.  The Government, through one of the cooperating

17   defendants, specifically called my client.  My client didn't

18   call this individual.  Now, if this was a conversation that was

19   in the middle of a wiretapped conversation, then maybe we could

20   have little more credence in that.  But this, to me, Your

21   Honor, was nothing more than a "Let's see what we can get him

22   to say.  "Let's see what we can get into.  Let's see what --

23   egg him on.  Egg him on.  Add a little fire -- add a little

24   fuel to the fire."  I think that should be discounted.

25            There's no other evidence, Your Honor, other than an

1    old, old 20-year-old conviction that he served out probation.

2    So we know he's capable of doing the things that he's asked to

3    do by probation.  There's no specific evidence of being a

4    flight risk, Your Honor.  There's nothing that they have

5    intercepted, phone conversations saying he's going to haul butt

6    to Costa Rica and get away, you know.  I know that they've been

7    on his phone.  They've been listening to his jail calls, you

8    know.  None of that.

9         So I do think that there are conditions that this

10   honorable Court can set that can ensure Mr. Magnuson's

11   appearance to every court setting?  As we've all said, this is

12   a triable case.  This is going to be a case that is going to go

13   to trial.  We do have health-related issues in many of the

14   jails.  I think they're trying to keep people from going in.  I

15   think we have a unique set of facts here where the Court can be

16   assured that he's not going to be a threat to anybody.  He's

17   can be confined, under house arrest, home arrest, whatever --

18   and we also have over a hundred employees that need his

19   leadership at Secret Med Apa that can, you know, that may end

20   up losing their jobs here shortly.

21        So for those reasons, Your Honor, we're asking the

22   Court to fashion conditions that will assure his appearances to

23   court.

24             THE COURT:  Thank you, Mr. De La Garza.

25             Mr. Shapiro, sir, I would like to offer you that

1  opportunity as well.  Do you have any other comments to make at

2  this time?

3          MR. SHAPIRO:  No, Your Honor.  We'll pass.

4          THE COURT:  All right.  Thank you.

5          Gentlemen, if I could ask for each of you to please

6  stand.

7          Mr. Clay Everett Magnuson, I'm going to advise you at

8  this time, sir, that I am going to take the matter of your

9  detention under advisement.  I would like an opportunity to

10 review the materials that have been proffered to the Court and

11 to again listen to the testimony that the agent provided here

12 today.  So what that means is at this time I am not making a

13 decision about whether or not you should be detained.  I'm not

14 telling you I am releasing you, nor am I telling you that I am

15 detaining you.  I will re-review that testimony as quickly as I

16 am able.

17         Mr. Justin, sir, I'm going to advise you, at this

18 time, sir, that I am going to detain you based upon the nature

19 of the offense with which you have been charged as well as the

20 evidence presented to the Court and including and specifically

21 in this case the applicability of the presumption, sir, I do

22 find that you should be detained.  And so as a result of that,

23 I will prepare an order reciting all of those reasons, and I'll

24 have you remanded back into custody at this time.  I will ask,

25 gentlemen, if you all can please be seated for a moment.

1          Mr. Uhl and Mr. De La Garza, if you all will take an

2     opportunity to speak with the Government, certainly it is your

3     right and you do have the ability to appeal my decision.  And

4     so if you-all can talk with the Government and please approach

5     so we can make a determination as to whether or not you are

6     going to elect to do that so I might notify the district court

7     and we can proceed in an orderly manner.

8          Karen, will you go off the record, please.

9          (Discussion off the record.)

10          THE COURT:  All right.  Gentlemen, the Court has

11     announced here today its determination as it relates to

12     Mr. Justin and further as it relates to Mr. Clay that I am

13     taking the matter under advisement.

14          Mr. Uhl and Mr. De La Garza, at this time I will

15     inquire, is it your intention to file an appeal of the Court's

16     decision to detain Mr. Justin?

17          MR. DE LA GARZA:  Yes, it is, Your Honor.  And we'll

18     have it filed by Friday.

19          THE COURT:  Okay.  So the Court will just formally

20     note it for purposes of the record that there is an appeal of

21     this Court's decision relating to the detention of Mr. Justin.

22     Mr. Uhl and Mr. De La Garza will have their formal notice of

23     appeal on file by this Friday, and then the Friday following,

24     the Government will file their response.  As a result of that,

25     the Court's going to notify the district court here today that

1   there has been an appeal and it should look for a formal

2   briefing on those particular dates.  As the Court has not yet

3   made a determination regarding Mr. Clay, certainly both

4   Government and defense counsel can reserve their positions as

5   it relates to appeal once the Court's made that determination.

6   My understanding, Ms. Rattan, is that there is something

7   further that you desire to address at this time as it is

8   related to a potential conflict in connection with

9   representation.

10          MS. RATTAN:  Yes, we're unaware at this moment of any

11   actual conflict, but we wanted to raise the potential of a

12   conflict.  The concern was that, if Justin Magnuson paid the

13   attorney fee for Clay Magnuson's client [sic], that would

14   compromise Clay Magnuson's situation in that there might be a

15   divided loyalty by the lawyer in terms of the client deciding

16   to cooperate against the person who's actually paying the fees.

17   So we feel like it's important at this point for, with the

18   potential of that existing, that Mr. Clay Magnuson be warned or

19   admonished of the potential conflict and be given the

20   opportunity, if he chooses to, to give up or waive the right to

21   a conflict-free attorney.  Now, it's also possible that no

22   conflict exists, but based on the information we reviewed, we

23   were concerned that it might exist.

24          THE COURT:  And, Mr. Shapiro, you may or may not.  Do

25   you want to make any comments or place any statements on the

1    record as it relates to the issue that the Government has

2    raised here today?

3              MR. SHAPIRO:  Judge, the only comment I can make is

4    this:  This issue has been fully discussed with my client.  He

5    is aware of his rights.  He is aware of his right to

6    conflict-free counsel, and he's indicated to me that his choice

7    is to proceed with me as his attorney.

8              THE COURT:  All right.  Thank you, everyone.  With

9    that, Court will be adjourned.

10             And, Mr. Justin and Mr. Clay, I will ask for you to

11   be remanded into the custody of the United States Marshal at

12   this time.

13             Thank you, everyone.

14             (End of proceedings.)

1                    **C E R T I F I C A T E**

2

3            I, court approved transcriber, hereby certify on this

4     date, August 27, 2020, that the foregoing is a correct

5     transcript from the official electronic sound recording of

6     proceedings in the above-entitled matter.

7

8         _/s/ Shawna Gauntt-Hicks_

9     SHAWNA GAUNTT-HICKS, CSR, CCR
      STATE OF TEXAS NO. 9353

10    EXPIRATION DATE: 12/31/2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25